## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

JANE DOE and SUSAN ROE,

        *Plaintiffs*,

    v.

LLOYD J. AUSTIN, III, in his official
capacity as Secretary of Defense; the U.S.
DEPARTMENT OF DEFENSE; the U.S.
DEFENSE HEALTH AGENCY; and the
TRICARE HEALTH PLAN,

        *Defendants.*

Civil Action No.: 2-22-cv-00368-NT

## PLAINTIFFS JANE DOE AND SUSAN ROE'S MOTION FOR SUMMARY JUDGMENT WITH INCORPORATED MEMORANDUM OF LAW

## MOTION

Pursuant to Fed. R. Civ. P. 56 and the Court's Local Rule 56(h) Order (Doc. 29),

Plaintiffs Jane Doe and Susan Roe move for summary judgment on Count I of Plaintiffs'

Amended Complaint (Fifth Amendment-Equal Protection).[1]

## MEMORANDUM OF LAW

## INTRODUCTION

Plaintiff Jane Doe is a 22-year-old transgender woman. Plaintiff Susan Roe is a 21-year-

old transgender woman. Each of the plaintiffs has been diagnosed with gender dysphoria. Gender

dysphoria is a serious medical condition characterized by clinically significant distress or

impairment in social, occupational, or important areas of functioning and often manifests as

---

[1] A stipulation of dismissal of Counts II and III only of the Amended Complaint has been filed
simultaneously with this Motion.

intense and persistent discomfort with the primary or secondary characteristics of a person's birth sex. With medical treatment gender dysphoria can be alleviated, enabling transgender people to thrive. Standard of care medical treatment for gender dysphoria includes a range of gender transition surgeries intended to bring a person's body into better alignment with their gender identity and allow them to live and function in society consistent with their gender identity.

The plaintiffs receive health benefits through the United States military's healthcare plan, known as TRICARE. They are eligible for TRICARE because their fathers each served for more than two decades in the United States military.[2] This case is a challenge to 10 U.S.C. Section 1079(a)(11) which excludes from military dependents' TRICARE coverage "[s]urgery which improves physical appearance but is not expected to significantly restore functions (including mammary augmentation, face lifts, and sex gender changes) . . . ." The Defendants rely on Section 1079(a)(11) to categorically exclude coverage of medically necessary surgeries for the treatment of gender dysphoria, even though they have stipulated that such surgeries are, in fact, medically necessary and essential treatment for some transgender individuals.[3]

---

[2] There are two routes to TRICARE eligibility for children of military personnel. First, children are eligible for TRICARE until age 21 (or 23 if they are enrolled in a full-time course of study and the sponsor is still providing more than half of their financial support.). *See Children*, TRICARE, https://www.tricare.mil/Plans/Eligibility/Children (last updated Feb. 1, 2023). Second, TRICARE Young Adult is a plan that qualified adult children can purchase after regular TRICARE coverage ends at 21 or 23 and they meet certain criteria. *See TRICARE Young Adult*, TRICARE, https://www.tricare.mil/TYA (last updated Aug. 9, 2023).

[3] The TRICARE Policy Manual states that "[s]urgical treatment of gender dysphoria for non-active duty beneficiaries is prohibited by statute (10 USC 1079)." TRICARE Policy Manual 6010.60-M, 6010.63-M, Ch. 7 § 1.2, ¶ 2.2, https://manuals.health.mil/pages/DisplayManualHtmlFile/2022-12-05/AsOf/TPT5/C7S1_2.html (Issue Date: Sept. 6, 2016) (parenthetical in original). The Policy Manual adds that "[a]ll services and supplies directly and or indirectly related to surgical treatment for gender dysphoria (i.e., sex gender change), to include oophorectomy and orchiectomy," are excluded. *Id.* at ¶ 4.1

This Court should enter summary judgment for Plaintiffs because: (1) Contrary to TRICARE's interpretation, the plain text of Section 1079(a)(11) does not exclude medically necessary surgeries for gender dysphoria. *See infra* Argument § I (statutory argument) and § II (constitutional avoidance argument); and (2) If Section 1079(a)(11) is read as a categorical ban on *all* gender transition surgeries, then it violates equal protection. *See infra* Argument §§ III-IV.

## STATEMENT OF FACTS[4]

Gender dysphoria is a serious medical condition experienced by many transgender people. Stip. ¶¶ 17-20; Doc. 34-1, # 136-37. It is characterized by clinically significant distress or impairment in functioning due to the incongruence between a person's birth sex and gender identity. Stip. ¶¶ 17-19; Doc. 34-1, # 136-37. The diagnosis is contained in the American Psychiatric Association's *Diagnostic & Statistical Manual of Mental Disorders, 5th Edition.* Stip. ¶¶ 18-19; Doc. 34-1, # 136-37. Gender identity is a well-established concept in medicine referring to a person's internalized sense of their own gender. Stip. ¶¶ 10-11; Doc. 34-1, # 136. A person's gender identity is innate an impervious to external influences. Stip. ¶ 15; Doc. 34-1, # 136. Transgender people have a gender identity that is not fully aligned with their birth sex. Stip. ¶¶ 12-14; Doc. 34-1, # 136. Because gender dysphoria results from an incongruence between gender identity and a person's birth sex, a person with a diagnosis of gender dysphoria is transgender. Stip. ¶ 22; Doc. 34-1, # 137.

---

(parenthetical in original). *See also* Department of Defense Implementing Regulation, 32 C.F.R. § 199.4 (e)(8)(ii)(D) ("[a]ny procedures related to sex gender changes . . . are excluded"); 32 C.F.R. § 199.4 (g)(29) (referencing the prohibition of "sex reassignment surgery").

[4] Citations are to The Parties Stipulation of Facts ("Stip.") (Doc. 34-1) and Plaintiffs Jane Doe and Susan Roe's Statement of Undisputed Material Facts in support of Motion for Summary Judgment ("SOF").

Without treatment, many transgender people are unable to function in occupational, social, or other areas of life, and they experience a range of debilitating physical and mental symptoms. Stip. ¶ 21; Doc. 34-1, # 137 and SOF ¶ 1. Gender dysphoria is highly treatable, and it can be ameliorated or cured through medical treatment. SOF ¶ 2. A key component of medical treatment for people with gender dysphoria is to live, function in society, and be regarded by others consistent with their gender identity. Stip. ¶ 21; Doc. 34-1, # 137 and SOF ¶ 3. Gender transition is the term for the process that a transgender person goes through to live consistent with their gender identity. Stip. ¶ 25; Doc. 34-1, # 137-38.

The medical treatment of gender dysphoria is well-established and endorsed by the broader medical community and authoritative medical organizations. Stip. ¶ 23; Doc. 34-1, # 137 and SOF ¶¶ 10-11. It involves a process known as gender transition which enables a transgender person to access medical treatments to align their body with their gender identity. Stip. ¶¶ 21, 25; Doc. 34-1, # 137-38. The prevailing standards of care for the treatment of gender dysphoria are set forth in evidence-based guidelines published by authoritative medical organizations, including the World Professional Association of Transgender Health (the "WPATH SOC") and the Endocrine Society. Stip. ¶ 23; Doc. 34-1, # 137. In accordance with the WPATH SOC, the number and type of medical interventions to treat gender dysphoria differ from person to person depending on an individual's needs. Stip. ¶¶ 26-27; Doc. 34-1, # 138.

Surgical treatments for gender transition are medically necessary for some individuals with gender dysphoria. Stip. ¶¶ 29, 31-40; Doc. 34-1, # 138-40 and SOF ¶¶ 4-8. Medically necessary surgical treatments for gender dysphoria are for the purpose of ameliorating the debilitation of gender dysphoria and allowing the individual to live and function in society consistent with their gender identity. SOF ¶ 4. The goal of gender transition surgeries is to bring

a person's body into better alignment with their gender identity. Stip. ¶ 30; Doc. 34-1, # 138 and SOF ¶ 5. As such, surgical procedures for the treatment of gender dysphoria better align a transgender individual's primary or secondary sex characteristics with their gender identity. Stip. ¶¶ 32-36; Doc. 34-1, # 138-39 and SOF ¶ 6. For some people, gender dysphoria cannot be treated without one or more gender transition surgeries. Stip. ¶¶ 37-40; Doc. 34-1, # 139-40.

Medically necessary surgical care can include, but is not limited to, mastectomy, chest reconstruction, hysterectomy, oophorectomy, orchiectomy, vaginoplasty, facial feminization surgery, and phalloplasty. Stip. ¶¶ 32-36; Doc. 34-1, # 138-39. Surgeons regularly perform these procedures to treat conditions other than gender dysphoria and for reasons other than gender transition. SOF ¶ 15. Medically necessary surgical treatments for gender dysphoria are not cosmetic because they do not have the goal of enhancing beauty, but are for the purpose of treating gender dysphoria. SOF ¶¶ 12-14.

The TRICARE health program provides worldwide medical, dental, and pharmacy benefits to uniformed military service members and their families. Stip. ¶ 4; Doc. 34-1, # 135. It is managed by the Defense Health Agency, which is overseen by the Department of Defense. Stip. ¶¶ 1, 3, 6, 8; Doc. 34-1, # 135-36. Plaintiffs Jane Doe and Susan Roe are eligible for and enrolled in TRICARE. SOF ¶¶ 16-17, 23-24. They are also transgender women who have been diagnosed with gender dysphoria. SOF ¶¶ 18-19, 25-26. Jane and Susan have begun and are continuing to undergo medically recommended and necessary treatment for their gender dysphoria, including medically necessary gender transition surgeries that are excluded from TRICARE's health benefits coverage under 10 U.S.C. Section 1079(a)(11). SOF ¶¶ 20, 27. TRICARE's exclusion of medically necessary surgical treatments for gender dysphoria remains

a complete barrier to coverage for additional gender transition surgeries needed by Jane Doe and Susan Roe. SOF ¶¶ 21, 28-29.

## LEGAL STANDARD

Summary judgment is appropriate if the record evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The facts are "viewed in the light most favorable to the nonmoving party," and the Court draws "all reasonable inferences [ ] in favor of the nonmoving party . . . ." *Fed. Ins. Co. v. Commerce Ins. Co.*, 597 F.3d 68, 70 (1st Cir. 2010).

## ARGUMENT

**I.     THE PLAIN LANGUAGE OF SECTION 1079(a)(11) DOES NOT EXCLUDE MEDICALLY NECESSARY SURGERIES.**

**A.     The Statutory Language.**

Section 1079(a)(11) provides:

> Surgery which improves physical appearance but is not expected to significantly restore functions (including mammary augmentation, face lifts, and sex gender changes) may not be provided, except that—
> (A)  breast reconstructive surgery following a mastectomy may be provided;
> (B)   reconstructive surgery to correct serious deformities caused by congenital anomalies or accidental injuries may be provided; and
> (C)   neoplastic surgery may be provided.

10 U.S.C. § 1079(a)(11).

**B.     The Plain Meaning of Section 1079(a)(11) Limits the Exclusion to Surgeries that are Intended to Improve Appearance and Do Not Restore Functioning and Therefore Does Not Exclude Medically Necessary Surgeries for Gender Transition.**

It is fundamental that the interpretation of a statute "begin[s] with the text itself."

*Penobscot Nation v. Frey*, 3 F.4th 484, 490 (1st Cir. 2021). "[I]f the statutory language is

unambiguous and 'the statutory scheme is coherent and consistent,' . . . [o]ur inquiry must cease." *Id.* (citations omitted).

The plain language of Section 1079(a)(11) does not exclude gender transition surgeries that are medically necessary to treat gender dysphoria. That is so because gender transition surgeries significantly restore functions and are not designed to improve physical appearance. The operative language of Section 1079(a)(11) does not encompass surgeries that are for the purpose of treating, curing, or ameliorating debilitation from a recognized medical condition. Rather, the text demonstrates a narrower understanding that fulfills the stated purpose of Section 1079(a)(11)—to guard against coverage of surgeries that are solely cosmetic and aimed at enhancing a person's attractiveness. To interpret the statute to bar surgeries that on an individualized basis are determined to be essential standard of care treatment for a serious illness is contrary to the plain meaning of the statute.

The language of Section 1079(a)(11) is a prohibition of coverage for any surgeries that do not restore functioning and are exclusively for cosmetic purposes. Although the statute suggests some examples of excluded procedures in a parenthetical, those parenthetical examples do not control the scope of the principle text. The Supreme Court has explained that "[t]he use of parentheses emphasizes the fact that that which is within is meant simply to be illustrative, hence redundant—a circumstance underscored by the lack of any suggestion that Congress intended the illustrative list to be complete." *Chickasaw Nation v. United States*, 534 U.S. 84, 89 (2001). "'A parenthetical . . . cannot be used to overcome the operative terms of the statute,'" especially where "the language outside the parenthetical is unambiguous." *Id*. at 95, 89 (quoting *Cabell Huntington Hosp. v. Shalala*, 101 F.3d 984, 990 (4th Cir. 1996). *See also White v. United Airlines, Inc*., 987 F.3d 616, 621-22 (7th Cir. 2021) (citing *Chickasaw Nation*, 534 U.S. at 95,

and rejecting interpretation of parenthetic language that "would contradict the surrounding text"); *Mass. Dep't of Telecomms. & Cable v. FCC*, 983 F.3d 28, 35 (1st Cir. 2020) (same). Section 1079(a)(11) is plainly limited to excluding coverage for surgeries that are for cosmetic purposes (*i.e.*, that do not restore functioning but are intended to enhance appearance) which defendants agree is inapplicable to medically necessary surgeries for the treatment of gender dysphoria. *See infra* § I.D.[5]

### C. *Yates v. United States* Dictates that the Phrase "Sex Gender Changes" Cannot Be Read to Defeat the Operative Language of Section 1079(a)(11).

*Yates v. United States*, 574 U.S. 528 (2015), reinforces that the unambiguous meaning of Section 1079(a)(11) does not exclude medically necessary gender transition surgeries. In *Yates*, the Court addressed whether a provision in the Sarbanes-Oxley Act making it a crime to destroy or cover up "any record, document, or tangible object with intent to impede, obstruct, or influence [an] investigation" included illegal undersized fish thrown overboard by a commercial fisherman. *Yates*, 574 U.S. at 531 (plurality opinion) (quoting 18 U.S.C. § 1519). The Court rejected a broad reading of the term "tangible object" that would "extend[] beyond the principal

---

[5] Although the Court need not look beyond the unambiguous text, the legislative history also supports a limitation of the exclusion to solely cosmetic surgeries that do not restore function. The provision that would become Section 1079(a)(11) first appeared in the 1976 Department of Defense appropriations legislation. Under a heading labeled "Cosmetic Surgery," the Committee Report included a prohibition of "reconstructive surgery justified solely on psychological needs including, but not limited to, mammary augmentation, face lifts, and sex gender changes." H.R. Rep. No. 94-517, Addendum ("add.") 1, 5 (1976). The Committee explained that its "primary concern [was] the practice of . . . face lifting and breast reconfiguration, done solely for cosmetic reasons." *Id*. at 2. In the 1981 appropriations bill, the Committee added an exception for "post-mastectomy reconstructive surgery to overcome the effects of trauma or disease," and explained that the exception was necessary since that surgery "does not treat illness or injury, nor restore function." H.R. Rep. No. 96-1317, add. 6, 7-8 (1981). In 1982 the language was changed to that of the current exclusion which in 1984 was codified at Section 1079(a)(11). *See* S. Doc. No. 97-40, add. 9, 10 (1982). *See also* Department of Defense Authorization Act, 1985, Pub. L. No. 98-525 § 1401, 98 Stat. 2617 (1984) (codification).

evil motivating" the statute's passage in favor of a narrower reading "tying 'tangible object' to the surrounding words . . . 'the specific context in which that language is used, and the broader context of the statute as a whole.'" *Id.* at 536-37 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

The Court looked to the context and purpose of the statute and concluded that while "[a] fish is no doubt an object that is tangible . . . [,] it would cut [the statute] loose from its financial-fraud mooring to hold that it encompasses any and all objects . . . . Mindful that . . . Congress trained its attention on corporate and accounting deception and coverups, . . . a matching construction of [the statute] is in order." *Id.* at 532. Next, the Court looked to the canon of construction "*noscitur a sociis*—a word is known by the company it keeps—to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words.'" *Id.* at 543 (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)). *See also United States v. Williams*, 553 U.S. 285, 294 (2008) ("[A] word is given more precise content by the neighboring words with which it is associated."). The Court concluded that because "'tangible object' is the last in a list of terms that begins 'any record [or] document['t]he term is therefore appropriately read to refer, not to any tangible object, but specifically to the subset of tangible objects involving records and documents." *Yates*, 574 U.S. at 544.[6]

---

[6] *See also Homaidan v. Sallie Mae, Inc.*, 3 F.4th 595, 599, 604 (2d Cir. 2021) (addressing question whether, for purposes of bankruptcy discharge, a private commercial loan is an "educational benefit" within the phrase "funds received as an educational benefit, scholarship, or stipend," and ruling that the inclusion of all private student loans "cannot be reconciled with the text and structure of [the statute]" because "[n]*oscitur* . . . instructs us to cabin it such that its scope aligns with that of its listed companions—'scholarship' and 'stipend'" which are unconditional grant payments unlike loans); *Veterans 4You LLC v. United States*, 985 F.3d 850, 853, 861 (Fed. Cir. 2021) (in government contract bid dispute, applying *noscitur* and concluding that labels promoting Veterans Administration suicide line to be placed on gun locks was not "printing" within the phrase "[a]ll printing, binding, and blank-book work" and noting that

Applying the factors in *Yates* to the scope of Section 1079(a)(11), the language, purpose, and context, as well as canons of construction, directs a narrow interpretation of "sex gender changes" which excludes coverage only if the surgery is for cosmetic reasons, and not if the surgery is to restore functions. The phrase "sex gender changes" must be understood consistent with the other terms in the illustrative list, "mammary augmentation" and "face lifts."

**D.      The Undisputed Facts and Stipulations Establish that Surgeries for Gender Dysphoria Are Generally Medically Necessary and Thus Fall Outside the Reach of the Section 1079(a)(11) Exclusion for "Sex Gender Changes."**

The record in this case establishes that medically necessary surgeries for the treatment of gender dysphoria are not cosmetic and are not excluded from TRICARE coverage by Section 1079(a)(11). First, there is no dispute that gender dysphoria is a serious but treatable medical condition. Stip. ¶¶ 18-20; Doc. 34-1, # 136-37.

Second, the parties agree that untreated gender dysphoria is debilitating and disrupts a person's ability to function. Stip. ¶¶ 21, 39; Doc. 34-1, # 137 and Stip. ¶ 18; Doc. 34-1, # 136-37 (individuals with gender dysphoria experience clinically significant distress or impairments in functioning resulting from the lack of congruence between their gender identity and sex classified at birth). *See also* Schechter Aff. ¶ 13; Doc. 34-2, # 146 ("Gender dysphoria impairs functioning and can lead to debilitati[on]") and Ettner Aff. ¶ 18; Doc. 34-3, # 222 ("Without treatment, many people with gender dysphoria are unable to adequately function in occupational, social or other areas of life and experience a range of debilitating physical and mental symptoms.").

---

"printing" is "susceptible of more than one construction" and in context of other words in the phrase "applies only to the production of written or graphic published materials.").

Third, the parties agree, as do authoritative medical organizations, that medically necessary surgical treatments which address a patient's gender dysphoria are for the purpose of curing disease and alleviating its debilitating symptoms. *See* Stip. ¶ 20; Doc. 34-1, # 137 ("Gender dysphoria can be a serious medical condition that may require medical treatment") and Stip. ¶ 21; Doc. 34-1, # 137 ("Medical treatment for gender dysphoria is intended to address [ ] clinically significant distress or impairment in functioning created by gender dysphoria by helping people who are transgender live in alignment with their gender identity") and Stip. ¶ 39; Doc. 34-1, # 140 ("gender transition surgeries are medically necessary to treat impairments in social, occupational, or other important areas of functioning resulting from that person's gender dysphoria") and Stip. ¶ 23; Doc. 34-1, # 137 (setting out consensus of medical authorities regarding standards of care for "appropriate treatment for gender dysphoria"). *See also* Ettner Aff. ¶ 19; Doc. 34-3, # 222 ("Gender dysphoria is highly treatable and can be ameliorated or cured through medical treatment.") and Schechter Aff. ¶ 20; Doc. 34-2, # 148 ("These surgeries are medically necessary care to ameliorate the debilitation of gender dysphoria . . . ."). The parties agree that "delays in obtaining medically necessary gender transition surgeries may increase or worsen impairments in social, occupational, or other important areas of functioning for that particular individual." Stip. ¶ 40; Doc. 34-1, # 140.

Fourth, medically necessary gender transition surgeries are not intended to "improve[]" appearance. *See* Ettner Aff. ¶ 26; Doc. 34-3, # 225 ("Gender transition surgeries are not cosmetic procedures because they do not have the goal of enhancing beauty or appearance. . . . [W]hen undertaken to treat gender dysphoria[,] [they] are clinically indicated by medical consensus for purposes of treatment.") and Schechter Aff. ¶ 25; Doc. 34-2, # 150 ("Gender confirming surgeries are not cosmetic. . . .[T]hey are clinically indicated to treat the underlying medical

11

condition of gender dysphoria."). Gender transition surgeries restore function. *See, e.g.*, Stip. ¶ 21; Doc. 34-1, # 137 and Stip. ¶ 39; Doc. 34-1, # 140 ("For some transgender individuals, gender transition surgeries are medically necessary to treat impairments in social, occupational, or other important areas of functioning resulting from a person's gender dysphoria.") and Schechter Aff. ¶ 20; Doc. 34-2, # 148 ("Surgical treatments for gender dysphoria include surgical procedures to better align a transgender individual's primary or secondary sex characteristics with their gender identity . . . and allow transgender individuals to live and function in society consistent with their gender identity.").

Finally, the parties agree that the determination of whether and which medical treatments for gender dysphoria are necessary, including surgeries, turns on the medical need of an individual patient. Stip. ¶ 26; Doc. 34-1, # 138 ("the precise treatment or medical interventions for gender dysphoria depends on an individual's needs."). "Surgical treatments for gender transition are a component of medical treatment for gender dysphoria that are medically necessary for some individuals based on the particular circumstances of that individual." Stip. ¶ 29; Doc. 34-1, # 138. *See also* Stip. ¶ 30; Doc. 34-1, # 138 ("Gender transition surgeries may be medically necessary for a particular patient depending on the circumstances of the patient and an appropriate physician's determination of the treatment required."). Health benefits plans, including TRICARE, have processes for evaluating on a case-by-case basis whether a particular surgery is medically necessary to cure or alleviate disease or debilitation based on the patient's circumstances. *See* 32 C.F.R. § 199.2(b) (defining "medically or psychologically necessary" care as care that is "reasonable and adequate for the diagnosis and *treatment of illness*, injury, pregnancy, and mental disorders . . . . ") (emphasis added). Plaintiffs do not seek mandatory coverage of any surgical treatment for gender dysphoria, but rather a case-by-case assessment of

whether a particular surgery is medically necessary to treat that individual's diagnosed illness and debilitating symptoms and therefore is not excluded by Section 1079(a)(11). In other words, Plaintiffs challenge Defendants' interpretation of Section 1079(a)(11) that creates a categorical exclusion of coverage for gender transition surgeries, even when it is undisputed that the surgery is not for cosmetic purposes.

## II. EVEN IF THERE WERE MORE THAN ONE PLAUSIBLE READING OF SECTION 1079(a)(11), THE COURT SHOULD INTERPRET THE STATUTE TO AVOID A CONSTITUTIONAL ISSUE.

Even assuming Section 1079(a)(11) could be interpreted to categorically exclude coverage for gender transition surgeries, even those that are medically necessary—a legal position with which Plaintiffs do not agree—the Court has a duty where "a 'serious doubt' of constitutionality is raised" with respect to a statutory provision to "first ascertain whether a construction of the statute is fairly possible by which [a constitutional] question may be avoided." *Jennings v. Rodriguez*, 138 S.Ct. 830, 842 (2018) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)). "The canon of constitutional avoidance 'comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction.'" *Id*. (quoting *Clark v. Suarez Martinez*, 543 U.S. 371, 385 (2005)). "It is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark*, 543 U.S. at 381. *See also United States v. Dwinells*, 508 F.3d 63, 70 (1st Cir. 2007) ("Congress is presumed to legislate in accordance with the Constitution and . . . , therefore, as between two plausible constructions of a statute, an inquiring court should avoid a constitutionally suspect one in favor of a constitutionally uncontroversial alternative.").

As demonstrated above, *see supra* § I, the unambiguous language of Section 1079(a)(11) limits the exclusion to cosmetic surgeries. But even if the Court were to find that the statute is susceptible to more than one construction, the narrower reading limiting the scope of the exclusion to surgeries that do not restore functioning is necessary to avoid the serious constitutional issues in this case.

### III. THE EXCLUSION OF TRICARE COVERGE FOR MEDICALLY NECESSARY GENDER TRANSITION SURGERIES VIOLATES EQUAL PROTECTION.

#### A. The Framework for Analyzing Plaintiffs' Equal Protection Claim.

If Section 1079(a)(11) is read as a categorical ban on *all* gender transition surgeries, including those medically necessary to treat gender dysphoria, then it violates equal protection. Such an interpretation results in the denial of coverage for surgical care to a class of persons solely because they are transgender. And defendants agree that the purported justification for this differential treatment—that standard of care medical treatments needed by transgender people (and only transgender people) are cosmetic and frivolous—is wholly baseless and illegitimate. *See* Stip. ¶¶ 16-43; Doc. 34-1, #136-40.

The Constitution's guarantee of equal protection is "essentially a direction that all persons similarly situated [ ] be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).[7] When considering an equal protection claim, a court must first determine what level of scrutiny applies. The Supreme Court requires "all gender-based classifications [to be

---

[7] "As this case involves federal, not state, legislation, the applicable equality guarantee is not the Fourteenth Amendment's explicit Equal Protection Clause, it is the guarantee implicit in the Fifth Amendment's Due Process Clause." *Sessions v. Morales-Santana*, 582 U.S. 47, 52 n.1 (2017) (citing *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975) ("[The Supreme] Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment.")).

subjected to] heightened scrutiny." *United States v. Virginia*, 518 U.S. 515, 555 (1996) (citations omitted). *See also Massachusetts v. United States HHS*, 682 F.3d 1, 9 & n.5 (1st Cir. 2012) ("Gender-based classifications invoke intermediate scrutiny and must be substantially related to achieving an important governmental objective.") (citing *Virginia*, 518 U.S. at 532-33; *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982); *Craig v. Boren*, 429 U.S. 190, 197 (1976); *Frontiero v. Richardson*, 411 U.S. 677, 682 (1973) (plurality opinion)). "Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action." *Virginia*, 518 U.S. at 531 (citations omitted). A justification cannot be based on "overbroad generalizations . . . ." *Id.* at 533. Any asserted justification must reflect the law's "actual purpose" when enacted, not a hypothetical rationale or one "invented *post hoc* in response to litigation." *Hogan*, 458 U.S. at 730; *Virginia*, 518 U.S. at 533. Heightened scrutiny serves to "smoke out" illegitimate motives by ensuring that the government can prove that the classification has a sufficiently persuasive justification. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989).

"To show that a policy discriminates based on sex or transgender status, [plaintiffs] must show discriminatory intent and disproportionate impact." *Kadel v. Folwell*, 620 F.Supp.3d 339, 375 (M.D.N.C. 2022) (citing *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)). There are two paths to this objective. First, and applicable to this case, because the ban on "sex gender changes" in Section 1079(a)(11) facially discriminates on the basis of sex (*see infra* § III.B), no further inquiry is needed to trigger heightened scrutiny. *See Kadel*, 620 F.Supp.3d at 375 ("'[n]o inquiry into legislative purpose is necessary,' [ ] when the suspect classification 'appears on the face' of the policy" (quoting *Shaw v. Reno*, 509 U.S. 630, 642 (1993))). If, however, the prohibition of surgeries for "sex gender changes" could somehow be

viewed as facially neutral, despite its clear language, heightened scrutiny is also required where, as here, the exclusion was motivated by a discriminatory purpose as gleaned from an "inquiry into such circumstantial and direct evidence of intent as may be available." *See Arlington Heights*, 429 U.S. at 266; *Bos. Parent Coal. for Acad. Excellence Corp.* v. *Sch. Comm. of Bos.*, 996 F.3d 37, 45 (1st Cir. 2021); *infra* § III.C.

Finally, even if this Court were to review the prohibition of surgical treatments for gender dysphoria under rational basis review, the Supreme Court and the First Circuit have "intensified scrutiny of purported justifications where minorities are subject to discrepant treatment[,] . . . the [ ] group was historically disadvantaged, or unpopular, and the statutory justification seemed thin, unsupported, or impermissible." *Massachusetts*, 682 F.3d at 10. *See infra* § III.D.

In the end, the ban on "sex gender changes" in Section 1079(a)(11) cannot survive any level of constitutional scrutiny because it targets a historically disadvantaged, even reviled, group based on myths, stereotypes, and bias which defendants do not, and cannot, stand behind. As another federal district court recently observed in a related context, "[t]ransgender status is rarely an appropriate basis on which to parcel out government benefits or burdens." *Doe v. Ladapo*, No. 4:23-cv-114, 2023 U.S. Dist. LEXIS 99603, at *26 (N.D. Fla. June 6, 2023).

**B.      The Prohibition of Coverage for Surgery for "Sex Gender Changes" in Section 1079(a)(11) Facially Classifies and Discriminates on the Basis of Sex.**

Section 1079(a)(11) facially discriminates based on sex and is subject to heightened scrutiny for three reasons: First, the sex-based classification is apparent from the text of the statute which by its very terms prohibits "chang[ing]" "sex" (or "gender"). The application of the exclusion necessarily turns on a determination of a person's birth sex. *See infra* § III.B.1. Second, the statute facially discriminates based on sex because its targeted group, people who seek surgeries for "sex gender changes," coincides exactly with the definition of a transgender

16

person. *See Bostock v. Clayton Cnty.*, 140 S.Ct. 1731, 1753-54 (2020) (laws and policies that target transgender people inherently discriminate based on sex); *infra* § III.B.2. Third, the prohibition discriminates based on impermissible gender stereotyping by reflecting and enforcing the gender norm that individuals must "keep . . . sex characteristics consistent with their natal sex." *Flack v. Wis. Dep't of Health Servs.*, 328 F.Supp.3d 931, 951 (W.D. Wis. 2018). *See Kadel*, 620 F.Supp.3d at 376; cases discussed *infra* § III.B.2.

The First Circuit has not addressed the level of scrutiny required in a challenge to an exclusion of medical treatment for gender transition. The Eighth Circuit has held that a statute that prohibits gender transition medical care is a sex-based classification triggering intermediate scrutiny. *See Brandt v. Rutledge,* 47 F.4th 661, 668-71 (8th Cir. 2022).[8] Federal district courts overwhelmingly agree.[9] Two recent decisions from the Sixth and Eleventh Circuits applied

---

[8] This decision upheld a district court's preliminary injunction; a permanent injunction has since been issued, and a petition for initial hearing *en banc* was granted by the Eighth Circuit. No. 23-2681 (8th Cir. Oct. 6, 2023). In *Doe v. Snyder*, a panel of the Ninth Circuit upheld the denial of preliminary relief in a challenge to an exclusion in Arizona's Medicaid program based on the insufficiency of the plaintiffs' factual showing, but the Court explained that heightened scrutiny applied to discrimination based on transgender status and noted that the district court's reading of *Bostock* was "erroneous" and "too narrow." *Doe v. Snyder*, 28 F.4th 103, 113 (9th Cir. 2022).

[9] Federal district courts have ruled that prohibitions of medical treatment for gender dysphoria trigger heightened scrutiny in a variety of contexts, including state employee health plans, state Medicaid plans, and state laws banning medical treatment for minors. *See Koe v. Noggle*, 1:23-cv-2904, 2023 U.S. Dist. LEXIS 147770 (N.D. Ga. Aug. 20, 2023) (ban on adolescent care), *stayed pending Mot. for Recons.*, (N.D. Ga. Sept. 5, 2023); *Brandt v. Rutledge*, 551 F.Supp.3d 882 (E.D. Ark. 2021) (ban on adolescent care), *aff'd*, 47 F.4th 661 (8th Cir. 2022), *permanently enjoined*, 4:21-cv-450, 2023 U.S. Dist. LEXIS 106517 (E.D. Ark. June 20, 2023), *appeal docketed sub nom. Brandt v. Griffin*, No. 23-2681 (8th Cir. July 21, 2023); *L.W. v. Skrmetti*, No. 3:23-cv-376, 2023 U.S. Dist. LEXIS 111424 (M.D. Tenn. June 28, 2023), *rev'd*, 83 F.4th 460 (6th Cir. 2023); *Doe v. Thornbury*, 3:23-cv-230, 2023 U.S. Dist. LEXIS 111390 (W.D. Ky. June 28, 2023), *vacated*, *L.W. v. Skrmetti*, 83 F.4th 460; *K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 1:23-cv-595, 2023 U.S. Dist. LEXIS 104870 (S.D. Ind. June 16, 2023) (ban on adolescent care), *appeal docketed*, No. 23-2366 (7th Cir. July 12, 2023); *Dekker v. Weida*, 4:22-cv-325, 2023 U.S. Dist. LEXIS 107421 (N.D. Fla. June 21, 2023) (Medicaid exclusion), *appeal docketed*, No. 23-12155 (11th Cir. June 27, 2023); *Doe v. Ladapo*, No. 4:23-

rational basis review to state laws banning the provision of gender transition medical care for minors. *Eknes-Tucker*, 80 F.4th 1205[10]; *Skrmetti*, 83 F.4th 460.[11] These decisions are neither binding on this Court, nor is their reasoning persuasive. The view that the direct and express denial of health benefits for the purpose of "gender" or "sex" transition is somehow sex-neutral is incorrect. *See infra* § III.B.4 (addressing *Eknes-Tucker* and *Skrmetti*). This Court should follow the more persuasive and soundly reasoned analyses of the courts that have recognized the inherently sex-based nature of these sweeping and targeted exclusions.[12]

---

cv-114, 2023 U.S. Dist. LEXIS 99603 (N.D. Fla. June 6, 2023) (ban on adolescent care), *appeal docketed*, No. 23-12159 (11th Cir. June 27, 2023); *Fain v. Crouch*, 618 F.Supp.3d 313 (D.W.Va. 2022), *reh'g en banc granted*, No. 22-1927 (4th Cir. argued Sept. 21, 2023) (state employment exclusion); *Kadel v. Folwell*, 620 F.Supp.3d 339 (M.D.N.C. 2022) (state employment exclusion), *reh'g en banc granted*, No. 22-1721 (4th Cir. argued Sept. 21, 2023); *Eknes-Tucker v. Marshall*, 603 F.Supp.3d 1131 (M.D. Ala. 2022) (ban on adolescent care), *rev'd sub nom. Eknes-Tucker v. Governor of the State of Ala.*, 80 F.4th 1205 (11th Cir. 2023); *Toomey v. Arizona*, No. 19-cv-35, 2019 U.S. Dist. LEXIS 219781 (D. Ariz. Dec. 20, 2019) (state employment exclusion) (consent decree approved on Sept. 28, 2023); *Boyden v. Conlin*, 341 F.Supp.3d 979 (W.D. Wis. 2018) (state employment exclusion); *Flack v. Wis. Dep't of Health Servs.*, 328 F.Supp.3d 931 (W.D. Wis. 2018) (Medicaid exclusion), *permanently enjoined by* 395 F.Supp.3d 1001 (W.D. Wis. 2019). *But see Poe v. Drummond*, No. 23-cv-177, 2023 U.S. Dist. LEXIS 179641 (N.D. Okla. Oct. 5, 2023) (ban on adolescent care), *appeal docketed*, No. 23-5510 (10th Cir. Oct. 10, 2023) (relying on *Skrmetti* and *Eknes-Tucker*)*; but cf. Lange v. Houston Cnty.*, 608 F.Supp.3d 1340 (M.D. Ga. 2022) (state employment exclusion), *appeal docketed*, No. 22-13636 (11th Cir. argued on Nov. 14, 2023) (Title VII grounds only); *Hennessy-Waller v. Snyder*, 529 F.Supp.3d 1031 (D. Ariz. 2021) (Medicaid exclusion), *aff'd on other grounds*, *Doe v. Snyder*, 28 F.4th 103 (9th Cir. 2022) (*see* note 8, *supra*).

[10] Preliminary injunction vacated.

[11] Preliminary injunction vacated.

[12] Plaintiffs cite and discuss federal district court rulings from the Sixth and Eleventh Circuits, and other cases pending appellate review, for their analysis of the issues and persuasive authority.

### 1.      The Sex-Based Classification in Section 1079(a)(11) is Apparent from the Text of the Statute.

"A facial inquiry is what it sounds like: a review of the language of the policy to see whether it is facially neutral or 'deal[s] in explicitly racial [or gendered] terms.'" *Kadel*, 620 F.Supp.3d at 375 (quoting *Washington v. Seattle Sch. Dist. No. 1,* 458 U.S. 457, 485 (1982)). Sex is baked into the text of the exclusion here. Two of the exclusion's three words are "sex" and "gender." The exclusion is necessarily sex-based because a determination of whether a particular surgery is prohibited turns, by the statute's words and operation, on a determination of an individual's birth sex and whether the purpose of the surgery is to "change" it. The individual's sex is outcome-determinative.

The sex-based nature of exclusions of treatment for gender transition is compelled by the Supreme Court's decision in *Bostock*. As paraphrased by the Court in *Kadel*, "'try writing out instructions' for which treatments are excluded 'without using the words man, woman or sex (or some synonym). It can't be done.'" *Kadel*, 620 F.Supp.3d at 376 (quoting *Bostock*, 140 S.Ct. at 1746). In fact, one cannot even explain the relevant diagnosis at issue in Section 1079(a)(11), gender dysphoria, "'without referencing sex' or a synonym." *Id.* at 377 (quoting *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020), *cert. denied* 141 S.Ct. 2878 (2021)).

In *Brandt* the Eight Circuit addressed a state law prohibiting gender transition procedures for minors which were defined, like the exclusion at issue here, as procedures "intended to change the 'individual's biological sex.'" *Brandt*, 47 F.4th at 669 (citations omitted). The Court concluded that "[b]ecause the minor's sex at birth determines whether or not the minor can receive certain types of medical care . . . , [the statute] discriminates on the basis of sex." *Id.*

That reasoning predominates federal district court cases. The Court in *Kadel*, for example, concluded that "[i]t is impossible to determine whether a particular treatment is

19

connected to 'sex changes or modifications and related care'—and thus, whether the exclusion applies—without comparing the [person's] biological sex before the treatment to how it might be impacted by the treatment." *Kadel*, 620 F.Supp.3d at 376. *See also Skrmetti*, 2023 U.S. Dist. LEXIS 111424 at *35-36 (if the prohibited medical procedure is to "enable the [person] to live as an 'identity inconsistent' with [their] sex . . . , it requires the ascertainment of whether the [person's] sex at birth is consistent with that [person's] (gender) identity"); *K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 2023 U.S. Dist. LEXIS 104870 at *21-22 ("sex-based classifications are . . . central to [the Act's] prohibitions" because "a medical provider can't know whether a gender transition is involved without knowing the patient's sex and the gender associated with the goal of the treatment") (emphasis omitted); *Koe v. Noggle*, 2023 U.S. Dist. LEXIS 147770 at *43 (a person's "sex at birth determines whether that [person] can receive a given form of medical treatment"); *Doe v. Ladapo*, 2023 U.S. Dist. LEXIS 99603 at *23 ("If one must know the sex of a person to know whether or how a provision applies to a person, the provision draws a line based on sex."); *Fain v. Crouch*, 618 F.Supp.3d at 327 ("Th[e] language refers explicitly to sex—one seeking . . . to change from their sex assigned at birth to the sex that more accurately reflects their gender identity."); *Kadel*, 620 F.Supp.3d at 376 ("[the] exclusions 'facially discriminate based on sex' . . . . because [they] cannot be stated or effectuated 'without referencing sex'") (quoting *Grimm* 972 F.3d at 608).

The exclusion of medical care for gender transition in Section 1079(a)(11) by its terms facially discriminates based on sex and is therefore subject to intermediate scrutiny.

### 2.   The Exclusion Facially Classifies Based on Sex Because Laws That Single Out Transgender People Discriminate on the Basis of Sex.

When laws single out transgender people for adverse treatment, they discriminate on the basis of sex. In *Bostock* the Supreme Court explained that "it is impossible to discriminate

against a person for being . . . transgender without discriminating against that individual based on sex." *Bostock*, 140 S.Ct. at 1741.

The exclusion of "sex gender changes" in Section 1079(a)(11) patently singles out transgender people for adverse treatment. The universe of people who seek "sex gender changes" by definition encompasses only transgender people. *See* Stip. ¶¶ 42-43; Doc. 34-1, #140 ("People who undergo gender transition are transgender"; "Only transgender people undergo gender transition").

Courts have readily applied these straight-forward concepts to conclude that laws excluding medical coverage for the treatment of gender dysphoria discriminate on the basis of transgender status and therefore sex. For example, in *Fain v. Crouch*, the district court reasoned that "inherent in a gender dysphoria diagnosis is a person's identity as transgender. In other words, a person cannot suffer from gender dysphoria without identifying as transgender . . . . [T]he exclusion targets transgender people because they are transgender." *Fain v. Crouch*, 618 F.Supp.3d at 324-25. Similarly, a Medicaid exclusion that "expressly *singles out and bars* a medically necessary treatment for transgender people suffering from gender dysphoria . . . directly singles out a [person's] transgender status as the basis for denying medical treatment." *Flack v. Wis. Dept. of Health Servs.*, 328 F.Supp.3d at 950 (emphasis in original). The federal district court in *Brandt* also reasoned that the exclusion at issue there "discriminates against transgender people" because "[t]he law prohibits medical care that only transgender people undergo." *See Brandt v. Rutledge*, No. 4:21-cv-450, 2023 U.S. Dist. LEXIS 106517 at *93-94 (E.D. Ark. June 20, 2023).[13]

---

[13] *See also Doe v. Ladapo*, 2023 U.S. Dist. LEXIS 99603 at *24 ("Drawing a line based on gender nonconformity—this includes transgender status—also triggers intermediate scrutiny.")

Nor does it matter that the exclusion in Section 1079(a)(11) "does not use the word 'transgender,' [because] the law plainly proscribes treatment for gender dysphoria—and . . . only transgender individuals suffer from gender dysphoria." *Skrmetti*, 2023 U.S. Dist. LEXIS 111424 at *25. Such an exclusion therefore "expressly and exclusively targets transgender people." *Id.* Under settled law, a statute that classifies based on characteristics that either define or are closely correlated with a particular group facially discriminates against that group. *See, e.g*, *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 689 (2010) (holding that a club's exclusion of people because they engaged in "unrepentant homosexual conduct" was discrimination based on sexual orientation); *Lawrence v. Texas,* 539 U.S. 558, 583 (2003) (O'Connor, J., concurring in judgment) (stating that a law targeting conduct "closely correlated with being homosexual" is "directed towards gay persons as a class").

Because the exclusion of medically necessary gender transition surgeries in Section 1079(a)(11) discriminates on the basis of transgender status, it is subject to intermediate scrutiny.

### 3.   Section 1079(a)(11)'s Ban on Changing a Person's Sex or Gender Rests on Impermissible Gender Stereotyping.

Constitutional limitations on gender classifications apply to laws that discriminate based on sex stereotypes. *See, e.g.*, *Sessions,* 582 U.S. at 57-58 (applying heightened scrutiny and invalidating statute distinguishing between mothers and fathers that relied on outdated gender

---

(citing *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011)); *Eknes-Tucker*, 603 F.Supp.3d 1131 at 1147,  ("The [exclusion] places a special burden on transgender minors because their gender identity does not match their birth sex . . . [and] therefore amounts to a sex-based classification [under] Equal Protection . . . ."); *Doe v. Thornbury*, 2023 U.S. Dist. LEXIS 111390 at *11 ("[D]iscrimination based on transgender status 'easily' constitutes sex discrimination for purposes of the Equal Protection Clause . . . ." (summarizing the holding in *Smith v. City of Salem*, 378 F.3d 566, 577 (6th Cir. 2004))); *Kadel*, 620 F.Supp.3d at 375-76 (a law that "distinguishes between medically necessary treatments that align with [ ] biological sex and medically necessary treatments . . . . facially discriminate based on [ ] transgender status").

stereotypes); *Hogan*, 458 U.S. at 729 (legislature may not "perpetuate the stereotyped view of nursing as an exclusively woman's job"); *Virginia*, 518 U.S. at 550 (in case challenging the exclusion of women from military school, "generalizations about 'the way women are,' [or] estimates of what is appropriate for *most women*," do not justify the exclusion (emphasis in original)).

These principles apply equally to laws and policies that penalize transgender people because they do not conform to gender-based norms. *See, e.g., Grimm*, 972 F.3d at 608-10 (discrimination against transgender persons under the Equal Protection Clause includes discrimination on the basis of "fail[ure] to conform to [ ] sex stereotype[s]"; *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) ("A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes.").

The essence of impermissible sex stereotyping is the enforcement of gender norms about acceptable attributes and behaviors of men and women. Courts have easily found that prohibitions on medical care for gender transition impermissibly reflect and enforce views that a person whose birth sex is male should maintain male attributes and a person whose birth sex is female should maintain female attributes. For example, "by limiting the availability of medical transitioning, . . . [the exclusion] requir[es] transgender individuals to maintain the physical characteristics of their natal sex . . . [and] entrenches the belief that transgender individuals must preserve their genitalia and other physical attributes of their natal sex." *Boyden*, 341 F.Supp.3d at 997. Exclusions that ban treatments solely because they are "only for the purpose of achieving gender-nonconforming physical characteristics" are based on impermissible sex stereotypes. *Koe v. Noggle*, 2023 U.S. Dist. LEXIS 147770 at *46. *See also Kadel*, 620 F.Supp.3d at 376 (health benefits plan that "prohibits coverage for treatments that 'change or modify' physiology to

23

conflict with assigned sex" discriminates for "failing to conform to the sex stereotypes propagated by the [Plan]."); *Eknes-Tucker*, 603 F.Supp.3d at 1147 (exclusion that "prohibits transgender minors—and only transgender minors—from taking [ ] medications due to their gender nonconformity" is a sex-based classification); *Koe v. Noggle*, 2023 U.S. Dist. LEXIS 147770 at *46 ("The desired outcome of the banned treatments . . . is to begin a physical transition so that the adolescent patient's development and appearance do not conform to those expected of the patient's birth sex . . . . [The law] bans [treatment] only for the purpose of achieving gender-nonconforming physical characteristics.").

The exclusion of "sex gender changes" in Section 1079(a)(11) is a sex-based classification that triggers heightened intermediate scrutiny because it denies transgender people medically necessary treatment based on their gender nonconformity.

### 4. The Decisions of the Sixth and Eleventh Circuits Applying Rational Basis Review to Prohibitions of Medical Treatment for Gender Dysphoria Misconstrue Supreme Court Precedent and are Wrong.

The Sixth and Eleventh Circuits recently applied rational basis review to state laws that prohibit minors from obtaining medical treatment for gender dysphoria. *See Skrmetti*, 83 F.4th at 486; *Eknes-Tucker,* 80 F.4th at 1210. In failing to grasp the sex-based nature of laws deliberately targeting gender transition and finding that such laws are simply neutral regulation of a medical condition, the Sixth and Eleventh Circuits misapplied the Supreme Court's sex discrimination and Equal Protection jurisprudence and relied on inapposite cases.

First, *Skrmetti* and *Eknes-Tucker* ruled that the bans of medical treatment for gender transition are subject to rational basis review because they apply to both males and females equally and therefore are not sex-based classifications. *See Skrmetti*, 83 F. 4th at 479 ("The laws regulate sex-transition treatments for all minors, regardless of sex. . . . Such an across-the-board

24

regulation lacks any of the hallmarks of sex discrimination."); *Eknes-Tucker*, 80 F.4th at 1128 ("[T]he statute does not establish an unequal regime for males and females . . . [but] applies equally to both sexes").

This reasoning was repudiated by *Bostock*. In *Bostock*, the Supreme Court rejected an interpretation of Title VII of the Civil Rights Act of 1964 that "would require [the Court] to consider the employer's treatment of groups rather than individuals to see how a policy affects one sex as a whole versus the other as a whole." 140 S.Ct. at 1740. The Court's "focus should be on individuals, not groups." *Id*. Title VII "works to protect individuals of both sexes from discrimination," even if an employer "treat[s] men and women as groups more or less equally." *Id*. at 1741. In fact, a law that discriminates against both transgender men *and* transgender women "doubles rather than eliminates" the discrimination. *Id.* at 1742.

The Supreme Court's case law similarly emphasizes that the Equal Protection Clause "protect[s] *persons*, not *groups*." *Adarand Constructors v. Pena*, 515 U.S. 200, 227 (1995) (emphasis in original). Thus, a law that treats groups equally in the aggregate, but individually classifies people based on impermissible characteristics, is subject to heightened scrutiny. *See Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 743 (2007). *See also J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 152 (1994) (Kennedy, J., concurring in judgment) (Equal Protection Clause bars gender discrimination in jury selection because "[t]he neutral phrasing of the Equal Protection Clause, 'any person,' reveals it is concerned with rights of individuals, not groups"). Applying these principles to the ban on "sex gender changes" in Section 1079(a)(11), the sex-based classification apparent on the face of the statute does not disappear simply because both a transgender woman, as an individual, and a transgender man, as

an individual, each are denied medical treatment because their birth sex is different from their gender identity.

Second, *Skrmetti* and *Eknes-Tucker* incorrectly asserted that the Supreme Court's sex discrimination analysis in *Bostock* applies only to Title VII because of its specific text and application in the employment discrimination context. *See Skrmetti*, 83 F.4th at 484-86*; Eknes-Tucker*, 80 F.4th at 1229-30. There is no support for that distinction. *Bostock's* reasoning was based on the Court's analysis of "but-for" causation, 140 S.Ct. at 1739, not any language specific to the employment discrimination context. The Court in *Bostock* stated that "if changing the employee's sex would have yielded a different" result, then the employer discriminated on the basis of sex. *Id.* at 1741. That fundamental principle of *Bostock* is exactly how the prohibition here works. In the context of bans on medical treatment for gender transition, one medical procedure—for example, a phalloplasty surgery to construct external genitalia—is available to a non-transgender person, whose birth sex was male, after cancer, a disabling infection, or traumatic injury (SOF ¶ 15), but not to a transgender person whose birth sex was female for gender transition. There is no principled basis for the view that a policy or practice that classifies based on sex under a federal sex discrimination statute somehow does not classify based on sex under the Constitution.

Both *Skrmetti and Eknes-Tucker* cited Justice Gorsuch's concurrence in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 143 S.Ct. 2141 (2023), to assert that Title VII differs from the Equal Protection Clause. *See Skrmetti*, 83 F.4th at 484-85; *Eknes-Tucker*, 80 F.4th at 1229. This misunderstands the majority opinion in *Students for Fair Admissions* and Justice Gorsuch's concurrence. The majority opinion, which Justice Gorsuch joined, invalidated both Harvard and the University of North Carolina's admissions policies on

26

the ground that Title VI's and the Equal Protection Clause's prohibitions on racial discrimination are coextensive. *Students for Fair Admissions*, 143 S.Ct. at 2156 n.2. Justice Gorsuch endorsed vigorous enforcement of the Equal Protection Clause's nondiscrimination mandate and argued that Title VI should also be vigorously enforced. *Id*. at 2221 (Gorsuch, J., concurring). Nothing in Justice Gorsuch's concurring opinion suggests that the Equal Protection Clause's protections should exclude a form of discrimination that constitutes sex discrimination under Title VII.

Third, both Courts of Appeals relied upon a line from *Dobbs v. Jackson Women's Health Org*., 142 S. Ct. 2228 (2022), a case involving laws that restricted abortion, which quoted *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974), which involved a law that barred disability insurance coverage for certain pregnancy-related disabilities. *See Skrmetti*, 83 F.4th at 480-81, 484; *Eknes-Tucker*, 80 F.4th at 1229-30. In dismissing arguments of *amici* that the Equal Protection Clause protected the right to abortion, *Dobbs* in dicta noted that "the regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" *Dobbs*, 142 S.Ct. at 2245-46 (quoting *Geduldig v. Aiello*, 447 U.S. 484, 496 n.20) (1974)).

In *Geduldig*, the Supreme Court held that a California disability insurance system administered by the state that excluded coverage for disabilities resulting from pregnancy did not violate the Equal Protection Clause. *Geduldig*, 447 U.S. at 494. The Court explained that regulation "merely removes one physical condition—pregnancy—from the list of compensable disabilities. While it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification." *Id.* at 496 n.20. The Court further explained that there was a "lack of identity" between pregnancy and gender

because the exclusion included the group of *both* pregnant women (which is exclusively female) and non-pregnant people (which includes both sexes). *Id.*

Dobbs and *Geduldig* are inapposite here. Both the Sixth and Eleventh Circuits drew an unfounded and illogical analogy between classifications based on pregnancy and abortion, and laws that *facially* discriminate based on sex.[14] That analogy crumbles on a fundamental distinction. *Dobbs* (abortion) and *Geduldig* (pregnancy) addressed the prohibition of medical care or disability benefits for all people and in all circumstances. Knowing a person's sex, *e.g.*, that they are female, does not determine whether or not the medical treatment in *Dobbs* or the disability in *Geduldig* is or is not covered. In the context of bans on medical treatment for gender transition, the only way to know whether the exclusion applies is to know the person's transgender status (or their birth sex).

Federal district courts have repeatedly rejected the *Geduldig* argument because laws prohibiting medical care for gender transition do not "prohibit certain medical procedures in all circumstances, but only when used for gender transition, which in turn requires sex-based classifications." *K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 2023 U.S. Dist. LEXIS 104870 at *23. One federal district court clearly explained the distinction:

> When men and women are treated the same, the [Supreme] Court reasoned, it is not intentional sex discrimination, even if the challenged provision has a disparate impact. . . . Transgender and cisgender individuals are not treated

---

[14] *See Skrmetti*, 83 F.4th at 481 (noting that only natal females use testosterone for gender transition and only natal males use estrogen for gender transition to conclude that "[i]f a law restricting a medical procedure that applies only to women does not trigger heightened scrutiny, as in *Dobbs* and *Geduldig*, these laws, which restrict medical procedures unique to each sex, do not require such scrutiny either"); *Eknes-Tucker*, 80 F.4th at 1229-30 ("By the same token, the regulation of a course of treatment that only gender nonconforming individuals can undergo would not trigger heightened scrutiny unless the regulation were a pretext for invidious discrimination against such individuals."). *But see Skrmetti,* 83 F.4th at 501 (White, J., dissenting) (arguing that the majority's "contention misreads *Geduldig and Dobbs*").

the same. . . . To know whether treatment with [the banned] medications is
legal, one must know whether the patient is transgender.

*Doe v. Ladapo*, 2023 U.S. Dist. LEXIS 99603 at *28-29. *See also Doe v. Thornbury*, 2023 U.S.

Dist. LEXIS 111390 art *12-13 (in *Dobbs* and *Geduldig*, unlike this case, the "law or policy at

issue did not bar access to treatment for some patients but not others depending on the parties'

sex"); *Dekker v. Weida*, 2023 U.S. Dist. LEXIS 107421 at *41 (exclusions of care for gender

transition do "not involve a medical treatment that only one sex can undergo, or that only

cisgender or transgender patients can undergo. . . . [T]he state has simply chosen to make the

treatment legal for some and illegal for others, depending on sex or transgender status."); *Koe v.

Noggle*, 2023 U.S. Dist. LEXIS 147770 at *50 ("the medical procedures at issue are not ones that

'only one sex can undergo'") (quoting *Dobbs*, 142 S.Ct. at 2245-46); *Kadel*, 620 F.Supp.3d at

379 (rejecting analogy to *Geduldig* and explaining that North Carolina's plan could not "be

explained without reference to sex, gender or transgender status," in contrast to pregnancy); *Fain

v. Crouch*, 618 F.Supp.3d at 327 (rejecting analogy to *Geduldig* because Medicaid plan treated

non-transgender individuals more favorably by allowing them to access the same surgeries that

were otherwise banned under the program's policy).

    *Dobbs* and *Geduldig* are wholly inapplicable to laws, such as Section 1079(a)(11), that do

"not merely involve transgender status; they are directly and exclusively targeted at [people] who

are transgender," *Skrmetti*, 2023 U.S. Dist. LEXIS 111424 at *27, n.18, "and place special

burdens on gender nonconformity." *Koe v. Noggle*, 2023 U.S. Dist. LEXIS 147770 at *50.

    **C.**    **Even if a Prohibition on "Sex Gender Changes" Could Be Viewed as Facially
Neutral, Heightened Scrutiny Applies Because There Are Clear Indicia of
Discriminatory Purpose under *Arlington Heights*.**

    As the First Circuit has explained, the Supreme Court's decision in *Arlington Heights* sets

out the factors to demonstrate that "a discriminatory purpose motivated [a law or policy]

requiring the application of heightened scrutiny." *Boston Parent Coal.*, 996 F.3d at 45 (citing

*Washington v. Davis*, 426 U.S. 229, 241 (1976)). The Eleventh Circuit expressly noted this path

to heightened scrutiny. *See Eknes-Tucker*, 80 F.4th at 1230. The task involves a "sensitive

inquiry into such circumstantial and direct evidence of [discriminatory] intent as may be

available." *Boston Parent Coal.*, 996 F.3d at 45 (quoting *Arlington Heights*, 429 U.S. at 266).

The Supreme Court emphasized that the identified "subjects of proper inquiry" did not "purport[]

to be exhaustive," but included the disproportionate impact of the policy; the justification, or lack

thereof, for any disproportionate effect; and "the legislative or administrative history." *Arlington

Heights*, 429 U.S. at 268; *Boston Parent Coal.*, 996 F.3d at 45 (quoting *Anderson v. City of

Boston*, 375 F.3d 71, 83 (1st Cir. 2004)); *see also Arlington Heights,* 429 U.S. at 266-68 (further

elaborating factors for consideration in "proper inquiry").

All factors demonstrate the discriminatory purpose at play in the adoption of an exclusion

of surgeries for gender transition in Section 1079(a)(11). First, this is not merely an instance of

*disproportionate* impact. The policy is directly aimed at transgender people. One hundred

percent of the population burdened by a ban on gender transition are transgender. Second,

Defendants agree that gender transition surgeries are medically necessary and that there is no

basis for deeming all surgeries for gender transition as cosmetic. Stip.; Doc. 34-1; Schechter

Aff.; Doc. 34-2; Ettner Aff.; Doc. 34-3. Finally, the historical background demonstrates that the

adoption of the exclusion was tainted by myths, stereotypes, and unfounded beliefs about

transgender people. The exclusion not only categorizes indisputably essential medical care as

merely for purposes of beautification, but also delegitimizes the core identity of a class of

people. Heightened scrutiny is particularly appropriate where, as here, a governmental policy

plainly shows "prejudice against [a] discrete and insular minorit[y]." *United States v. Carolene*

*Products Co.*, 304 U.S. 144, 152 n.4 (1938). Because there are clear indicia of discriminatory intent behind Section 1079(a)(11), the prohibition on gender transition surgeries is subject to heightened scrutiny requiring an exceedingly persuasive governmental justification.

### IV. THE PROHIBITION OF MEDICALLY NECESSARY SURGERIES FOR GENDER DYSPHORIA IN SECTION 1079(a)(11) FAILS ANY LEVEL OF CONSTITUIONAL REVIEW.

It is evident that a ban on coverage for all gender transition surgeries pursuant to Section 1079(a)(11) cannot come close to surviving intermediate scrutiny.

Nor can it satisfy even rational basis review. The lack of any legitimate justification for a sweeping exclusion of medically necessary medical care, which is lumped in with procedures such as face lifts that are solely intended to improve appearance, shows that the prohibition of medically necessary treatments for gender dysphoria was arbitrary at best and animus-based at worst. Further, any consideration of rational basis review in this case requires a more searching and "intensified" inquiry into the law's relationship to a legitimate governmental objective. *See Massachusetts*, 682 F.3d at 10. In *Massachusetts*, the First Circuit surveyed Supreme Court cases in which the Court conducted a more searching and demanding review, nominally under rational basis, when the targeted group was "historically disadvantaged, or unpopular, and the statutory justification seemed thin, unsupported or impermissible." *Id.* (discussing *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985); and *Romer v. Evans*, 517 U.S. 620 (1996)). The Court noted that there has been "a more careful assessment of the justifications than the light scrutiny offered by conventional rational basis review" in cases where there exist "historic patterns of disadvantage suffered by the group adversely affected by the statute." *Id.* at 11.

The ban on medically necessary surgeries for gender dysphoria targets medical treatment needed only by transgender people. The defendants agree it has no legitimate purpose. Such an interpretation would render Section 1079(a)(11) violative of the constitutional guarantee of equal protection.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs Jane Doe and Susan Roe respectfully request that the Court enter summary judgment for them on Count I of the Amended Complaint.

Dated: December 21, 2023                    Respectfully submitted,

By:      */s/ Kayla Grant*
ORRICK, HERRINGTON, & SUTCLIFFE LLP

Kayla Grant (Maine Bar No. 006711)
Shane McCammon
1152 15th Street, N.W.
Washington, D.C. 20005-1706
T: (202) 339-8400
F: (202) 339-8500
kgrant@orrick.com
smcammon@orrick.com

Seth Harrington
222 Berkeley Street
Suite 2000
Boston, MA 02116
T: (617) 880-1800
F: (617) 880-1801
sharrington@orrick.com

By:      */s/ Bennett H. Klein*
GLBTQ LEGAL ADVOCATES & DEFENDERS
Bennett H. Klein
bklein@glad.org
18 Tremont Street
Suite 950
Boston, MA 02108

T: (617) 426-1350
F: (617) 426-3594

*Counsel for Plaintiffs*

# **ADDENDUM**

| 94TH CONGRESS | HOUSE OF REPRESENTATIVES | REPORT |
| 1st Session | | No. 94–517 |

# DEPARTMENT OF DEFENSE APPROPRIATION BILL, 1976

SEPTEMBER 25, 1975.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. MAHON, from the Committee on Appropriations, submitted the following

# REPORT

together with

## SEPARATE VIEWS

[To accompany H.R. 9861]

The Committee on Appropriations submits the following report in explanation of the accompanying bill making appropriations for the Department of Defense for the fiscal year ending June 30, 1976, and the period ending September 30, 1976.

### APPROPRIATIONS AND ESTIMATES

Appropriations for the military functions of the Department of Defense are provided for in the accompanying bill for the fiscal year 1976 and for the three month transition period ending September 30, 1976. This bill does not provide for military assistance, military construction, military family housing, or civil defense, which requirements are considered in connection with other appropriation bills.

59–108 O

146

### COSMETIC SURGERY

Another procedure which concerns the Committee is the practice of cosmetic surgery in military medical facilities. The primary concern is the practice of rhylidectomies and mammary augmentations; which is face lifting and breast reconfiguration, done solely for cosmetic reasons. The Committee has previously discussed this practice with officials of the Department. Recently, the Committee again had several discussions with the Department concerning this practice. There has been no assurance received that this costly procedure will be adequately monitored even though it is not necessary for the care of military personnel and such services cannot be obtained under the CHAMPUS program. The Committee is of the opinion that personnel employed solely for the performance of this practice should be allowed to terminate their services which would result in a savings in both Military Personnel and Operations and Maintenance costs.

### CHANGE IN CHAMPUS BENEFITS

The Committee has for the past few years pointed out that changes and reorientations were required to reduce CHAMPUS cost. The Committee recognizes that, even though it is critical of Defense medical operations overall, the Department has endeavored to reduce CHAMPUS cost through the initiation of changes in various benefits provided under the program. The Committee also knows that to a great extent such changes have been vigorously resisted within and outside the military establishment. For example, the Department deleted services of pastoral, family, and marital counseling. This deletion has been contested even though the Department employs directly thousands of counselors of all types whose services can be used by eligible CHAMPUS recipients.

The Department also excluded from payment under the CHAMPUS program such other services as special education, except when provided as secondary to the active psychiatric treatment on an institutional inpatient basis; therapy or counseling for sexual dysfunctions or sexual inadequacies; the treatment of obesity when obesity is the sole or major condition treated, and many other non-related medical services. There are those who are endeavoring to have such services reinstated under CHAMPUS. Education is an entire field of its own and not at all a part of the field of medicine. The Department was of the opinion that it made no sense for CHAMPUS to pay for special educational programs on the advice of a physician. Benefits are available under CHAMPUS for sexual incompetencies when treatment is received from a medical physician. However, CHAMPUS was being charged for sexual therapy by counselors and counseling organizations. This type of sex therapy training center has been established in many areas of the country. Since there are no legal standards, no licensing requirements, no federal regulations, and no medical restraints for these organizations, the Department decided that payments under CHAMPUS should not be allowed.

Furthermore, none of the various services discontinued by CHAMPUS are allowable under the Federal Employees Health Benefits Pro-

147

gram or under health benefits programs supported by major business corporations or unions in this country. The problem was that once they got started under CHAMPUS there is much resistance to their being discontinued. Also, organizations and individuals receiving payments under CHAMPUS use it as a means of trying to convince those responsible for the administration of other health benefit programs that such services should be allowed. To support the position taken by the Department of Defense, the Committee is recommending that a new general provision be included in the bill which, in effect, prevents the payment of such claims with funds appropriated to the Department.

### COMMISSARY STORE OPERATION

#### FUNDING SUPPORT

For fiscal year 1976 the Department requested $148,300,000 of Operation and Maintenance funds for the support of commissary store operations. For the transition period the request is $28,400,000. For military personnel support cost during the same periods, the Department requested $22,600,000 and $5,700,000, respectively. Thus, the total support cost requested for fiscal year 1976 is $170,900,000 and for the transition period is $34,100,000.

The Operation and Maintenance request for fiscal year 1976 is $80,300,000 below the amount of support funds provided in fiscal year 1975 and $109,200,000 below the funds estimated to be required for full support during fiscal year 1976. The amount requested for the transition period was $35,100,000 below the amount required for full support during this time. The reduced funding was based upon a proposed change in the procedures for the future support of commissary store operations. The Department proposed that Section 814 of the General Provisions (Section 714 of this bill) which concerns commissary operations be amended generally to the effect that commissaries become fifty percent self-supporting on October 1, 1975, and fully self-supporting on October 1, 1976. This proposal would have placed commissaries on a non-appropriation supported operation in the same manner as military post exchanges are now operated. That is, they would become self sufficient operations unto themselves.

#### COMMITTEE RECOMMENDATION

The Committee held detailed hearings on this proposal. After considering both the testimony of officials of the Department of Defense and various outside witnesses who opposed the change, the Committee has concluded that commissary operations should be fully supported with appropriated funds. Accordingly, the Committee is recommending that the amendments proposed to Section 814 of the general provisions be denied and that the $109,200,000 required for full support in fiscal year 1976 and the $35,100,000 required for full support during the transition period be appropriated. These funds are included in the various appropriation requests affected.

327

portation of household effects when personnel choose to move their household goods themselves. This allowance shall only be available when the total cost will provide a saving to the government. The provision will enable personnel in some instances to be paid for moving their household goods an amount in excess to their actual costs. This will enable the personnel to obtain additional compensation and will save the government money. This provision is discussed more fully in the Military Personnel title of the Report.

### ACCRUED LEAVE PAYMENTS

The Committee recommends the enactment of Section 749 which would limit the unused accrued leave payments made to military personnel to 60 days. This is in line with the limitation placed on other government personnel and is discussed further in Title I of this Report.

### GENERAL SERVICES ADMINISTRATION CHARGES

The Committee recommends reductions throughout the bill of 15 percent of the standard level user charge established by the General Services Administration for space and services provided to the Department of Defense. Section 750 limits such payments to 85 per centum of the charge established. The Committee believes that the charges established are excessive and are not proper charges against appropriations made to the Defense Department. This is discussed more fully in Title III of this Report.

### EXTENSION OF MILEAGE FOR INPATIENT CARE UNDER CHAMPUS

The Committee recommends the inclusion of Section 751 which extends from 30 to 50 miles the area beyond which a beneficiary under the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) program must reside before being able to receive inpatient medical care without obtaining a certificate that medical services are not available at a military medical facility. The Committee believes this provision will assist in the better utilization of military medical facilities and will reduce the cost of the CHAMPUS program. This provision only extends the distance required to obtain a certification and is otherwise consistent with Defense regulations prescribing circumstances under which statements of nonavailability may be issued; such as, in the case of emergency medical care. The need for this provision is more fully discussed on page 144 of the report.

### RESTRICTION ON THE USE OF CHAMPUS FUNDS

The Committee also recommends that Section 752 be included in the bill. This section prohibits the use of appropriated funds for certain types of services; such as, pastoral, family, marital, and sexual counseling under the CHAMPUS program. This section is recommended for inclusion to assist in reducing CHAMPUS costs by eliminating nonmedical services now being paid under the program. None of the services to be discontinued are allowable under the Federal Employees Health Benefits Program. This provision is more fully discussed on page 146 of the report.

331

*baggage and household effects are moved by privately owned or rental vehicle. Such allowance shall not be limited to reimbursement for actual expenses and may be paid in advance of the transportation of said baggage and household effects. However, the monetary allowance shall be in an amount which will provide savings to the government when the total cost of such movement is compared with the cost which otherwise would have been incurred under section 406(b).*

On page 56, beginning in line 14, in connection with "General Provisions":

*Sec. 749. None of the funds appropriated by this Act shall be available to pay any member of the uniformed service for unused accrued leave pursuant to section 501 of title 37, United States Code, for more than 60 days of such leave, less the number of days for which payment was previously made under section 501 after the effective date of this Act.*

On page 57, beginning in line 3, in connection with "General Provisions":

*Sec. 751. No funds appropriated in this Act shall be available to pay claims for non-emergency inpatient hospital care provided on or after January 1, 1976, under the Civilian Health and Medical Program of the Uniformed Services for services available at a facility of the uniformed services within a 50-mile radius of the patient's residence.*

On page 57, beginning in line 9, in connection with "General Provisions":

*Sec. 752. None of the funds contained in this Act available for the Civilian Health and Medical Program of the Uniformed Services under the provisions of section 1079(a) of title 10, United States Code, shall be available for (a) services of pastoral counselors, or family and child counselors, or marital counselors, (b) special education, except when provided as secondary to the active psychiatric treatment on an institutional inpatient basis, (c) therapy or counseling for sexual dysfunctions or sexual inadequacies, (d) treatment of obesity when obesity is the sole or major condition treated, (e) reconstructive surgery justified solely on psychiatric needs including, but not limited to, mammary augmentation, face lifts, and sex gender changes, (f) perceptual or visual training, or (g) any other service or supply which is not medically necessary to diagnose and treat a mental or physical illness, injury, or bodily malfunction as diagnosed by a physician.*

On page 58, beginning in line 1, in connection with "General Provisions":

*Sec. 753. None of the funds appropriated in this Act may be expended by the Department of the Army for the design, procurement of plant equipment, or construction of new ammunition plant facilities except in areas in which existing ammunition plant facilities are being closed, placed in layaway, or at which production has been curtailed.*

| 96TH CONGRESS 2d Session } | HOUSE OF REPRESENTATIVES | { REPORT No. 96–1317 |
|---|---|---|

# DEPARTMENT OF DEFENSE APPROPRIATION BILL, 1981

---

## REPORT

OF THE

## COMMITTEE ON APPROPRIATIONS

together with

## SEPARATE AND ADDITIONAL VIEWS

[To accompany H.R. 8105]



SEPTEMBER 11, 1980.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

---

U.S. GOVERNMENT PRINTING OFFICE

67–327 O    WASHINGTON : 1980

53

TABLE 16.—OPERATION AND PERSONNEL COSTS OF DOD MEDICAL PROGRAMS

[In thousands of dollars; fiscal years]

| | 1979 actual | 1980 estimate, 1980 budget | 1980 estimate, 1981 budget | 1981 estimate, 1981 budget |
|---|---|---|---|---|
| Military personnel, DOD: | | | | |
| Care in regional defense facilities | 375,466 | 378,631 | 398,398 | 404,904 |
| Care in station hospitals and clinics | 682,860 | 676,025 | 717,734 | 749,749 |
| Dental activities | 175,411 | 174,340 | 185,628 | 185,789 |
| Care in nondefense facilities | 160 | 188 | 130 | 0 |
| CHAMPUS | 0 | 40 | 125 | 125 |
| Other health activities | 197,164 | 242,313 | 224,008 | 250,538 |
| Education and training, health care | 156,579 | 160,072 | 182,651 | 188,529 |
| USUHS | 4,322 | 6,266 | 6,753 | 8,685 |
| Medical information systems | 633 | 671 | 759 | 759 |
| Base operations | 3,943 | 4,040 | 4,224 | 3,781 |
| Command health care | 8,734 | 9,294 | 9,663 | 10,201 |
| Examining activities | 1,548 | 1,410 | 1,568 | 3,083 |
| Research and development | 39,716 | 38,581 | 42,377 | 46,151 |
| Total, military personnel, DOD | 1,646,536 | 1,691,871 | 1,774,018 | 1,852,294 |
| Reserve personnel, DOD: Armed Forces health professional scholarship program | 28,953 | 31,592 | 34,192 | 36,211 |
| Operation and maintenance, DOD: | | | | |
| Care in regional defense facilities | 446,460 | 440,376 | 456,726 | 537,462 |
| Care in station hospitals and clinics | 561,231 | 648,477 | 644,122 | 770,751 |
| Dental activities | 63,050 | 71,060 | 73,263 | 84,058 |
| Care in nondefense facilities | 82,229 | 65,782 | 90,616 | 103,526 |
| CHAMPUS | 485,591 | 754,000 | 731,460 | 832,228 |
| Other health activities | 126,697 | 137,856 | 146,430 | 162,307 |
| Education and training, health care | 41,899 | 44,667 | 45,616 | 53,682 |
| APHPSP | 22,719 | 26,151 | 27,668 | 30,608 |
| Other health acquisition programs | 401 | 246 | 294 | 185 |
| USUHS | 13,791 | 17,700 | 17,990 | 21,700 |
| Medical information systems | 20,323 | 41,600 | 29,084 | 33,400 |
| Base operations | 44,841 | 46,906 | 50,843 | 51,119 |
| Command health care | 13,278 | 13,836 | 14,312 | 14,955 |
| Examining activities | 9,783 | 10,177 | 12,638 | 12,892 |
| Real property maintenance | 56,929 | 68,156 | 56,991 | 66,761 |
| Communications, health care | 2,671 | 2,656 | 3,000 | 3,410 |
| Other medical support | 4,665 | 14,988 | 11,254 | 5,457 |
| Total, operation and maintenance, DOD | 1,996,558 | 2,404,634 | 2,412,307 | 2,784,501 |

EFFECT OF SECTION 743 ON REIMBURSEMENT FOR CANCER PATIENTS

*Post-mastectomy reconstruction*

Section 745 of the Defense Appropriations Act of 1980 prohibits payment of ". . . reconstructive surgery justified solely on psychiatric needs including, but not limited to mammary augmentation . . ." Since breast reconstruction and implant does not treat an illness or injury, nor restore function, its purpose is therefore solely psychiatric and thus generally excluded by section 745. Since the ultimate purpose of the reconstruction process is to augment the breast, it is also specifically excluded by the 1980 language.

In the past, breast reconstruction following mastectomy was an uncommon and controversial procedure—considered by many to be investigational at best. Professional concern about the possibility of disease recurrence, a high rate of complication and the technical difficulties imposed by the radical mastectomy militated against widespread acceptance of the reconstructive procedure. This was the environment at the time the limiting language was initially adopted into the fiscal year 1976 Defense Appropriations Act.

**54**

However, in recent years, there has been a change in attitude concerning management of breast disease. At one time, radical mastectomy was the procedure of choice for breast cancer. Improved diagnostic techniques, including educational programs encouraging self-examination which enable earlier diagnosis and treatment, have led to the development of less radical procedures. Women in ever-increasing numbers are refusing to accept radical mastectomy simply because it is recommended.

The less radical mastectomy procedures have made reconstruction technically feasible. There is also a greater awareness that the possibility of reconstruction has made women better able to accept amputation of a breast when medically indicated. Better identification of persons at risk and improved methods of diagnosis, combined with the greater acceptability of mastectomy because of subsequent reconstruction, leads to early treatment. This then results in an increase in cures. More cures reduce morbidity and mortality, and ultimately, costs—even when the additional costs of reconstruction are considered.

These factors have combined to remove most of the professional concerns about the appropriateness of post-mastectomy breast reconstruction. Reconstruction is now considered by most authorities to be a practical component of the management of the non-radical mastectomy patient. This change in the professional environment is reflected in third party benefits now available for this procedure. Unlike five years ago, today most major third party medical benefits programs cover breast reconstruction procedures following mastectomy. This includes the Blue Cross Federal Employee Program for civilian Government employees—the program after which CHAMPUS was modeled. Within the last few months, Medicare announced a policy change and now that Program also extended benefits for the post-mastectomy breast reconstruction.

This exclusion by CHAMPUS has become a significant source of beneficiary dissatisfaction, particularly since the benefit is now fairly widely available in private health insurance plans. Based on an Office of Assistant Secretary of Defense (Health Affairs) study which was begun last year, the study shows that the procedure no longer is considered investigational and that the profession generally no longer considers it to be an unnecessary risk to the patient due to complications.

To accomplish a change in CHAMPUS policy on postmastectomy reconstructive surgery, the Committee recommends the following parenthetical phrase (in italic) to allow reconstructive surgery to overcome the effects of trauma or disease be incorporated into what is currently Section 745(e) of the fiscal year 1980 Defense Appropriations Act:

SEC. 743. None of the funds contained in this Act available for the Civilian Health and Medical Program of the Uniformed Services under the provisions of section 1079(a) of title 10, United States Code, shall be available for . . . (e) reconstructive surgery (*other than post-mastectomy reconstructive surgery to overcome the effects of trauma or disease*), justified solely on psychiatric needs including, but not limited to, mammary augmentation, face lifts and sex gender changes; . . .

# APPROPRIATIONS, BUDGET ESTIMATES, ETC.

---

# STATEMENTS

## NINETY-SEVENTH CONGRESS, SECOND SESSION

### (January 25, 1982 to December 21, 1982)

SHOWING

I.—APPROPRIATIONS MADE DURING THE SECOND SESSION OF THE NINETY-SEVENTH CONGRESS IN REGULAR, ANNUAL, SUPPLEMENTAL, AND MISCELLANEOUS APPROPRIATION ACTS; RESCISSION ACTS; DEFERRAL RESOLUTIONS; AND MAJOR ACTS AUTHORIZING APPROPRIATIONS (pp. 1-1405)

II.—PERMANENT APPROPRIATIONS—FEDERAL FUNDS (pp. 1407-1418)

III.—PERMANENT APPROPRIATIONS—TRUST FUNDS (pp. 1419-1432)

IV.—RECAPITULATION OF APPROPRIATIONS (pp. 1433-1441)

V.—CHRONOLOGICAL HISTORY OF REGULAR AND SUPPLEMENTAL APPROPRIATION BILLS (pp. 1444-1450)

VI.—AMOUNT OF LOAN AND BORROWING AUTHORIZATIONS, CONTRACT AUTHORIZATIONS, AND APPROPRIATIONS TO LIQUIDATE CONTRACT AUTHORIZATIONS (pp. 1451-1456)

VII.—AUTHORIZATIONS FOR APPROPRIATIONS (p. 1457)

VIII.—COMPARISON OF BUDGET ESTIMATES AND APPROPRIATIONS (pp. 1459-1594)

IX.—COMPARISON OF BUDGET ESTIMATES AND APPROPRIATIONS BY SESSIONS OF CONGRESS (pp. 1595-1601)

X.—TOTAL APPROPRIATIONS BY SESSIONS OF CONGRESS (pp. 1603-1611)

---

PREPARED UNDER THE DIRECTION OF THE COMMITTEES ON APPROPRIATIONS OF THE SENATE AND HOUSE OF REPRESENTATIVES AS REQUIRED BY LAW (U.S. CODE, TITLE 2, SECTION 105)

BY

**J. KEITH KENNEDY**
*Staff Director and Clerk to the
Committee on Appropriations
United States Senate*

**KEITH F. MAINLAND**
*Clerk and Staff Director to the
Committee on Appropriations
House of Representatives*

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1983

17-100 O

SEC. 736. None of the funds available to the Department of Defense shall be utilized for the conversion of heating plants from coal to oil at defense facilities in Europe.

SEC. 737. None of the funds appropriated by this Act shall be available for any research involving uninformed or nonvoluntary human beings as experimental subjects: *Provided,* That this limitation shall not apply to measures intended to be beneficial to the recipient and consent is obtained from the recipient or a legal representative acting on the recipient's behalf.

SEC. 738. Appropriations for the current fiscal year for operation and maintenance of the active forces shall be available for medical and dental care of personnel entitled thereto by law or regulation (including charges of private facilities for care of military personnel, except elective private treatment); welfare and recreation; hire of passenger motor vehicles; repair of facilities; modification of personal property; design of vessels; industrial mobilization; installation of equipment in public and private plants; military communications facilities on merchant vessels; acquisition of services, special clothing, supplies, and equipment; and expenses for the Reserve Officers' Training Corps and other units at educational institutions.

SEC. 739. No part of the funds in this Act shall be available to prepare or present a request to the Committees on Appropriations for the reprogramming of funds, unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which reprogramming is requested has been denied by the Congress.

SEC. 740. No funds appropriated by this Act shall be available to pay claims for nonemergency inpatient hospital care provided under the Civilian Health and Medical Program of the Uniformed Services for services available at a facility of the uniformed services within a 40-mile radius of the patient's residence: *Provided,* That the foregoing limitation shall not apply to payments that supplement primary coverage provided by other insurance plans or programs that pay for at least 75 per centum of the covered services.

SEC. 741. None of the funds contained in this Act available for the Civilian Health and Medical Program of the Uniformed Services under the provisions of section 1079(a) of title 10, United States Code, shall be available for (a) services of pastoral counselors, or family and child counselors, or marital counselors unless the patient has been referred to such counselor by a medical doctor for treatment of a specific problem with results of that treatment to be communicated back to the physician who made such referral; (b) special education, except when provided as secondary to the active psychiatric treatment on an institutional inpatient basis; (c) therapy or counseling for sexual dysfunctions or sexual inadequacies; (d) treatment of obesity when obesity is the sole or major condition treated; (e) surgery which improves physical appearance but which is not expected to significantly restore functions including, but not limited to, mammary augmentation, face lifts and sex gender changes except that breast reconstructive surgery following mastectomy and reconstructive surgery to correct serious deformities caused by congenital anomalies, accidental injuries and neoplastic surgery are not excluded; (f) reimbursement of any physician or other authorized individual provider of medical care in excess of the eightieth percentile of the customary charges made for similar services in the same locality where the medical care was furnished, as determined for physicians in accordance with section 1079(h) of title 10, United States Code; or (g) any service or supply which is not medically or psychologically necessary to prevent, diagnose, or treat a mental or physical illness, injury, or bodily malfunction as assessed or diagnosed by a physician, dentist, clinical psychologist, optometrist, podiatrist, certified nurse-midwife, certified nurse practitioner, or certified clinical social worker, as appropriate, except as authorized by section 1079(a)(4) of title 10, United States Code: