# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

JANE DOE and SUSAN ROE,

       *Plaintiffs*,

    v.

LLOYD J. AUSTIN, III, in his official
capacity as Secretary of Defense; the U.S.
DEPARTMENT OF DEFENSE; the U.S.
DEFENSE HEALTH AGENCY; and the
TRICARE HEALTH PLAN,

       *Defendants.*

Civil Action No.: 2-22-cv-00368-NT

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO DEFENDANTS' OPPOSITON TO PLAINTIFFS' MOTION FOR SUMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, and the Court's Local Rule 56(h) Order (Doc. 29), Plaintiffs Jane Doe and Susan Roe submit this opposition to Defendants' Cross-motion for Summary Judgment and reply to Defendants' Opposition to Plaintiffs' Motion for Summary Judgment (Doc. 44). In support of this opposition and reply, Plaintiffs have filed the Supplemental Affidavit of Randi Ettner, Ph.D. (Doc. 48-1) and Plaintiffs' Statement of Additional Undisputed Facts.

## INTRODUCTION

This case is a challenge to a federal statute that excludes surgery for "sex gender changes" from TRICARE's health benefits coverage for dependents of military personnel. *See* 10 U.S.C. § 1079(a)(11) ("[s]urgery which improves physical appearance but is not expected to significantly restore functions (including mammary augmentation, face lifts, and sex gender changes)"). The Defendants have always pointed to this statute, and nothing else, as the basis for

1

the exclusion of coverage for medically necessary gender transition surgeries.[1] Defendant Department of Defense (DoD) has explicitly acknowledged that Section 1079(a)(11) is what prevents it from eliminating this categorical ban. *See infra* Argument § I.B (discussing the 2016 TRICARE rulemaking process in which DoD stated that although the previous exclusion of all treatments for gender dysphoria was "no longer justifiable," the surgical ban was "dictated by statute" which "constrained" the Department's authority to eliminate it).

In their opposition and cross-motion, Defendants do not dispute Plaintiffs' argument that the plain language of Section 1079(a)(11) is inapplicable to medically necessary gender transition surgeries. Nor do they disagree that if the statute is read as a ban on all gender transition surgeries, then it targets a class of persons solely because they are transgender and violates equal protection under any level of review. Instead, Defendants seek to divert the Court from the obvious statutory and constitutional problems posed by Section 1079(a)(11) and suggest two reasons that the Court does not have jurisdiction to address Plaintiffs' claims. Neither has merit.

First, Defendants claim that Plaintiffs' asserted injury cannot be redressed by a ruling on the statute because a TRICARE regulation excluding "[s]urgery performed primarily for psychological reasons (such as psychogenic)," 32 C.F.R. § 199.4(g)(25), otherwise forecloses coverage of gender transition surgeries.[2] Defendants posit, without any legal analysis, that

---

[1] *See* 32 C.F.R. § 199.4(g)(29) (1986) ("Sex gender changes. Services and supplies related to sex gender change, also referred to as sex reassignment surgery, as prohibited by section 1079 of title 10, United States Code."); TRICARE Policy Manual cited at Pls.' Mot. for Summ. J. at n.3; Doc. 36, # 252 ("[s]urgical treatment of gender dysphoria for non-active duty beneficiaries is prohibited by statute (10 USC 1079)"). *See also infra* Argument § I.B.

[2] *See* Defs.' Opp'n to Pls.' Mot. for Summ. J. at 2; Doc. 44, # 310 ("Plaintiffs . . . do not acknowledge that the coverage they seek would be independently precluded by a separate regulation that they do not challenge"); *id.* at 11, # 319 ("Plaintiffs' case suffers from a

because gender dysphoria is identified in the American Psychiatric Association's diagnostic manual[3] and is "characterized by 'clinically significant distress or impairment in functioning'," this regulation must apply and therefore Plaintiffs' claims are completely beyond review and redress by this Court. Defs.' Opp'n to Pls.' Mot. For Summ. J. at 2-3, 13-14; Doc. 44, # 310-11, 321-22.[4] This is a smokescreen. This Court should reject Defendants' position because:

(1) The background of the regulation's adoption in 1977, the meaning of the sole illustrative example ("psychogenic"), and the context of the surrounding regulatory provisions—all of which Defendants disregard—establish that the phraseology "for psychological reasons" is simply part and parcel of the prohibition of surgeries that do not treat disease or injury, such as cosmetic procedures. This regulation does not apply to gender transition surgeries which Defendants agree are medically necessary in individually appropriate cases. *See* Parties' Stipulation of Facts ("Stip.") ¶¶ 29-36; Doc. 34-1, # 138-39. *See also infra* Argument § I.A.

(2) Defendants' position is belied by their own statements. *See infra* Argument § I.B.

(3) Defendants misconstrue the plain language of the regulation which does not pertain to psychological conditions generally but requires inquiry into the *reasons* for a surgical treatment. The undisputed facts set forth in the Supplemental Affidavit of Randi Ettner, Ph.D. ("Ettner

---

fundamental jurisdictional flaw. Their asserted injury . . . would not be redressed by resolution of their claim . . . because . . . coverage would be foreclosed by a separate TRICARE exclusion that is not at issue here.").

[3] Defendants refer to the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (hereinafter referred to as "DSM-5").

[4] The logical endpoint of Defendants' position is not simply that a technical error precludes review of Section 1079(a)(11) in this case, but that TRICARE's exclusion of gender transition surgeries is entirely insulated from judicial review under any circumstances because "[t]here also is no basis to doubt the constitutionality of the 'psychological reasons' exclusion" which "in any event . . . does not classify TRICARE beneficiaries based on sex or any other constitutionally suspect lines." Defs.' Opp'n to Pls.' Mot. for Summ. J. at 14; Doc. 44, # 322.

Supp.") (Doc. 48-1) establish that the inclusion of a condition in DSM-5 does not necessarily indicate that it has a psychological or emotional etiology or that treatment for it is for psychological reasons. Gender dysphoria is a *physiological* condition arising from hormonal factors in utero that create a differentiation between a person's immutable, brain-based gender identity and their anatomy. The purpose of surgical treatment for gender dysphoria is to correct that physiological difference—that is, to bring a person's anatomy into congruence with their gender identity. *See infra* Argument § I.C.

Second, Defendants' assert that Plaintiffs' facial challenge to Section 1079(a)(11) "cannot succeed because, on Plaintiffs' own reading, the statute is subject to a constitutional interpretation." Defs.' Opp'n to Pls.' Mot. For Summ. J. at 3; Doc. 44, # 311.[5] Defendants fail to recognize, however, that Plaintiffs' statutory and equal protection arguments are in the alternative and independent of each other. *See infra* Argument § II.

For these reasons, the Court should reject Defendants' arguments and grant Plaintiffs' requested relief, including the care that Defendants acknowledge is medically necessary.

## ARGUMENT

I.   **TRICARE'S EXCLUSION OF SURGERY "PERFORMED PRIMARILY FOR PSYCHOLOGICAL REASONS (SUCH AS PSYCHOGENIC)" IS INAPPLICABLE TO MEDICALLY NECESSARY GENDER TRANSITION SURGERY AND DOES NOT PRECLUDE THE RELIEF PLAINTIFFS SEEK IN THIS CASE.**

A.   **The Phrase "For Psychological Reasons (Such as Psychogenic)" Refers to Surgeries That Are Cosmetic and Have No Medical Basis.**

---

[5] *See also* Defs.' Opp'n to Pls.' Mot. For Summ. J. at 3; Doc. 44, # 311 ("Because Plaintiffs concede that the statute's text permits [a] construction . . . that . . . passes constitutional muster, their facial challenge fails as a matter of law.").

The history, text, and surrounding provisions of 32 C.F.R. Section 199.4(g)(25) reveal that it pertains to the general prohibition of non-medically necessary surgeries such as cosmetic procedures—nothing more. Because there is no dispute that gender transition surgeries in individually appropriate cases are medically necessary and not cosmetic (Stip. ¶¶ 29-36; Doc. 34-1, # 138-39), this regulation is inapplicable.

The prohibition of surgery for psychological or psychiatric "reasons" or "needs" was first articulated in the 1976 Department of Defense appropriations legislation. *See* Pls.' Mot. for Summ. J. at 8 n.5; Doc. 36 # 258. The Committee report noted:

> Another procedure which concerns the Committee is the practice of cosmetic surgery in military medical facilities. The primary concern is the practice of rhylidectomies [sic] and mammary augmentations; which is face lifting and breast configuration, done solely for cosmetic reasons.

*See id.*; Pls.' Mot. for Summ. J. add. at 2; Doc. 36, # 286. To implement this concern, the Committee adopted language that:

> [No funds] under the provisions of section 1079(a) of title 10, United States Code, shall be available for . . . *reconstructive surgery justified solely on psychiatric needs* including, but not limited to, mammary augmentation, face lifts, and sex gender changes . . . or . . . any other service which is *not medically necessary to diagnose and treat a mental or physical illness*, injury, or bodily malfunction as diagnosed by a physician.

*See* Pls.' Mot. for Summ. J. at 8 n. 5; Doc. 36, # 258 and Pls.' Mot. for Summ. J. add. at 5; Doc. 36, # 289 (emphasis added). The phraseology "reconstructive surgery justified solely on psychiatric needs" was plainly the Committee's descriptor for cosmetic surgeries that have no medical basis. This concept, simply changing the word "psychiatric" to "psychological," was immediately incorporated into the TRICARE regulations in 1977. *See* 42 Fed. Reg. 17,972, 18,002 (Apr. 4, 1977), add. at 8 ("Surgery. Psychological Reasons. Surgery performed primarily

5

for psychological reasons (i.e., psychogenic).)" The regulation has remained unaltered. The timing and similarity in language compel the conclusion that the regulation was intended to effectuate Congress's intent with respect to non-medically necessary cosmetic procedures.

The 1980 Defense appropriations legislation removes any doubt about the intent of the phrase "for psychiatric needs." During the passage of the amendment, the Committee noted that an explicit exception was necessary because "breast reconstruction . . . does not treat an illness or injury . . . its purpose is therefore solely psychiatric and thus generally excluded." Pls.' Mot. for Summ. J. at 8 n.5; Doc. 36, # 258 and Pls.' Mot. for Summ. J. add. at 7; Doc. 36, # 291.

This understanding of the language "for psychological reasons" is reinforced by its repeated reference in both TRICARE's 1977 regulations and the current regulations, all in the context of discussion of cosmetic procedures. *See* 42 Fed. Reg. at 17,997, add. at 3 ("cosmetic, reconstructive, and/or plastic surgery is that surgery which can be expected primarily to improve physical appearance and/or which is performed primarily for psychological purposes and/or which restores form, but does not correct or materially improve a bodily function."); *id*. (excluding "[c]osmetic, reconstructive and/or plastic surgery procedures performed primarily for psychological reasons or as a result of the aging process"). For comparison, *see also* 32 C.F.R. § 199.4(e)(8), add. at 11 (same); 32 C.F.R. § 199.4(8)(ii)(B), add. at 12-13 (same).[6] In addition, both the 1977 and current regulations include "cosmetic, reconstructive, and/or plastic surgical procedures which are justified primarily on the basis of psychological or psychiatric need" in a lengthy list of noncovered cosmetic procedures which include augmentation and reduction mammoplasties, face lifts related to the aging process, body sculpture procedures, repair of

---

[6] The relevant sections of the current TRICARE regulations are included in the Addendum for ease of comparison to the 1977 regulations.

sagging eyelids, rhinoplasties without evidence of injury, dermabrasion of the face, and the removal of tattoos. 42 Fed. Reg. at 17,997, add. at 4; 32 C.F.R. § 199.4(e)(8)(iv)(B), add. at 13 (virtually identical list). The inclusion of the language "psychological" or "psychiatric" "reason" or "need" in a list of cosmetic treatments elucidates its meaning and its lack of relevance to medically necessary gender transition surgeries. *See, e.g.*, *United States v. Williams,* 553 U.S. 285, 294 (2008) ("[A] word is given more precise content by the neighboring words with which it is associated."); Pls.' Mot. for Summ. J. at 9; Doc. 36, # 259 (discussing cases).

Finally, the illustrative example of "psychogenic" surgeries further supports the inapplicability of 32 C.F.R. Section 199.4(g)(25) to medically necessary gender transition surgeries. As Plaintiffs' expert Dr. Ettner explained, "the term 'psychogenic' refers to the development of a disability without any physiological or organic cause," such as "blindness, hearing loss, or the sudden inability to walk with no underlying medical or physiological cause." Ettner Supp. ¶ 10; Doc. 48-1, # 348-49.[7] Gender dysphoria is a biologically based medical condition resulting from differences in the brain. *See* Ettner Supp. ¶ 1; Doc. 48-1, # 345. It is a "neurodevelopmental anatomical anomaly" that arises in utero from the "interaction of the developing brain and sex hormones." Ettner Supp. ¶¶ 1-2; Doc. 48-1, # 345-46. *See also* Ettner Aff.  ¶¶ 15-17; Doc. 34-3, # 219-22. No record evidence supports the assertion that gender dysphoria is a psychogenic condition. Ettner Supp. ¶ 11; Doc. 48-1, # 349.

---

[7] *See also Psychogenic,* Merriam Webster, https://www.merriam-webster.com/dictionary/psychogenic (last visited Mar. 13, 2024) (defining "psychogenic" as "originating in the mind or in mental or emotional conflict"); *Stedman's Medical Dictionary* 1595 (Lippincott Williams & Wilkins ed., 28th ed. 2006) ("of mental origin or causation").

**B.      Defendants' Position is Belied by Their Own Statements.**

Defendants' position that 32 C.F.R. Section 199.4(g)(25) is an independent and sufficient basis for the exclusion of medically necessary gender transition surgeries is belied by their own statements. Prior to 2016, TRICARE excluded all treatments for gender dysphoria. In its 2016 rulemaking process, DoD noted that "[i]t is no longer justifiable to categorically exclude and not cover currently accepted medically and psychologically necessary treatments for gender dysphoria . . . ." 81 Fed. Reg. 5061, 5066 (Feb. 1, 2016), add. at 14, 16. DoD proposed eliminating only the prohibition of non-surgical treatments for gender dysphoria because surgical treatments for gender dysphoria were "excluded by statute . . . (Section 1079(a)(11))." *Id*. There was no mention of any regulation that would independently create an impediment to the coverage of gender transition surgeries.

 In the Final Rule removing the exclusion of non-surgical treatments, DoD reiterated that "it is no longer justifiable to categorically exclude and not cover current medical and psychologically necessary and appropriate proven treatments that are not otherwise excluded by law." 81 Fed. Reg. 61,068, 61,073 (Sept. 2, 2016), add. at 17, 18. DoD agreed that "to the extent the Department has discretion, prevailing medical assessments and nondiscrimination principles call for removal of this categorical exclusion." *Id*. at 61,074, add. at 19. DoD, however, ultimately rejected commenters' suggestions to remove the surgical exclusion. It stated:

> Surgical coverage of gender dysphoria was not included in the proposed rule, is not included in this final rule, and remains prohibited by statute at 10 U.S.C. 1079(a)(11). . . . As a statutory entitlement program, the Department is constrained in its authority absent a legislative change. The final regulatory language is dictated by statute and is not meant to imply any Departmental position regarding the medical necessity of surgical treatment.

*Id.* Simply put, by specifically referencing Section 1079(a)(11), the need for "*legislative*

change," and the regulatory language being "dictated by *statute*," *see id.* (emphases added),

Defendant DoD understood it was constrained by *statute*, not by regulation. Defendants ignore

this history by arguing now they are constrained by 32 C.F.R. Section 199.4(g)(25). This Court

should hold Defendants to what they have always said before: that they cannot pay for care they

believe to fall within Section 1079(a)(11)'s prohibitions. And because Defendants concede that

the care Plaintiffs seek is medically necessary and therefore Section 1079(a)(11) either does not

apply or is unconstitutional if it does, the Court should grant Plaintiffs' requested relief.

> **C.   Defendants' Position That Medically Necessary Gender Transition Surgeries Are Excluded by Regulation Because Gender Dysphoria is a "Psychological Condition" Is Contrary to the Regulation's Plain Meaning and the Undisputed Facts.**

This Court need go no further than to conclude that the language "for psychological

reasons" in 32 C.F.R. Section 199.4(g)(25) does not apply to medically necessary surgeries for

gender dysphoria. Defendants' position, however, misconstrues the plain language of the

regulation and is contrary to the undisputed facts. As to the text of the regulation, 32 C.F.R.

Section 199.4(g)(25) does not refer generally to psychological or any other conditions. Rather,

the necessary Inquiry is the *reason* for the surgery.

The underlying premise of Defendants' position is incorrect. As Dr. Ettner explained,

there are disorders in DSM-5 that do not have a psychological or emotional etiology, such as

intellectual disabilities, neurocognitive disorders due to medical conditions, and breathing-

related sleep disorders. *See* Ettner Supp. ¶ 7; Doc. 48-1, # 346-47. In fact, many, if not all,

treatments for these conditions are not for psychological reasons. *See id.* Therefore, it does not

follow that simply because a condition is listed in the DSM-5 that treatment for it is necessarily

for psychological reasons. *See id.*

The undisputed facts demonstrate that gender transition surgeries are to treat the physiological cause of gender dysphoria. *See* Ettner Supp. ¶¶ 5, 9; Doc. 48-1, # 346, 348. Gender dysphoria does not have a psychological or emotional etiology. *See* Ettner Supp. ¶¶ 1-2; Doc. 48-1, # 345. The defining feature of gender dysphoria is a "physical differentiation resulting from [a] neurodevelopmental anatomical anomaly, commonly referred to as gender incongruence." *Id*. ¶ 2; Doc. 48-1, # 345. The clinically significant distress associated with gender dysphoria is an indicator of the underlying condition. Ettner Supp. ¶ 8; Doc. 48-1, # 347-48. When gender transition surgery is medically necessary in individually appropriate cases, its purpose is to correct a person's anatomy—that is, "to correct the incongruence between a person's anatomy and their immutable brain-based gender identity." Ettner Supp. ¶ 5; Doc. 48-1, # 346. There is no recognized or effective psychiatric or psychological treatment for gender dysphoria. Ettner Supp. Aff. ¶ 4; Doc. 48-1, # 346.

As with a person born without a limb due to a congenital condition, the surgical creation of a new limb is not primarily for psychological reasons, even though the surgery would likely have a positive psychological impact. *See* Ettner Supp. ¶ 9; Doc. 48-1, # 348. Similarly, surgical treatment for gender dysphoria may reduce the clinical distress a person experiences due to living with gender incongruence, but the purpose of the surgery is to treat the underlying congenital anatomical differentiation. *Id*.

TRICARE's regulation excluding surgeries "for psychological reasons" does not apply to medically necessary gender transition surgeries. It does not prevent this Court from deciding the statutory and constitutional issues in this case.

## II.    PLAINTIFFS' STATUTORY ARGUMENT DOES NOT VITIATE ITS ARGUMENT THAT A STATUTE INTERPRETED TO EXCLUDE ALL GENDER TRANSITION SURGERIES IS FACIALLY UNCONSTITUTIONAL.

Defendants assert that Plaintiffs' facial constitutional challenge to Section 1079(a)(11) is vitiated by their argument that the statutory language does not exclude medically necessary gender transition surgeries. This is incorrect for the simple reason that Plaintiffs' statutory argument and its constitutional argument are alternative arguments that are to be considered independently. If the Court agrees that the language of Section 1079(a)(11) does not exclude medically necessary gender transition surgeries, then it need not consider Plaintiffs' constitutional claims at all to grant Plaintiffs' relief. If, however, the Court disagrees with Plaintiffs' statutory argument, then Plaintiffs' facial challenge to a categorical ban on all gender transition surgeries is proper. *See* Pls.' Mot. for Summ. J. at 14; Doc. 36, # 264 ("If Section 1079(a)(11) is read as a categorical ban on *all* gender transition surgeries, including those medically necessary to treat gender dysphoria, then it violates equal protection.") (emphasis in original).

In addition, Defendants' argument ignores the doctrine of constitutional avoidance which merits the Court's consideration in this case. *See* Pls.' Mot. for Summ. J. at 13-14; Doc. 36, # 263-64.

## CONCLUSION

For the foregoing reasons, and the reasons stated in their Motion for Summary Judgment with Incorporated Memorandum of Law (Doc. 36), Plaintiffs Jane Doe and Susan Roe respectfully request that the Court grant their Motion for Summary Judgment and deny Defendants' Motion for Summary Judgment (Doc. 44).

Dated: March 15, 2024                    Respectfully submitted,


                                         By:      */s/ Kayla Grant*
                                         ORRICK, HERRINGTON, & SUTCLIFFE LLP

                                         Kayla Grant (Maine Bar No. 006711)
                                         Shane McCammon
                                         2100 Pennsylvania Ave, NW
                                         Washington, D.C. 20036
                                         T: (202) 339-8400
                                         F: (202) 339-8500
                                         kgrant@orrick.com
                                         smcammon@orrick.com

                                         Robert Shwarts
                                         405 Howard Street
                                         San Francisco, CA 94105-2669
                                         T: 415-773-5760
                                         rshwarts@orrick.com

                                         By:      */s/* Bennett H. Klein
                                         GLBTQ LEGAL ADVOCATES & DEFENDERS
                                         Bennett H. Klein
                                         bklein@glad.org
                                         18 Tremont Street
                                         Suite 950
                                         Boston, MA 02108
                                         T: (617) 426-1350
                                         F: (617) 426-3594

                                         *Counsel for Plaintiffs*

# **ADDENDUM**

17972

## RULES AND REGULATIONS

Title 32—National Defense

CHAPTER I—OFFICE OF THE SECRETARY OF DEFENSE

SUBCHAPTER M—MISCELLANEOUS

[DoD Instruction 6010.8 and 6010.8-R]

PART 199—IMPLEMENTATION OF THE CIVILIAN AND MEDICAL PROGRAM OF THE UNIFORMED SERVICES

Pursuant to Chapter 55 of title 10, United States Code, Department of Defense Directive 5136.1 as amended, comprehensive regulations implementing the "Civilian Health and Medical Program of the Uniformed Services" (CHAMPUS) were adopted and made effective on January 10, 1977, through approval of Department of Defense Instruction 6010.8 by the Assistant Secretary of Defense for Health Affairs. The adopting Instruction and regulations were concurred in on January 10, 1977, by the Assistant Secretary for Health of the Department of Health, Education, and Welfare. The adopting Instruction and regulations will constitute a new Part 199 to Title 32 of the Code of Federal Regulations.

The adopting Instruction cancelled numerous memorandums and policy statements which previously governed CHAMPUS. Although some of the policies, practices, and procedures contained in those cancelled memorandums and statements have been rescinded or altered in substance by issuance of the new regulations, many have been retained and incorporated in the adopted regulations.

The new regulations comprehensively outline the authorities and responsibilities for the administration of CHAMPUS and identify eligible CHAMPUS beneficiaries and authorized CHAMPUS providers. They also establish the scope of authorized benefits for both the "Basic Program" and the "Program for the Handicapped" of CHAMPUS and set forth substantive and procedural requirements for the submission, review, and payment of claims filed under them. In addition, the regulations fix rules and procedures governing situations where benefits under other programs overlap or duplicate those under CHAMPUS, and they establish an administrative-appeals process which includes informal review, reconsideration of an informal review, and, in certain circumstances, appeal to, or formal review by, the Office of the Civilian Health and Medical Program for the Uniformed Services (OCHAMPUS). In some cases, appealing parties are entitled to an administrative hearing by a hearing officer as part of the appeal process.

Pursuant to a court order issued in the United States District Court for the Northern District of Georgia in the case of Edison v. Department of Defense, the regulations pertaining to the administrative-appeals process were previously published in Volume 41 of the FEDERAL REGISTER at page 47505 on September 29, 1976, to give public notice and to invite public comment. Only a few comments were received, generally expressing concern over the minimum-dollar require-

ments for various levels of appeal. In recognition of this concern, the requirements have been adjusted downward so that a CHAMPUS contractor's decision is final only in cases involving amounts in dispute of $50.00 or less (down from $100.00 or less) and so that there is a right to an administrative hearing by a hearing officer in cases involving amounts in dispute in excess of $300.00 (down from $500.00). In addition, the time to file an amended request for a hearing was extended from 10 to 30 days, and the requirement that a transcript be prepared and a copy provided to an appealing party for all hearings was changed to a requirement that all hearings be taped and a duplicate tape be provided to an appealing party upon request. Other minor changes have also been made for clarification and technical purposes.

With the exception of the sections pertaining to the administrative-appeals process (§ 199.16), the regulations were adopted without use of the proposed rulemaking process (see 32 CFR Part 296). The proposed rulemaking process was not used, because the regulations which do not concern the administrative-appeals process were still being developed until recently. When these regulations were developed, it was determined that further delay in their adoption would be contrary to the public interest (32 CFR 296.2(d)(4)). Among other things, the absence of comprehensive regulations for CHAMPUS has led to administrative difficulties and, in some cases, litigation regarding basic issues like eligibility to benefits, scope of authorized benefits, minimum standards and requirements for authorized providers, acceptable provider billing practices, and reasonable provider charges. In view of these and other problems relating to the administration of CHAMPUS which derive at least in part from the lack of comprehensive implementation, adoption at the earliest practicable date was deemed necessary.

In recognition of the value of public comment, written comments on the adopted regulations comprising new Part 199 are invited until June 3, 1977. Changes resulting from comments received during the 60-day period which operate to increase the rights, benefits, or privileges currently provided in the adopted regulations will be effective retroactively to this date insofar as administratively feasible.

Written comments on these regulations shall include the name and address of the submitting person and reasons for recommended changes. The comments should be submitted to:

Deputy Assistant Secretary of Defense (Health Resources and Programs), Room 3E182, the Pentagon, Washington, D.C. 20301.

32 CFR Chapter I is amended by adding a new Part 199, reading as follows:

Sec.
199.1   Purpose.
199.2   Cancellations.
199.3   Applicability and scope.

Sec.
199.4   Policy.
199.5   Responsibilities.
199.6   Effective date and implementation.
199.7   General provisions.
199.8   Definitions.
199.9   Eligibility.
199.10   Basic program benefits.
199.11   Program of the handicapped.
199.12   Authorized providers.
199.13   Claims submission, review and payment.
199.14   Double coverage.
199.15   Federal Medical Care Recovery Act.
199.16   Appeal and hearing procedures.

AUTHORITY: 10 U.S.C. 1079, 1086, 5 U.S.C. 301.

### § 199.1   Purpose.

This Instruction:

(a) Authorizes publication of DoD Regulation 6010.8-R, "Civilian Health and Medical Program of the Uniform Services (CHAMPUS)."

(b) Sets forth the policies and procedures for:

(1) Dependents of active duty members of the Uniformed Services,

(2) Retired members of the Uniformed Services,

(3) Dependents of retired members of the Uniformed Services, and

(4) Dependents of deceased active duty or deceased retired members of the Uniformed Services.

(c) Furnishes medical benefits to dependents of active duty members of the Armed Forces of the foreign NATO nations, who, in connection with their official duties, are stationed in or passing through the United States.

### § 199.2   Cancellations.

Any memorandum or Instruction not consistent with the policies of this Part, is hereby superseded. Insofar as DoD Directive 6010.4, "Dependents' Medical Care," April 25, 1962 (27 FR 5591, 13 Jun 62), only that section or sections applicable to the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) is hereby superseded and cancelled.

### § 199.3   Applicability and scope.

The provisions of this Part, apply to the Office of the Secretary of Defense, the Military Departments, the Organization of the Joint Chiefs of Staff, the Defense Agencies, and the Unified and Specified Commands (hereinafter referred to collectively as "DoD Components") ; and, by agreement, to the Coast Guard, the Commissioned Corps of the National Oceanic and Atmospheric Administration and the Commissioned Corps of the U.S. Public Health Service.

### § 199.4   Policy.

(a) Regulations pertaining to the administration of the CHAMPUS, which have a substantial and direct impact on the CHAMPUS public, shall be promulgated as an enclosure to this Instruction and published in the FEDERAL REGISTER, in accordance with DoD Directive 5400.9, "Publication of Proposed and Adopted Regulations Affecting the Public," December 23, 1974 (32 CFR 286b).

physician or dentist (except that insulin is covered for a known diabetic, even though a prescription may not be required for its purchase) in connection with an otherwise covered condition or treatment, including Rhogam.

(a) Drugs administered by a physician or other authorized individual professional provider as an integral part of a procedure covered under paragraphs (b) and (c) of this section (such as chemotherapy) are not covered under this subparagraph inasmuch as the benefit for the institutional services or the professional services in connection with the procedure itself also includes the drug used.

(b) CHAMPUS benefits may not be extended for drugs not approved by the Food and Drug Administration for general use by humans (even though approved for testing with humans).

(vii) Phosthetic devices. The purchase of prosthetic devices is limited to artificial limbs and eyes, except those items which are surgically inserted inside the body as an essential and integral part of an otherwise covered surgical procedure are not excluded.

NOTE.—In order for CHAMPUS benefits to be extended, any surgical implant must be approved for use in humans by the U.S. Food and Drug Administration.

(viii) Orthopedic braces and appliances. The purchase of leg braces (including attached shoes), arm braces, back braces and neck braces are covered. Orthopedic shoes, arch supports, etc., including special-ordered, custom-made built-up shoes or regular shoes subsequently built-up, are not covered.

(e) Special benefit information.—(1) General. There are certain circumstances, conditions and/or limitations which impact the extension of benefits and which require special emphasis and explanation. This paragraph (e) sets forth those benefits and/or limitation areas recognized to be in this category. The benefits and/or limitations herein described are also subject to any and all applicable definitions, conditions, limitations, exceptions and/or exclusions as set forth in this or other sections of this Regulation, except as may be otherwise specifically provided in paragraph (e) of this section.

(2) Abortion. Benefits under the CHAMPUS Basic Program are available for otherwise covered services and supplies provided in connection with abortion, when legally performed in accordance with the applicable rulings of the United States Supreme Court in Doe v. Bolton, 410 U.S. 179 (1973), Roe v. Wade, 410 U.S. 113 (1973) and Planned Parenthood of Missouri v. Danforth, —— U.S. ——, 96 S.Ct. 2831 (1976).

NOTE.—Covered abortion services are limited to medical services and/or supplies only and do not include abortion counseling or referral fees.

(3) Family planning. It is considered essential that CHAMPUS-eligible families have access to information and services that will allow freedom to choose the number and spacing of their chil-

dren within the dictates of individual conscience. The scope of the CHAMPUS family planning benefit is as follows:

(i) Birth control (i.e., contraception). —(a) Benefits provided. Benefits are available for services and supplies related to preventing conception, including the following:

(1) Surgical insertion, removal and/or replacement of, intrauterine devices.

(2) Measurement for, and purchase of, contraceptive diaphragms (and subsequent remeasurement and replacement).

(3) Prescription oral contraceptives.

(4) Surgical sterilization (either male or female).

(b) Exclusions. The Family Planning benefit does not include the following:

(1) Prophylactics (condoms).

(2) Spermicidal foams, jellies, sprays, etc., not requiring a prescription.

(3) Artificial insemination including any costs related to donors and/or semen banks.

(4) Reversal of a surgical sterilization procedure (male or female).

(ii) Genetic testing. Genetic testing is essentially preventive rather than related to active medical treatment of an illness or injury. However, under the Family Planning benefit, genetic testing is covered when performed in certain high risk situations. For the purpose of CHAMPUS, genetic testing includes tests to detect developmental abnormalities as well as purely genetic defects.

(a) Benefits provided. Benefits may be extended for genetic testing performed on a pregnant beneficiary under the following prescribed circumstances. The tests must be appropriate to the specific risk situation and must meet one of the following criteria:

(1) The mother-to-be is 35 years of age or older; or

(2) The mother and/or father-to-be have (has) had a previous child born with a congenital abnormality; or

(3) Either the mother or father-to-be has a family history of congenital abnormalities; or

(4) The mother-to-be contracted rubella during the first trimester of the pregnancy; or

(5) Such other specific situations as may be determined by the Director, OCHAMPUS (or a designee) to fall within the intent of this paragraph (e) (3) (ii).

(b) Exclusions. It is emphasized that routine or demand genetic testing is not covered. Further, genetic testing does not include the following:

(1) Tests performed to establish paternity of a child.

(2) Tests to determine the sex of an unborn child.

(4) Alcoholism. Inpatient hospital stays may be required for detoxification services during acute stages of alcoholism when the patient is suffering from delirium, confusion, trauma, unconsciousness and severe malnutrition, and is no longer able to function. During such acute periods of detoxification and physical stabilization (i.e., "drying out") of the alcoholic patient, it is generally accepted that there can be a need for medi-

cal management of the patient; i.e., there is a probability that medical complications will occur during alcohol withdrawal, necessitating the constant availability of physicians and/or complex medical equipment found only in a hospital setting. Therefore, inpatient hospital care, during such acute periods and under such conditions, is considered reasonable and medically necessary for the treatment of the alcoholic patient and thus covered under CHAMPUS. Active medical treatment of the acute phase of alcoholic withdrawal and the stabilization period usually takes from 3 to 7 days.

(i) Rehabilitative phase. An inpatient stay for alcoholism (either in a hospital or through transfer to another type of authorized institution) may continue beyond the 3 to 7 day period, moving into the rehabilitative program phase. Each such case will be reviewed on its own merits to determine whether an inpatient setting continues to be required.

Example. If a continued inpatient rehabilitative stay primarily involves administration of antabuse therapy and the patient has no serious physical complications otherwise requiring an inpatient stay, the inpatient environment would not be considered necessary and therefore benefits could not be extended.

(ii) Repeated rehabilitative stays: Limited to 3 episodes. Even if a case is determined to be appropriately continued on an inpatient basis, repeated rehabilitative stays will be limited to 3 episodes (lifetime maximum); and any further rehabilitative stays are not eligible for benefits. However, inpatient stays for the acute stage of alcoholism requiring detoxification/stabilization will continue to be covered. When the inpatient hospital setting is medically required, a combined program of detoxification/stabilization and rehabilitation will normally not be approved for more than a maximum of 3 weeks per episode.

(iii) Outpatient psychiatric treatment programs. Otherwise medically necessary covered services related to outpatient psychiatric treatment programs for alcoholism are covered and continue to be covered even though benefits are not available for further inpatient rehabilitative episodes, subject to the same psychotherapy review guidelines as other diagnoses. (Refer to paragraph (c) of this section; also refer to § 199.13, "Claims Submission, Review and Payment.")

(iv) Review Guidelines and Criteria. The Director, OCHAMPUS (or a designee), will issue specific instructions, guidelines and criteria for review of claims for services and supplies related to alcoholism.

(5) Organ transplants. CHAMPUS Basic Program benefits are available for otherwise covered services and/or supplies in connection with an organ transplant procedure: Provided, Such transplant procedure is generally in accordance with accepted professional medical standards, and is not considered to be experimental.

(i) Recipient costs. CHAMPUS benefits are payable for recipient costs when

the recipient of the transplant is a beneficiary, whether or not the donor is a beneficiary.

(ii) *Donor costs.* (a) Donor costs are payable when both the donor and recipient are CHAMPUS beneficiaries.

(b) Donor costs are payable when the donor is a CHAMPUS beneficiary but the recipient is not.

(c) Donor costs are payable when the donor is the sponsor and the recipient is a beneficiary. (In such an event donor costs are paid as a part of the beneficiary/recipient costs.)

(d) Donor costs are also payable when the donor is neither a CHAMPUS beneficiary nor a sponsor, if the recipient is a CHAMPUS beneficiary. (Again, in such an event donor costs are paid as a part of the beneficiary/recipient costs.)

(iii) *General limitations.* (a) If the donor is not a beneficiary, CHAMPUS benefits for donor costs are limited to those directly related to the transplant procedure itself and do not include any medical care costs related to other treatment of the donor, including complications.

(b) In most instances, for costs related to kidney transplants, Medicare (not CHAMPUS) benefits will be applicable. (Refer to paragraph (e)(3)(vi) "Eligibility.")

(c) Donor transportation costs are excluded whether or not the donor is a beneficiary.

(d) Where the organ transplant is performed under a study, grant or research program, no CHAMPUS benefits are payable for either recipient or donor cost.

(iv) *Kidney acquisition.* With specific reference to acquisition costs for kidneys, each hospital which performs kidney transplants is required for Medicare purposes to develop for each year separate standard acquisition costs for kidneys obtained from live donors and kidneys obtained from cadavers. The standard acquisition cost for cadaver kidneys is compiled by dividing the total cost of transplants using cadaver kidneys. The standard acquisition cost for kidneys from live donors is compiled similarly using the total acquisition cost of kidneys from live donors and the number of transplants using kidneys from live donors. All recipients of cadaver kidneys are charged the same standard cadaver kidney acquisition cost and all recipients of kidneys from live donors are charged the same standard live donor acquisition cost. The appropriate hospital standard kidney acquisition costs (live donor or cadaver) required for Medicare must in every instance be used as the acquisition cost for purposes of providing CHAMPUS benefits.

(6) *Eyeglasses, spectacles, contact lenses or other optical devices.* Eyeglasses, spectacles, contact lenses or other optical devices are excluded under the CHAMPUS Basic Program except under very limited and specific circumstances.

(i) *Exception to general exclusion.* Benefit for glasses and lenses may be

extended only in connection with the following specified eye conditions and circumstances:

(a) Eyeglasses or contact lenses which perform the function of the human lens, lost as the result of intraocular surgery or ocular injury.

(b) "Pinhole" glasses prescribed for use after surgery for detached retina.

(c) Lenses prescribed as "treatment" in lieu of surgery for the following conditions:

(1) Contact lenses used for treatment of infantile glaucoma.

(2) Corneal or scleral lenses prescribed in connection with treatment of keratoconus.

(3) Scleral lenses prescribed to retain moisture in cases where normal tearing is not present or is inadequate.

(4) Corneal or scleral lenses prescribed to reduce a corneal irregularity other than astigmatism.

(ii) *Limitations.* The specified benefits are further limited to 1 set of lenses related to one of the qualifying eye conditions set forth in paragraph (e)(6)(i) of this section. If there is a prescription change requiring a new set of lenses (but still related to the qualifying eye condition), benefits may be extended for a second set of lenses, subject to specific medical review.

(7) *Transsexualism or hermaphroditism.* All services and supplies directly or indirectly related to transsexualism (or such other conditions as gender dysphoria) or hermaphroditism are excluded under the CHAMPUS Program. This exclusion includes, but is not limited to, psychotherapy, prescription drugs, intersex surgery, etc., which may be provided in connection with transsexualism or hermaphroditism. There is only one very limited exception to this general exclusion: notwithstanding the definition of congenital anomaly, CHAMPUS benefits may be extended for surgery performed on a child ten (10) years of age or under to correct sex gender confusion (i.e., ambiguous genitalia).

(8). *Cosmetic, reconstructive and/or plastic surgery.* For the purposes of CHAMPUS, cosmetic, reconstructive and/or plastic surgery is that surgery which can be expected primarily to improve physical appearance and/or which is performed primarily for psychological purposes and/or which restores form, but does not correct or materially improve a bodily function.

NOTE.—If a surgical procedure primarily restores function, whether or not there is also a concomitant improvement in physical appearance, the surgical procedure does not fall within the provisions set forth in this section.

(i) *Limited benefits under CHAMPUS.* Benefits under the CHAMPUS Basic Program are generally not available for cosmetic, reconstructive and/or plastic surgery. However, under certain limited circumstances, benefits for otherwise covered services and supplies may be provided in connection with cosmetic, reconstructive and/or plastic surgery, as follows:

(a) Correction of a congenital anomaly; or

(b) Restoration of body form following an accidental injury; or

(c) Revision of disfiguring and extensive scars resulting from neoplastic surgery.

(d) Generally, benefits are limited to those cosmetic, reconstructive and/or plastic surgery procedures performed no later than December 31 of the year following the year in which the related accidental injury or surgical trauma occurred. However, special consideration for exception will be given to cases involving children, which may require a growth period.

(ii) *General exclusions.* (a) For the purpose of CHAMPUS, dental congenital anomalies such as absent tooth buds, malocclusion, etc., are specifically excluded. Also excluded are any procedures related to transsexualism or hermaphroditism, except as otherwise specifically provided in paragraph (e)(7) of this section.

(b) Cosmetic, reconstructive and/or plastic surgery procedures performed primarily for psychological reasons or as a result of the aging process are also excluded.

(c) In addition, whether or not they would otherwise qualify for benefits under paragraph (e)(8)(i) of this section, the breast augmentation mammoplasty, surgical insertion of prosthetic testicles and the penile implant procedure are specifically excluded.

(iii) *Non-covered surgery: All related services and supplies excluded.* When it is determined that a cosmetic, reconstructive and/or plastic surgery procedure does not qualify for CHAMPUS benefits, all related services and supplies are excluded, including any institutional costs.

(iv) *Preauthorization required.* In order for CHAMPUS benefits to be extended for cosmetic, reconstructive and plastic surgery procedures which might qualify under paragraph (e)(8) of this section, preauthorization is required from the Director, OCHAMPUS (or a designee).

(a) Such preauthorization requests must include full details of the proposed cosmetic, reconstructive and/or plastic surgery procedure, including photographs of the defect to be surgically corrected.

(b) When a preauthorization request is approved, it is for a specific surgical procedure and is valid for only 90 days from date of issuance.

(c) If the approved cosmetic, reconstructive and/or plastic surgical procedure is not performed within the 90 day period, a new preauthorization is required.

(d) Preauthorization is required for each specific procedure even though a series of surgical procedures is related to the correction of one defect or condition (for example, one which requires that the corrective surgery be done in steps). A preauthorization is not valid for any surgical procedure except as specifically stated in the preauthorization.

Note.—If a surgical procedure primarily restores function, whether or not there is a concomitant improvement in physical appearance, there is no requirement for preauthorization. However, if a surgical procedure only marginally improves function or if there is any question on the part of the surgeon or beneficiary (or sponsor), OCHAMPUS should be contacted for a determination prior to performing the surgery.

(v) *Examples of non-covered cosmetic, reconstructive* and/or *plastic surgery procedures.* The following is a partial list of cosmetic, reconstructive and/or plastic surgery procedures which Do Not Qualify for Benefits under CHAMPUS. This list is for example purposes only, and is not to be construed as being all-inclusive.

(a) Any procedure performed for personal reasons, to improve the appearance of an obvious feature or part of the body which would be considered by an average observer to be normal and acceptable for the patient's age and/or ethnic and/or racial background.

(b) Cosmetic, reconstructive and/or plastic surgical procedures which are justified primarily on the basis of a psychological or psychiatric need.

(c) Augmentation mammoplasties.

(d) Face lifts and other precedures related to the aging process.

(e) Reduction mammoplasties (unless there is medical documentation of intractable pain not amenable to other forms of treatment, as the result of increasingly large, pendulous breasts).

(f) Panniculectomy; body sculpture procedures.

(g) Repair of sagging eyelids (without demonstrated and medically documented significant impairment of vision).

(h) Rhinoplasties (without evidence of accidental injury occurring within the previous 6 months which resulted in significant obstruction of breathing).

(i) Chemical peeling for facial wrinkles.

(j) Dermabrasion of the face.

(k) Revision of scars resulting from surgery and/or a disease process, except disfiguring and extensive scars resulting from neoplastic surgery.

(l) Removal of tatoos.

(m) Hair transplants.

(n) Electrolysis.

(o) Any procedures related to Transsexualism or Hermaphroditism, except as specifically provided in paragraph (e) (7) of this section.

(p) Penile implant procedure.

(q) Insertion or prosthetic testicles.

(9) *Complications* (*unfortunate Sequelae*) *resulting from non-covered initial surgery/treatment.* Benefits are available for otherwise covered services and supplies required in the treatment of complications resulting from a non-covered incident of treatment (such as non-adjunctive dental care, transsexual surgery, cosmetic surgery, etc.), but only if the subsequent complication represents a separate medical condition such as a systemic infection, cardiac arrest, acute drug reaction, etc. Benefits may not be extended for any subsequent care or procedure related to the complication that is essentially similar to the initial non-covered care. Examples of complica-

tions similar to the initial episode of care (and thus not covered) would be repair of facial scarring resulting from dermabrasion for acne or repair of a prolapsed vagina in a biological male who had undergone transsexual surgery.

(10) *Dental.* The CHAMPUS Program does not include a dental benefit. Under very limited circumstances, benefits are available for dental services and supplies when the dental services are adjunctive to otherwise covered medical treatment.

(i) *Adjunctive dental care: Limited.* Adjunctive dental care is limited to that dental care which is medically necessary in the treatment of an otherwise covered medical (not dental) condition, is an integral part of the treatment of such medical condition and is essential to the control of the primary medical condition.

(a) Elimination of a non-local oral infection (such as cellulitis or osteitis) which is clearly exacerbating and directly affecting a medical condition currently under treatment would be an example of adjunctive dental care.

(b) Another example of adjunctive dental care would be where teeth and tooth fragments must be removed in order to treat and repair facial trauma resulting from an accidental injury.

Note.—The test of whether or not dental trauma is covered is whether or not the trauma is solely dental trauma. Dental trauma must be related to, and an integral part of, medical trauma in order to be covered as adjunctive dental care.

(ii) *General exclusions.* Generally, preventive, routine, restorative, prosthodontic and/or emergency dental care are not covered by CHAMPUS.

(a) Dental care which is essentially preventive and (even if performed to prevent a potential medical condition) which is not an integral part of the treatment of a medical (not dental) condition, does not qualify as adjunctive dental care for the purposes of CHAMPUS. An example would be routine dental care provided a rheumatic heart patient as a "preventive" measure.

(b) Adjunctive care which does not include dental services which involve only the teeth and/or their supporting structure, even if the result of an accident. An example would be the child who falls and breaks, chips or loosens a tooth.

(c) Adjunctive dental care does not include restoration or peridontal splinting of teeth and/or dental prosthesis, whether permanent or temporary and whether required as a result of an accidental injury or whether injured, affected or fractured during the medical or surgical management of a medical condition.

(d) Adjunctive dental care does not include treatment of peridontal disease and/or the consequence of peridontal disease; nor does it include such dental services as filling cavities or adding or modifying bridgework to assist in mastication whether or not related to gastro-intestinal or hematopoietic diseases.

(e) All orthodontia is specifically excluded, except when directly related to and as an integral part of, surgical cor-

rection of cleft palate congenital anomaly.

(iii) *Preauthorization required.* Adjunctive dental care, in order to be covered, requires prior approval and written preauthorization from the Director, OCHAMPUS (or a designee).

(a) The preauthorization request must include a detailed statement from the dentist as to the dental procedure to be performed and its cost, and a statement from the attending physician providing the medical evidence as to its relationship to a medical condition currently under treatment.

(b) Such preauthorization is for specific dental service and is valid for only 90 days from date of issuance.

(c) If the approved adjunctive dental care is not rendered within the 90 day period, a new preauthorization is required. However, unless some unusual medical circumstance occurs, the fact that the dental care was not rendered during the specified time limit will raise significant question as to whether it was, in fact, adjunctive.

(d) Preauthorization is required for each specific adjunctive dental service or appliance (i.e., each instance of dental care), even though related to an ongoing medical episode. A preauthorization is not valid for any adjunctive dental service or supply except as specifically stated in the preauthorization.

(e) Where adjunctive dental care involves an emergency medical (not dental) situation (such as facial injuries resulting from an accident), preauthorization is waived. However, such waiver is limited to the essential adjunctive dental care related to the medical condition requiring the immediate emergency treatment. When claims are submitted for such adjunctive dental care rendered in an emergency situation, a complete explanation along with supporting medical documentation must be submitted.

(iv) *Covered oral surgery.* Notwithstanding the above limitations on dental care, there are certain oral surgical procedures which are performed by both physicians and dentists, and which are essentially medical rather than dental care. For the purposes of CHAMPUS, the following procedures, whether performed by a physician or dentist, are considered to be in this category and benefits may be extended for otherwise covered services and supplies without preauthorization:

(a) Excision of tumors and cysts of the jaws, cheeks, lips, tongue, roof and floor of the mouth, when such conditions require a pathological (histological) examination.

(b) Surgical procedures required to correct accidental injuries of the jaws, cheeks, lips, tongue, roof and floor of the mouth.

(c) Treatment of oral and/or facial cancer.

(d) Treatment of fractures of facial bones.

(e) External (extra-oral) incision and drainage of cellulitis.

(f) Surgery of accessory sinuses, salivary glands or ducts.

(g) Reduction of dislocations of and the excision of the temporamandibular joints, when surgery is a necessary part of the reduction.

(h) Any oral surgical procedure which falls within the cosmetic, reconstructive and/or plastic surgery definition is subject to the limitations and requirements set forth in paragraph (e) (8) of § 199.10, "Basic Program Benefits".

NOTE.—Preparation of the mouth for dentures is not a covered oral surgery procedure. Also excluded are the removal of unerupted or partially erupted, malposed and/or impacted teeth, with or without the attached follicular or development tissues.

(v) *Inpatient hospital stay in connection with nonadjunctive, non-covered dental care.* Institutional benefits specified in paragraph (b) of this section may be extended for inpatient hospital stays related to non-covered, non-adjunctive dental care when such inpatient stay is medically necessary to safeguard the life of the patient from the effects of dentistry because of the existence of a specific and serious non-dental organic impairment currently under active treatment. (Hemophilia is an example of a condition that could be considered a serious non-dental impairment.) Preauthorization by OCHAMPUS is required for such inpatient stay to be covered in the same manner as required for adjunctive dental care described in paragraph (e) (10) (iii) (and its subparts) of this section. Regardless of whether or not the preauthorization request for the hospital admission is approved and thus qualifies for institutional benefits, the professional service related to the non-adjunctive dental care is not covered.

(11) *Drug Abuse.* Under the CHAMPUS Basic Program, benefits may be extended for medically necessary prescription drugs required in the treatment of an illness or injury or in connection with maternity care (refer to paragraph (d) of this section). However, CHAMPUS benefits cannot be authorized to support and/or maintain an existing or potential drug abuse situation, whether or not the drugs (under other circumstances) are eligible for benefit consideration and whether or not obtained by legal means.

(i) *Limitations on who can prescribe drugs.* CHAMPUS benefits are not available for any drugs prescribed by a member of the beneficiary/patient's family or by a non-family member residing in the same household with the beneficiary/patient (or sponsor). CHAMPUS Contractors are not authorized to make any exception to this restriction.

(ii) *Drug maintenance programs excluded.* Drug maintenance programs where one addictive drug is substituted for another on a maintenance basis (such as methadone substituted for heroin) are not covered. Further, this exclusion applies even in areas outside the United States where addictive drugs are legally dispensed by physicians on a maintenance dosage level.

(iii) *Kinds of prescription drugs which are carefully monitored by CHAMPUS for possible abuse situations.*

(a) *Narcotics.* Examples are morphine and demerol.

(b) *Non-Narcotic Analgesics.* Examples are Talwin and Darvon.

(c) *Tranquilizers.* Examples are Valium, Librium, and Meprobamate.

(d) *Barbiturates.* Examples are Seconal and Nembutal.

(e) *Non-Barbiturate Hypnotics.* Examples are Doriden and Chloral Hydrate.

(f) *Stimulants.* Examples are Amphetamines and Methedrine.

(iv) *CHAMPUS contractor responsibilities.* CHAMPUS Contractors are responsible for implementing utilization control and quality assurance procedures designed to identify possible drug abuse situations. The CHAMPUS Contractor is directed to screen all drug claims for potential over-utilization and/or irrational prescribing of drugs, and to subject any such cases to extensive review to establish the necessity for the drugs and their appropriateness on the basis of diagnosis and/or definitive symptoms.

(a) When a possible drug abuse situation is identified, all claims for drugs for that beneficiary and/or provider will be suspended pending the results of a review.

(b) If the review determines that a drug abuse situation does in fact exist, all drug claims held in suspense will be denied.

(c) If the record indicates previously paid drug benefits, the prior claims for that beneficiary and/or provider will be reopened and the circumstances involved reviewed to determine whether or not a drug abuse situation also existed at the time the earlier claims were adjudicated. If drug abuse is subsequently ascertained, benefit payments previously made will be considered to have been extended in error and the amount paid recouped.

(d) Inpatient stays primarily for the purpose of obtaining drugs and any other service and supplies related to drug abuse situations are also excluded.

(v) *Unethical or illegal provider practices related to drugs.* Any such investigation into a possible drug abuse situation which uncovers unethical or illegal drug dispensing practices on the part of an institution or physician will be referred to the professional and/or investigative agency having jurisdiction. CHAMPUS Contractors are directed to withhold payment of all CHAMPUS claims for services and/or supplies rendered by a provider under active investigation for possible unethical or illegal drug dispensing activities.

(vi) *Detoxification.* The above monitoring and control of drug abuse situations shall in no way be construed to deny otherwise covered medical services and supplies related to drug detoxification (including newborn addicted infants) when medical supervision is required.

(12) *Custodial care.* The statute under which CHAMPUS operates specifically excludes custodial care. This is a very difficult area to administer. Further, many beneficiaries (and sponsors) misunderstand what is meant by custodial care, assuming that because custodial care is not covered, it implies the custodial care is not necessary. This is not the case; denial of benefits only means the care being provided is not a type of care for which CHAMPUS benefits can be extended.

(i) *Definition of custodial care.* Custodial Care is defined to mean that care rendered to a patient (a) who is mentally or physically disabled and such disability is expected to continue to be prolonged, and (b) who requires a protected, monitored and/or controlled environment whether in an institution or in the home, and (c) who requires assistance to support the essentials of daily living, and (d) who is not under active and specific medical, surgical and/or psychiatric treatment which will reduce the disability to the extent necessary to enable the patient to function outside the protected, monitored and/or controlled environment. A custodial care determination is not precluded by the fact that a patient is under the care of a supervising and/or attending physician and that services are being ordered and prescribed to support and generally maintain the patient's condition, and/or provide for the patient's comfort, and/or assure the manageability of the patient. Further, a custodial care determination is not precluded because the ordered and prescribed services and supplies are being provided by a R.N. or L.P.N.

(ii) *Kinds of conditions that can result in custodial care.* There is no absolute rule that can be applied. With most conditions there is a period of active treatment before custodial care, some much more prolonged than others. Examples of potential custodial care cases might be a spinal cord injury resulting in extensive paralysis, a severe cerebral vascular accident, multiple sclerosis in its latter stages, or pre-senile and senile dementia. These conditions do not necessarily result in custodial care but are indicative of the types of conditions that sometimes do. It is not the condition itself that is controlling but whether the care being rendered falls within the definition of custodial care.

(iii) *Benefits available in connection with a custodial care case.* CHAMPUS benefits are not available for services and/or supplies related to a custodial care case (including the supervisory physician's care), with the following specific exceptions:

(a) *Prescription drugs.* Benefits are payable for otherwise covered prescription drugs, even if prescribed primarily for the purpose of making the person receiving custodial care manageable in the custodial environment.

(b) *Nursing services: Limited.* It is recognized that even though the care being received is determined to be primarily custodial, an occasional specific skilled nursing service may be required. Where it is determined such skilled nursing services are needed, benefits may be extended for 1 hour of nursing care per day.

(c) *Payment for prescription drugs and limited skilled nursing services does not affect custodial care determination.* The fact that CHAMPUS extends benefits for prescription drugs and limited skilled nursing services in no way affects the custodial care determination if the case otherwise falls within the definition of custodial care.

(iv) *Beneficiary recieving custodial care: Admission to a hospital.* CHAMPUS Benefits may be extended for otherwise covered services and/or supplies directly related to a medically necessary admission to an acute general or special hospital, under the following circumstances:

(a) *Presence of another condition.* When a beneficiary receiving custodial care requires hospitalization for the treatment of a condition other than the condition for which he or she is receiving custodial care (an example might be a broken leg as a result of a fall); or

(b) *Acute exacerbation of the condition for which custodial care is being received.* When there is an acute exacerbation of the condition for which custodial care is being received which requires active inpatient treatment which is otherwise covered.

(13) *Domiciliary care.* The statute under which CHAMPUS operates also specifically excludes domiciliary care. This is another area that is often misunderstood by beneficiaries (and sponsors).

(i) *Definition of domiciliary care.* Domiciliary care is defined to mean inpatient institutional care provided the beneficiary, not because it is medically necessary, but because the care in the home setting is not available, is unsuitable and/or members of the patient's family are unwilling to provide the care. Institutionalization because of abandonment constitutes domiciliary care.

(ii) *Examples of domiciliary care situations.* The following are examples of domiciliary care for which CHAMPUS benefits are not payable:

(a) *Home care is not available.* Institutionalization primarily because parents work, or extension of a hospital stay beyond what is medically required because the patient lives alone, are examples of domiciliary care provided because there is no other family member or other person available in the home.

(b) *Home care is not suitable.* Institutionalization of a child because a parent or (parents) is an alcoholic who is not sufficiently responsible to care for the child, or because someone in the home has a contagious disease, are examples of domiciliary care being provided because the home setting is unsuitable.

(c) *Family unwilling to care for individual in the home.* A child who is difficult to manage may be placed in an institution, not because institutional care is medically required, but because the family does not want to handle him or her in the home. Such institutionalization would represent domiciliary care, i.e., the family being unwilling to assume responsibility for the child.

(iii) *Benefits available in connection with a domiciliary care case.* Should the

beneficiary receive otherwise covered medical services and/or supplies while also being in a domiciliary care situation, CHAMPUS benefits are payable for those medical services and/or supplies in the same manner as though the beneficiary resided in his or her own home. Such benefits would be cost-shared as though rendered to an outpatient.

(iv) *General exclusion.* Domiciliary care is institutionalization essentially to provide a substitute home—not because it is medically necessary for the beneficiary to be in the institution (although there may be conditions present which have contributed to the fact that domiciliary care is being rendered). CHAMPUS benefits are not payable for any costs/charges related to the provision of domiciliary care. While a substitute home and/or assistance may be necessary for the beneficiary, domiciliary care does not represent the kind of care for which CHAMPUS benefits can be provided.

(f) *Beneficiary (or sponsor) liability.* (1) *General.* As stated in the introductory paragraph to this section, the CHAMPUS Basic Program is essentially a supplemental program to the Uniformed Services direct medical care system. In order to encourage use of the Uniformed Services direct medical care system wherever its facilities are available and appropriate, the CHAMPUS Basic Program benefits are designed so that it is to the financial advantage of a CHAMPUS beneficiary (or sponsor) to use the direct medical care system. When medical care is received from civilian sources, a CHAMPUS beneficiary is responsible for payment of certain deductible and cost-sharing amounts in connection with otherwise covered services and supplies. By statute, this joint financial responsibility between the beneficiary (or sponsor) and CHAMPUS is more favorable for dependents of active duty members than for other classes of beneficiaries.

(2) *Dependents of active duty members of the Uniformed Services.* CHAMPUS beneficiary (or sponsor) liability set forth for dependents of active duty members is as follows:

(i) *Annual fiscal year deductible for outpatient services. and/or supplies.* A CHAMPUS beneficiary (or sponsor) is responsible for the payment of the first fifty ($50) dollars of the CHAMPUS-determined reasonable costs/charges for otherwise covered outpatient services and/or supplies provided in any one fiscal year. However, when such outpatient services are provided to more than one beneficiary member of a family during the same fiscal year, the aggregate outpatient deductible amount paid by any two or more beneficiary members of the family, who submit claims, shall not exceed one hundred ($100) dollars during any fiscal year.

NOTE.—The Federal Government's current fiscal year runs from October 1 through September 30 of each year. This fiscal year period became effective October 1, 1976. Prior to that time, the fiscal year period ran from July 1 through June 30 of each year. For pur-

poses of applying the CHAMPUS fiscal year outpatient deductible provision, the transitional quarter July 1, 1976 through September 30, 1976, is considered to be a part of the fiscal year commencing July 1, 1975. Thus for the purposes of satisfying the annual fiscal year outpatient deductible, CHAMPUS beneficiaries have the advantage of a one-time 15-month fiscal year, running from July 1, 1975, through September 30, 1976.

(a) In any one fiscal year, if only one beneficiary member of a family files a claim (regardless of the number of beneficiary members actually in the family), that beneficiary member is only required to satisfy a fifty ($50) dollar annual fiscal year deductible for outpatient services and/or supplies as described in paragraph (f) (2) (i) of this section.

(b) In any one fiscal year, if 2 or more beneficiary members of a family file claims, the total amount of which is less than one hundred ($100) dollars, but none of the beneficiary members submit a claim for over fifty ($50) dollars, no CHAMPUS benefits are payable for otherwise covered outpatient services and/or supplies provided such beneficiary members during that particular fiscal year.

(c) For any family, the outpatient deductible amounts will be applied sequentially, as the CHAMPUS claims are submitted.

(d) If the fiscal year outpatient deductible has been met by a beneficiary ($50) or a family ($100 aggregate) through the submission of a claim(s) to a CHAMPUS Contractor in another geographic location from the location where a current claim is being submitted, the beneficiary (or sponsor) must obtain a deductible certificate from the CHAMPUS Contractor where the applicable individual and/or family fiscal year deductible was met. Such deductible certificate must be attached to the current claim being submitted for benefits. Failure to obtain a deductible certificate under such circumstances will result in a second individual and/or family fiscal year deductible being applied. However, this second deductible may be reimbursed once appropriate documentation as described in this paragraph (f) (2) (i) (d) of this section is supplied to the CHAMPUS Contractor applying the second deductible. (Refer to paragraph (a) of § 199.13, "Claims Submission, Review and Payment.")

(ii) *Inpatient cost-sharing.* Dependents of active duty members of the Uniformed Services (or their sponsors) are responsible for the payment of the first twenty-five ($25) dollars of the reasonable institutional costs incurred with each covered inpatient admission to a hospital or other authorized institutional provider (refer to § 199.12 "Authorized Providers"), or the amount the beneficiary/patient (or sponsor) would have been charged had the inpatient care been provided in a Uniformed Service hospital, whichever is greater.

NOTE.—The Secretary of Defense (after consulting with the Secretary of Health, Education and Welfare), prescribes the fair charges for inpatient hospital care provided through Uniformed Services medical facili-

ties. This determination is currently made on an annual basis. The following chart gives the applicable amounts for each calendar year since 1966:

| Calendar year | Charge per day |
|---|---|
| 1966 | $1.75 |
| 1967 | 1.75 |
| 1968 | 1.75 |
| 1969 | 1.75 |
| 1970 | 1.75 |
| 1971 | 1.75 |
| 1972 | 1.75 |
| 1973 | 1.75 |
| 1974 | 3.50 |
| 1975 | 3.70 |
| 1976 | 3.90 |
| 1977 | 4.10 |

(a) *Inpatient cost-sharing payable with each separate inpatient admission.* A separate cost-sharing amount (as described in paragraph (f) (2) of this section) is payable for each inpatient admission to a hospital or other authorized institution regardless of the purpose of the admission (i.e., maternity, surgery, etc.), regardless of the number of times the beneficiary/patient is admitted and regardless of whether or not the in-patient admissions are for the same or related conditions; except that successive inpatient admissions shall be deemed one inpatient confinement for the purpose of computing the inpatient cost-share payable, provided not more than 60 days have elapsed between the successive admissions. However, notwithstanding this provision, all admissions related to a single maternity episode shall be considered one confinement, regardless of the number of days between admissions. (Refer to paragraph (b) of this section.)

(b) *Multiple family inpatient admissions.* A separate cost-sharing amount is payable for each inpatient admission regardless of whether or not 2 or more beneficiary members of a family are admitted at the same time and/or from the same cause (such as an accident). A separate beneficiary inpatient cost-sharing amount must be applied for each separate admission of each beneficiary member of the family.

(c) *Newborn: Patient in his or her own right.* When a newborn infant remains as an inpatient in his or her own right (usually after the mother is discharged), the newborn child becomes the beneficiary/patient and the extended inpatient stay becomes a separate inpatient admission. In such a situation a new, separate inpatient cost-sharing amount is applied. If a multiple birth is involved (i.e., twins, triplets, etc.), and 2 or more newborn infants become patients in their own right, a separate inpatient cost-sharing amount must be applied to the inpatient stay for each newborn child who has remained as an inpatient in his or her own right.

(iii) *Outpatient cost-sharing.* Dependents of active duty members of the Uniformed Services (or their sponsors) are responsible for payment of 20 percent of the CHAMPUS-determined reasonable cost/charge in excess of the annual fiscal year deductible amount (as described in paragraph (f) (2) (i) of this section) for otherwise covered services and/or supplies provided on an outpatient basis by authorized providers. (Refer to § 199.12, "Authorized Providers.")

(3) *Retirees; dependents of retirees; dependents of deceased active duty members; and dependents of deceased retirees.* CHAMPUS beneficiary liability set forth for retirees, dependents of retirees, dependents of deceased active duty members, and dependents of deceased retirees is as follows:

(i) *Annual fiscal year deductible for outpatient services and/or supplies.* The annual fiscal year deductible for otherwise covered outpatient services and/or supplies provided retirees, dependents of retirees, dependents of deceased active duty members, and dependents of deceased retirees is identical to the annual fiscal year outpatient deductible applicable to dependents of active duty members. (Refer to paragraph (f) (2) (i) of this section.)

(ii) *Inpatient cost-sharing.* Retirees, dependents of retirees, dependents of deceased active duty members, and dependents of deceased retirees are responsible for the payment of 25 percent of the CHAMPUS-determined reasonable costs/charges for otherwise covered services and/or supplies provided on an inpatient basis by an authorized provider.

(iii) *Outpatient cost-sharing.* Retirees, dependents of retirees, dependents of deceased active duty members, and dependents of deceased retirees are responsible for payment of 25 percent of the CHAMPUS-determined reasonable costs/charges in excess of the annual fiscal year deductible amount (as described in paragraph (f) (2) (ii) of this section) for otherwise covered services and/or supplies provided on an outpatient basis by authorized providers.

(4) *Amounts in excess of CHAMPUS-determined reasonable costs/charges.* It is the responsibility of the CHAMPUS Contractor to determine reasonable costs for services and supplies provided by hospitals and other institutions and reasonable charges for services and supplies provided by physicians, other individual professional providers, and other providers. Such CHAMPUS-determined reasonable costs/charges are made in accordance with the provisions of paragraph (e) of § 199.12, "Authorized Providers." All CHAMPUS benefits, including calculation of the CHAMPUS and/or beneficiary cost-sharing amounts, are based on such CHAMPUS-determined reasonable costs/charges. The effect on the beneficiary when the billed cost/charge is in excess of the CHAMPUS-determined reasonable amount is dependent upon whether or not the applicable claim was submitted on a participating basis on behalf of the beneficiary/patient or submitted directly by the beneficiary on a non-participating basis. This provision applies to all classes of CHAMPUS beneficiaries.

NOTE.—In any situation where the provider "forgives" or "waives" any beneficiary liability, such as amounts applicable to the annual Fiscal Year deductible for outpatient

services and/or supplies, or the inpatient or outpatient cost-sharing as previously set forth in this section, the CHAMPUS-determined reasonable charge/cost allowance (whether payable to the CHAMPUS beneficiary or sponsor, or to a participating provider) shall be reduced by the same amount.

(i) *Participating provider.* Under CHAMPUS, an authorized provider has the option of participating on a claim-by-claim basis. If a provider elects to participate, the provider signs the applicable CHAMPUS claim form(s) and submits it to the appropriate CHAMPUS Contractor. (In the case of an institution or medical supplier, the claim must be signed by an individual having such authority.) This signature certifies that the provider has agreed to accept the CHAMPUS-determined r e a s o n a b l e charge/cost as payment in full for the medical services and supplies listed on the specific claim form; and further has agreed to accept the amount paid by CHAMPUS and/or the CHAMPUS payment combined with the cost-sharing amount paid by (or in behalf of) the beneficiary/patient, as full payment for the covered medical services and/or supplies. Therefore, when costs/charges are submitted on a participating basis, the patient is not obligated to pay any amounts disallowed as being in excess of the CHAMPUS-determined reasonable cost/charge for authorized medical services and/or supplies.

(ii) *Non-participating providers.* Non-participating providers are those providers who do not sign the CHAMPUS claim form and thereby do not agree to accept the CHAMPUS-determined reasonable costs/charges as the full charge. For otherwise covered services and supplies provided by such non-participating CHAMPUS providers, payment is made directly to the beneficiary (or sponsor) and the beneficiary is liable under applicable law for any amounts in excess of the CHAMPUS-determined reasonable costs/charges. CHAMPUS shall have no responsibility for any amounts in excess of reasonable costs/charges as determined by CHAMPUS.

(g) *Exclusions and limitations.* In addition to any definitions, requirements, conditions and/or limitations enumerated and described in other sections of this regulation, the following are specifically excluded from the CHAMPUS Basic Program:

(1) *Not medically necessary.* Services and supplies which are not medically necessary for the diagnosis and/or treatment of a covered illness or injury.

(2) *Unnecessary diagnostic tests.* X-ray, laboratory and pathological services and machine diagnostic tests not related to a specific illness or injury or a definitive set of symptoms.

(3) *Institutional level of care.* Services and supplies related to inpatient stays in hospitals or other authorized institutions above the minimum level required to provide necessary medical care.

(4) *Computer-Assisted Tomography Scanning (CAT Scanning).* Except as specifically provided in paragraph (b) (5) (viii) of this section.

(5) *Diagnostic admission.* Services and supplies related to an admission primarily to perform diagnostic tests, examinations and procedures that could have been and routinely are, performed on an outpatient basis.

NOTE: If it is determined that the diagnostic X-ray, laboratory and pathological service and machine tests performed during such admission were medically necessary and would have been covered if performed on an outpatient basis, CHAMPUS benefits may be extended for such diagnostic procedures, but cost-sharing will be computed as if performed on an outpatient basis.

(6) *Unnecessary post-partum inpatient stay: Mother or Newborn.* Postpartum inpatient stay of a mother for purposes of staying with a newborn infant (usually primarily for the purpose of breast feeding the infant) where the infant (but not the mother) requires the extended stay; or continued inpatient stay of a newborn infant primarily for purposes of remaining with the mother when the mother (but not the newborn infant) requires extended post-partum inpatient stay.

(7) *Therapeutic absences.* Therapeutic absences from an inpatient facility; those absences which do not exceed 72 hours are not automatically excluded.

(8) *Custodial care.* Custodial care regardless of where rendered.

(9) *Domiciliary care.* Inpatient stays primarily for domiciliary care purposes.

(10) *Rest or rest cures.* Inpatient stays primarily for rest or rest cures.

(11) *Amounts above reasonable costs/charges.* Costs of services and supplies to the extent amounts billed are in excess of the CHAMPUS-determined reasonable cost/charge, as provided for in paragraph (e) of § 199.12, "Authorized Providers."

(12) *No legal obligation to pay:* No charge would be made. Services and/or supplies for which the beneficiary (or sponsor) has no legal obligation to pay; or for which no charge would be made if the individual was not an eligible beneficiary.

(13) *Furnished without charge.* Services and/or supplies furnished without charge.

(14) *Furnished by local, state or federal government.* Services and supplies paid for, or eligible for payment directly or indirectly by a local, state or Federal government, except as provided under the CHAMPUS Program or by government hospitals serving the general public, or medical care provided by a Uniformed Service medical care facility, or benefits provided under Title XIX of the Social Security Act (Medicaid). (Refer to § 199.14, "Double Coverage.")

(15) *Study, grant or research programs.* Services and supplies provided as a part of or under a scientific or medical study, grant or research program.

(16) *Not in accordance with accepted standards: Experimental.* Services and supplies not provided in accordance with accepted professional medical standards; or related to essentially experimental procedures or treatment regimens.

(17) *Immediate family: household.* Services or supplies provided or prescribed by a member of the beneficiary/patient's immediate family, or a person living in the beneficiary/patient's (or sponsor's) household.

(18) *Double coverage.* Services and supplies which are (or are eligible to be) payable under another medical insurance or program, either private or governmental (such as coverage through employment, Medicare, etc.). (Refer to § 199.14, "Double Coverage.")

(19) *Nonavailability statement required.* Services and supplies provided under circumstances and/or in geographic locations requiring a Nonavailability Statement (DD 1251), when such a statement was not obtained.

(20) *Preauthorization required.* Services or supplies provided in connection with an institution and/or circumstances which require preauthorization in order for CHAMPUS benefits to be extended, for which preauthorization was not obtained; or where preauthorization was obtained but the services and/or supplies it covered were not obtained within the prescribed time limit (usually a 90 day period).

(21) *Psychoanalysis and/or psychotherapy: Part of education.* Psychoanalysis and/or psychotherapy provided to mediate family, that is credited toward earning a degree or furtherance of the education or training of a beneficiary (or sponsor), regardless of diagnosis or symptoms that may be present.

(22) *Runaways.* Inpatient stays primarily to control and/or detain a runaway child, whether or not admission is to an authorized institution.

(23) *Court orders: Court directed inpatient stays.* Court ordered services and supplies; inpatient stays directed by or agreed to with the Court as an alternative to incarceration for a criminal act (i.e., jail, reform school, etc.) whether or not admission is to an authorized institution. It is intended that inpatient stays paid by CHAMPUS be directed only by an authorized physician provider.

(24) *Service connected.* Services and supplies related to military service-connected illness or injury.

(25) *Work-r e l a t e d (Occupational) disease or injury.* Services and supplies required as a result of occupational disease or injury for which any benefits are payable under a workman's compensation or similar law, whether or not such benefits have been applied for or paid; except if benefits provided under such laws are exhausted, as specifically provided for in paragraph (g) of § 199.14 "Double Coverage."

(26) *Cosmetic, reconstructive and/or plastic surgery.* Services and supplies in connection with cosmetic, reconstructive and/or plastic surgery except as specifically provided in paragraph (e) of this section.

(27) *Surgery: Psychological reasons.* Surgery performed primarily for psychological reasons (i.e., psychogenic).

(28) *Electrolysis.*

(29) *Dental care.* Dental care or oral surgery, except as specifically provided in paragraph (e) of this section.

(30) *Obesity: Weight reduction.* Services and supplies related to obesity and/or weight reduction; the intestinal or stomach bypass procedures, the stomach stapling procedure, wiring of the jaws, or any procedure of similar purpose, are also excluded regardless of the circumstances under which performed.

(31) *Transsexualism or hermaphroditism.* Services and supplies related to transsexualism (or other conditions such as gender dysphoria) or hermaphroditism (including but not limited to intersex surgery, psychotherapy, prescription drugs, etc.), except as specifically provided in paragraph (e) of this section for children ten (10) years of age or under.

(32) *Sexual dysfunctions or inadequacies.* Sex therapy; or other services or supplies provided in connection with sexual dysfunctions or inadequacies; sex behavior modification.

(33) *Corns, calluses and toenails.* Removal of corns or calluses or trimming of toenails, and other routine podiatry services, except those required as a result of a diagnosed systemic medical disease affecting the lower limbs, such as severe diabetes.

(34) *Minimal brain dysfunction.* Services and supplies related to minimal brain dysfunction (MBD), also sometimes called Organic Brain Syndrome, Hyperkinesis, Learning Disorder, etc.

(35) *Dyslexia.*

(36) *Sterilization: Reversal.* Surgery to reverse surgical sterilization procedures.

(37) *Artificial insemination.* Services and supplies related to artificial insemination (including semen donors and semen banks).

(38) *Non-prescription contraceptives.*

(39) *Tests to determine paternity or sex of a child.* Diagnostic tests to establish paternity of a child; or tests to determine sex of an unborn child.

(40) *Preventive care.* Preventive care, i.e., routine, annual or employment-requested physical examinations; routine screening procedures; immunizations; except that the following are not excluded: (i) Newborn examination (including PKU).

(ii) Rabies shots.

(iii) Tetanus shot following an accidental injury.

(iv) Rhogam.

(v) Genetic tests as specified in paragraph (e) of this section.

(vi) Immunizations and physical examinations provided when required in the case of dependents of active duty military personnel who are traveling outside the United States as a result of an active member's duty assignment and such travel is being performed under orders issued by a Uniformed Service.

(41) *Well baby care.* Services and supplies related to providing well baby care, except that newborn examinations, PKU tests and newborn circumcisions are not excluded.

(42) *Chiropractors and Naturopaths.* Services of chiropractors and naturo-

**Office of the Secretary of Defense**

§ 199.1

TABLE TO APPENDIX A—EXPLANATION OF FOIA EXEMPTIONS—Continued

| Exemption | Explanation |
|---|---|
| (b)(5) ........................... | Applies to records and information of internal records that are deliberative in nature and are part of the decision making process that contain opinions and recommendations. |
| (b)(6) ........................... | Applies to records or information the release of which could reasonably be expected to constitute a clearly unwarranted invasion of the personal privacy of individuals. |
| (b)(7) ........................... | Applies to records or information compiled for law enforcement purposes that could: (a) Reasonably be expected to interfere with law enforcement proceedings; (b) deprive a person of a right to a fair trial or impartial adjudication; (c) reasonably be expected to constitute an unwarranted invasion of the personal privacy of others; (d) disclose the identity of a confidential source; (e) disclose investigative techniques and procedures; or (f) reasonably be expected to endanger the life or physical safety of any individual. |
| (b)(8) ........................... | Applies to records and information for the use of any agency responsible for the regulation or supervision of financial institutions. |
| (b)(9) ........................... | Applies to records and information containing geological and geophysical information (including maps) concerning wells. |

(2) *Classification Categories.* Information will not be considered for classification unless its unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security in accordance with section 1.2 of Executive Order 13526, and it pertains to one or more of the following:

(i) Military plans, weapons systems, or operations;

(ii) Foreign government information;

(iii) Intelligence activities (including covert action), intelligence sources or methods, or cryptology;

(iv) Foreign relations or foreign activities of the United States, including confidential sources;

(v) Scientific, technological, or economic matters relating to the national security;

(vi) U.S. Government programs for safeguarding nuclear materials or facilities;

(vii) Vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security; or

(viii) The development, production, or use of weapons of mass destruction.

(b) [Reserved]

## PART 199—CIVILIAN HEALTH AND MEDICAL PROGRAM OF THE UNIFORMED SERVICES (CHAMPUS)

Sec.
199.1   General provisions.
199.2   Definitions.
199.3   Eligibility.
199.4   Basic program benefits.
199.5   TRICARE Extended Care Health Option (ECHO).
199.6   TRICARE—authorized providers.
199.7   Claims submission, review, and payment.
199.8   Double coverage.
199.9   Administrative remedies for fraud, abuse, and conflict of interest.
199.10   Appeal and hearing procedures.
199.11   Overpayments recovery.
199.12   Third party recoveries.
199.13   TRICARE Dental Program.
199.14   Provider reimbursement methods.
199.15   Quality and utilization review peer review organization program.
199.16   Supplemental Health Care Program for active duty members.
199.17   TRICARE program.
199.18   [Reserved]
199.20   Continued Health Care Benefit Program (CHCBP).
199.21   TRICARE Pharmacy Benefits Program.
199.22   TRICARE Retiree Dental Program (TRDP).
199.23   Special Supplemental Food Program.
199.24   TRICARE Reserve Select.
199.25   TRICARE Retired Reserve.
199.26   TRICARE Young Adult.
APPENDIX A TO PART 199—ACRONYMS

AUTHORITY: 5 U.S.C. 301; 10 U.S.C. chapter 55.

SOURCE: 51 FR 24008, July 1, 1986, unless otherwise noted.

### § 199.1   General provisions.

(a) *Purpose.* This part prescribes guidelines and policies for the administration of the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) for the Army, the Navy, the Air Force, the Marine Corps, the Coast Guard, the Commissioned Corps of the U.S. Public Health Service (USPHS) and the Commissioned Corps of the National Oceanic and Atmospheric Administration (NOAA).

(b) *Applicability*—(1) *Geographic.* This part is applicable geographically within the 50 States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and the United States possessions and territories, and

prescribed eligibility evidence in the DEERS file.

(3) The Director, OCHAMPUS, shall issue guidelines as necessary to implement the provisions of this section.

[64 FR 46135, Aug. 24, 1999, as amended at 66 FR 9654, Feb. 9, 2001; 66 FR 16400, Mar. 26, 2001; 66 FR 40606, Aug. 3, 2001; 67 FR 15725, Apr. 3, 2002; 68 FR 23032, Apr. 30, 2003; 68 FR 32361, May 30, 2003; 69 FR 51564, Aug. 20, 2004; 69 FR 60554, Oct. 12, 2004; 70 FR 12802, Mar. 16, 2005; 72 FR 2447, Jan. 19, 2007; 75 FR 50883, Aug. 18, 2010; 76 FR 81367, Dec. 28, 2011; 77 FR 38176, June 27, 2012; 80 FR 55254, Sept. 15, 2015]

## § 199.4 Basic program benefits.

(a) *General.* The CHAMPUS Basic Program is essentially a supplemental program to the Uniformed Services direct medical care system. The Basic Program is similar to private insurance programs, and is designed to provide financial assistance to CHAMPUS beneficiaries for certain prescribed medical care obtained from civilian sources.

(1)(i) *Scope of benefits.* Subject to all applicable definitions, conditions, limitations, or exclusions specified in this part, the CHAMPUS Basic Program will pay for medically or psychologically necessary services and supplies required in the diagnosis and treatment of illness or injury, including maternity care and well-baby care. Benefits include specified medical services and supplies provided to eligible beneficiaries from authorized civilian sources such as hospitals, other authorized institutional providers, physicians, other authorized individual professional providers, and professional ambulance service, prescription drugs, authorized medical supplies, and rental or purchase of durable medical equipment.

(ii) *Impact of TRICARE program.* The basic program benefits set forth in this section are applicable to the basic CHAMPUS program. In areas in which the TRICARE program is implemented, certain provisions of § 199.17 will apply instead of the provisions of this section. In those areas, the provisions of § 199.17 will take precedence over any provisions of this section with which they conflict.

(2) *Persons eligible for Basic Program benefits.* Persons eligible to receive the Basic Program benefits are set forth in § 199.3 of this part. Any person determined to be an eligible CHAMPUS beneficiary is eligible for Basic Program benefits.

(3) *Authority to act for CHAMPUS.* The authority to make benefit determinations and authorize the disbursement of funds under CHAMPUS is restricted to the Director, OCHAMPUS; designated OCHAMPUS staff; Director, OCHAMPUSEUR; or CHAMPUS fiscal intermediaries. No other persons or agents (such as physicians, staff members of hospitals, or CHAMPUS health benefits advisors) have such authority.

(4) *Status of patient controlling for purposes of cost-sharing.* Benefits for covered services and supplies described in this section will be extended either on an inpatient or outpatient cost-sharing basis in accordance with the status of the patient at the time the covered services and supplies were provided, unless otherwise specifically designated (such as for ambulance service or maternity care). For cost-sharing provisions, refer to paragraph (f) of this section.

(5) *Right to information.* As a condition precedent to the provision of benefits hereunder, OCHAMPUS or its CHAMPUS fiscal intermediaries shall be entitled to receive information from a physician or hospital or other person, institution, or organization (including a local, state, or U.S. Government agency) providing services or supplies to the beneficiary for which claims or requests for approval for benefits are submitted. Such information and records may relate to the attendance, testing, monitoring, or examination or diagnosis of, or treatment rendered, or services and supplies furnished to a beneficiary, and shall be necessary for the accurate and efficient administration of CHAMPUS benefits. Before a determination will be made on a request for preauthorization or claim of benefits, a beneficiary or sponsor must provide particular additional information relevant to the requested determination, when necessary. The recipient of such information shall in every case hold such records confidential except when:

(i) Disclosure of such information is authorized specifically by the beneficiary;

or the cost of repair would exceed 60 percent of the cost of replacement.

(viii) *Orthopedic braces and appliances.* The purchase of leg braces (including attached shoes), arm braces, back braces, and neck braces is covered, orthopedic shoes, arch supports, shoe inserts, and other supportive devices for the feet, including special-ordered, custom-made built-up shoes or regular shoes subsequently built up, are not covered.

(ix) *Diabetes Self-Management Training (DSMT).* A training service or program that educates diabetic patients about the successful self-management of diabetes. It includes the following criteria: Education about self-monitoring of blood glucose, diet, and exercise; an insulin treatment plan developed specifically for the patient who is insulin-dependent; and motivates the patient to use the skills for self-management. The DSMT service or program must be accredited by the American Diabetes Association.

Coverage limitations on the provision of this benefit will be as determined by the Director, TRICARE Management Activity, or designee.

(e) *Special benefit information*—(1) *General.* There are certain circumstances, conditions, or limitations that impact the extension of benefits and that require special emphasis and explanation. This paragraph (e) sets forth those benefits and limitations recognized to be in this category. The benefits and limitations herein described also are subject to all applicable definitions, conditions, limitations, exceptions, and exclusions as set forth in this or other sections of this part, except as otherwise may be provided specifically in this paragraph (e).

(2) *Abortion.* The statute under which CHAMPUS operates prohibits payment for abortions with one single exception—where the life of the mother would be endangered if the fetus were carried to term. Covered abortion services are limited to medical services and supplies only. Physician certification is required attesting that the abortion was performed because the mother's life would be endangered if the fetus were carried to term. Abortions performed for suspected or confirmed fetal abnormality (e.g., anencephalic) or for

mental health reasons (e.g., threatened suicide) do not fall within the exceptions permitted within the language of the statute and are not authorized for payment under CHAMPUS.

NOTE: Covered abortion services are limited to medical services or supplies only for the single circumstance outlined above and do not include abortion counseling or referral fees. Payment is not allowed for any services involving preparation for, or normal followup to, a noncovered abortion. The Director, OCHAMPUS, or a designee, shall issue guidelines describing the policy on abortion.

(3) *Family planning.* The scope of the CHAMPUS family planning benefit is as follows:

(i) *Birth control (such as contraception)*—(A) *Benefits provided.* Benefits are available for services and supplies related to preventing conception, including the following:

(*1*) Surgical inserting, removal, or replacement of intrauterine devices.

(*2*) Measurement for, and purchase of, contraceptive diaphragms (and later remeasurement and replacement).

(*3*) Prescription contraceptives.

(*4*) Surgical sterilization (either male or female).

(B) *Exclusions.* The family planning benefit does not include the following:

(*1*) Prophylactics (condoms).

(*2*) Spermicidal foams, jellies, and sprays not requiring a prescription.

(*3*) Services and supplies related to noncoital reproductive technologies, including but not limited to artificial insemination (including any costs related to donors or semen banks), invitro fertilization and gamete intrafallopian transfer.

(*4*) Reversal of a surgical sterilization procedure (male or female).

(ii) *Genetic testing.* Genetic testing essentially is preventive rather than related to active medical treatment of an illness or injury. However, under the family planning benefit, genetic testing is covered when performed in certain high risk situations. For the purpose of CHAMPUS, genetic testing includes to detect developmental abnormalities as well as purely genetic defects.

(A) *Benefits provided.* Benefits may be extended for genetic testing performed on a pregnant beneficiary under the

132

other optical devices are excluded under the Basic Program except under very limited and specific circumstances.

(i) *Exception to general exclusion.* Benefits for glasses and lenses may be extended only in connection with the following specified eye conditions and circumstances:

(A) Eyeglasses or lenses that perform the function of the human lens, lost as a result of intraocular surgery or ocular injury or congenital absence.

NOTE: Notwithstanding the general requirement for U.S. Food and Drug Administration approval of any surgical implant set forth in paragraph (d)(3)(vii) of this section, intraocular lenses are authorized under CHAMPUS if they are either approved for marketing by FDA or are subject to an investigational device exemption.

(B) ''Pinhole'' glasses prescribed for use after surgery for detached retina.

(C) Lenses prescribed as ''treatment'' instead of surgery for the following conditions:

(*1*) Contract lenses used for treatment of infantile glaucoma.

(*2*) Corneal or scleral lenses prescribed in connection with treatment of keratoconus.

(*3*) Scleral lenses prescribed to retain moisture when normal tearing is not present or is inadequate.

(*4*) Corneal or scleral lenses prescribed to reduce a corneal irregularity other than astigmatism.

(ii) *Limitations.* The specified benefits are limited further to one set of lenses related to one of the qualifying eye conditions set forth in paragraph (e)(6)(i) of this section. If there is a prescription change requiring a new set of lenses (but still related to the qualifying eye condition), benefits may be extended for a second set of lenses, subject to specific medical review.

(7) [Reserved]

(8) *Cosmetic, reconstructive, or plastic surgery.* For the purposes of CHAMPUS, cosmetic, reconstructive, or plastic surgery is surgery that can be expected primarily to improve physical appearance or that is performed primarily for psychological purposes or that restores form, but does not correct or improve materially a bodily function.

NOTE: If a surgical procedure primarily restores function, whether or not there is also a concomitant improvement in physical appearance, the surgical procedure does not fall within the provisions set forth in this paragraph (e)(8).

(i) *Limited benefits under CHAMPUS.* Benefits under the Basic Program generally are not available for cosmetic, reconstructive, or plastic surgery. However, under certain limited circumstances, benefits for otherwise covered services and supplies may be provided in connection with cosmetic, reconstructive, or plastic surgery as follows:

(A) Correction of a congenital anomaly; or

(B) Restoration of body form following an accidental injury; or

(C) Revision of disfiguring and extensive scars resulting from neoplastic surgery.

(D) Reconstructive breast surgery following a medically necessary mastectomy performed for the treatment of carcinoma, severe fibrocystic disease, other nonmalignant tumors or traumatic injuries.

(E) Penile implants and testicular prostheses for conditions resulting from organic origins (i.e., trauma, radical surgery, disease process, for correction of congenital anomaly, etc.). Also, penile implants for organic impotency.

NOTE: Organic impotence is defined as that which can be reasonably expected to occur following certain diseases, surgical procedures, trauma, injury, or congenital malformation. Impotence does not become organic because of psychological or psychiatric reasons.

(F) Generally, benefits are limited to those cosmetic, reconstructive, or plastic surgery procedures performed no later than December 31 of the year following the year in which the related accidental injury or surgical trauma occurred, except for authorized postmastectomy breast reconstruction for which there is no time limitation between mastectomy and reconstruction. Also, special consideration for exception will be given to cases involving children who may require a growth period.

(ii) *General exclusions.* (A) For purposes of CHAMPUS, dental congenital anomalies such as absent tooth buds or malocclusion specifically are excluded.

134

(B) Cosmetic, reconstructive, or plastic surgery procedures performed primarily for psychological reasons or as a result of the aging process also are excluded.

(C) Procedures performed for elective correction of minor dermatological blemishes and marks or minor anatomical anomalies also are excluded.

(D) Any procedures related to sex gender changes, except as provided in paragraph (g)(29) of this section, are excluded.

(iii) *Noncovered surgery, all related services and supplies excluded.* When it is determined that a cosmetic, reconstructive, or plastic surgery procedure does not qualify for CHAMPUS benefits, all related services and supplies are excluded, including any institutional costs.

(iv) *Example of noncovered cosmetic, reconstructive, or plastic surgery procedures.* The following is a partial list of cosmetic, reconstructive, or plastic surgery procedures that do not qualify for benefits under CHAMPUS. This list is for example purposes only and is not to be construed as being all-inclusive.

(A) Any procedure performed for personal reasons to improve the appearance of an obvious feature or part of the body that would be considered by an average observer to be normal and acceptable for the patient's age or ethnic or racial background.

(B) Cosmetic, reconstructive, or plastic surgical procedures that are justified primarily on the basis of a psychological or psychiatric need.

(C) *Augmentation mammoplasties.* Augmentation mammoplasties, except for breast reconstruction following a covered mastectomy and those specifically authorized in paragraph (e)(8)(i) of this section.

(D) Face lifts and other procedures related to the aging process.

(E) *Reduction mammoplasties.* Reduction mammoplasties (unless there is medical documentation of intractable pain, not amenable to other forms of treatment, resulting from large, pendulous breasts or unless performed as an integral part of an authorized breast reconstruction procedure under paragraph (e)(8)(i) of this section, including reduction of the collateral breast for purposes of ensuring breast symmetry)

(F) Panniculectomy; body sculpture procedures.

(G) Repair of sagging eyelids (without demonstrated and medically documented significant impairment of vision).

(H) Rhinoplasties (without evidence of accidental injury occurring within the previous 6 months that resulted in significant obstruction of breathing).

(I) Chemical peeling for facial wrinkles.

(J) Dermabrasion of the face.

(K) Elective correction of minor dermatological blemishes and marks or minor anatomical anomalies.

(L) Revision of scars resulting from surgery or a disease process, except disfiguring and extensive scars resulting from neoplastic surgery.

(M) Removal of tattoos.

(N) Hair transplants.

(O) Electrolysis.

(P) [Reserved]

(Q)) Penile implant procedure for psychological impotency or as related to sex gender changes, as prohibited by section 1079 of title 10, United States Code.

(R) Insertion of prosthetic testicles as related to sex gender changes, as prohibited by section 1079 of title 10, United States Code.

(9) *Care related to non-covered initial surgery or treatment.* (i) Benefits are available for otherwise covered services and supplies required in the treatment of complications resulting from a non-covered incident of treatment (such as nonadjunctive dental care or cosmetic surgery) but only if the later complication represents a separate medical condition such as a systemic infection, cardiac arrest, and acute drug reaction. Benefits may not be extended for any later care or a procedure related to the complication that essentially is similar to the initial non-covered care. Examples of complications similar to the initial episode of care (and thus not covered) would be repair of facial scarring resulting from dermabrasion for acne.

(ii) Benefits are available for otherwise covered services and supplies required in the treatment of complications (unfortunate sequelae) and any necessary follow-on care resulting from a non-covered incident of treatment

135

**5061**

**ADDRESSES:** The public hearing is being held in the IRS Auditorium, Internal Revenue Service Building, 1111 Constitution Avenue NW., Washington, DC 20224. Due to building security procedures, visitors must enter at the Constitution Avenue entrance. In addition, all visitors must present photo identification to enter the building.

Send Submissions to CC:PA:LPD:PR (REG–139483–13), Room 5205, Internal Revenue Service, P.O. Box 7604, Ben Franklin Station, Washington, DC 20044. Submissions may be hand-delivered Monday through Friday to CC:PA:LPD:PR (REG–139483–13), Couriers Desk, Internal Revenue Service, 1111 Constitution Avenue NW., Washington, DC 20224 or sent electronically via the Federal eRulemaking Portal at *www.regulations.gov* (IRS–2015–0047).

**FOR FURTHER INFORMATION CONTACT:** Concerning the regulations, Ryan A. Bowen at (202) 317–6937; concerning submissions of comments, the hearing and/or to be placed on the building access list to attend the hearing Regina Johnson at (202) 317–6901 (not toll-free numbers).

**SUPPLEMENTARY INFORMATION:**

**Background**

The notice of public hearing on a proposed rulemaking that is the subject of this document is under sections 367 and 482 of the Internal Revenue Code.

**Need for Correction**

As published, the notice of public hearing on proposed rulemaking contains an omission in its summary that may prove to be misleading and is in need of clarification.

**Correction of Publication**

Accordingly, the notice of public hearing on proposed rulemaking (REG–139483–13), that are subject to FR Doc. 2016–00961, is corrected as follows:

On page 3069, in the preamble, second column, under the caption **SUMMARY**, the last line of the paragraph is corrected to read "Code. This document also provides notice of public hearing on the proposed regulations under section 482 clarifying the coordination of the transfer pricing rules under section 482 with other Internal Revenue Code provisions.".

**Martin V. Franks,**
*Chief, Publications and Regulations Branch, Legal Processing Division, Associate Chief Counsel (Procedure and Administration).*
[FR Doc. 2016–01807 Filed 1–29–16; 8:45 am]
**BILLING CODE 4830–01–P**

## DEPARTMENT OF DEFENSE

**Office of the Secretary**

**32 CFR Part 199**

**[DOD–2015–HA–0109]**

**RIN 0720–AB65**

**TRICARE; Mental Health and Substance Use Disorder Treatment**

**AGENCY:** Office of the Secretary, Department of Defense (DoD).

**ACTION:** Proposed rule.

---

**SUMMARY:** This rulemaking proposes comprehensive revisions to the TRICARE regulation to reduce administrative barriers to access to mental health benefit coverage and to improve access to substance use disorder (SUD) treatment for TRICARE beneficiaries, consistent with earlier Department of Defense and Institute of Medicine recommendations, current standards of practice in mental health and addiction medicine, and governing laws. This proposed rule has four main objectives: (1) To eliminate quantitative and qualitative treatment limitations on SUD and mental health benefit coverage and align beneficiary cost-sharing for mental health and SUD benefits with those applicable to medical/surgical benefits; (2) to expand covered mental health and SUD treatment under TRICARE, to include coverage of intensive outpatient programs and treatment of opioid use disorder; (3) to streamline the requirements for mental health and SUD institutional providers to become TRICARE authorized providers; and (4) to develop TRICARE reimbursement methodologies for newly recognized mental health and SUD intensive outpatient programs and opioid treatment programs.

**DATES:** Written comments received at the addresses indicated below will be considered for possible revisions to this rule in development of the final rule. Comments must be received on or before April 1, 2016.

**ADDRESSES:** You may submit comments identified by docket number and or Regulatory Information Number (RIN) number and title, by either of the following methods:

• *Federal eRulemaking Portal: www.regulations.gov.* Follow the instructions for submitting documents.

• *Mail:* Department of Defense, Office of the Deputy Chief Management Officer, Directorate of Oversight and Compliance, Regulatory and Audit Matters Office, 9010 Defense Pentagon, Washington, DC 20301–9010.

*Instructions:* All submissions received must include the agency name and docket number or RIN for this **Federal Register** document. The general policy for comments and other submissions from members of the public is to make these submissions available for public viewing on the Internet at *http://www.regulations.gov* as they are received without change, including any personal identifiers or contact information.

**FOR FURTHER INFORMATION CONTACT:** Dr. Patricia Moseley, Defense Health Agency, Clinical Support Division, Condition-Based Specialty Care Section, 703–681–0064.

**SUPPLEMENTARY INFORMATION:**

**I. Executive Summary**

*A. Purpose of the Proposed Rule*

**1. The Need for the Regulatory Action**

This proposed rule seeks to comprehensively update TRICARE mental health and substance use disorder benefits, consistent with earlier Department of Defense and Institute of Medicine recommendations, current standards of practice in mental health and addiction medicine, and our governing laws. The Department of Defense remains intently focused on ensuring the mental health of our service members and their families, as this continues to be a top priority. The Department is also working to further de-stigmatize mental health treatment and expand the ways by which our beneficiaries can access authorized mental health services. This proposed regulatory action is in furtherance of these goals and imperative in order to eliminate requirements that may be viewed as barriers to medically necessary and appropriate mental health services.

(a) Eliminating Quantitative and Qualitative Treatment Limitations on SUD and Mental Health Benefit Coverage and Aligning Beneficiary Cost-Sharing for Mental Health and SUD Benefits With Those Applicable to Medical/Surgical Benefits

The requirements of the Mental Health Parity Act (MHPA) of 1996 and the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act (MHPAEA) of 2008, as well as the plan benefit provisions contained in the Patient Protection and Affordable Care Act (PPACA) do not apply to the TRICARE program. The provisions of MHPAEA and PPACA serve as models for TRICARE in proposing changes to existing benefit coverage. These changes intend to reduce administrative barriers

to treatment and increase access to medically or psychologically necessary mental health care consistent with TRICARE statutory authority.

Section 703 of the National Defense Authorization Act (NDAA) National Defense Authorization Act (NDAA) for Fiscal Year (FY) 2015, signed into law December 19, 2014, amends section 1079 of title 10 of the U.S.C. to remove prior existing statutory limits and requirements on TRICARE coverage of inpatient mental health services. This proposed rule is necessary to conform the regulation to provisions in the recently enacted law. Specifically, TRICARE coverage is no longer subject to an annual limit on stays in inpatient mental health facilities of 30 days for adults and 45 days for children. In addition, TRICARE coverage is no longer subject to a 150-day annual limit for stays at Residential Treatment Centers (RTCs) for eligible beneficiaries.

In addition to the elimination of these statutory inpatient day limits, and corresponding waiver provisions, the proposed rule also seeks to eliminate other regulatory quantitative and qualitative treatment limitations, consistent with principles of mental health parity and our governing laws. These include the 60-day partial hospitalization program limitation; annual and lifetime limitations on SUD treatment; presumptive limitations on outpatient services including the number of psychotherapy sessions per week and family therapy sessions for the treatment of SUD per benefit period; and limitations on the smoking cessation program. While there are clear waiver provisions in place for all of the existing quantitative treatment benefit limitations in order to ensure that beneficiaries have access to medically or psychologically necessary and appropriate care, these presumptive limitations may serve as an administrative barrier and thus disincentive to continued care regardless of the continued medical necessity of such care.

Additionally, this rulemaking proposes to remove the categorical exclusion on treatment of gender dysphoria. This proposed change will permit coverage of all non-surgical medically necessary and appropriate care in the treatment of gender dysphoria, consistent with the program requirements applicable for treatment of all mental or physical illnesses. Surgical care remains prohibited by statute at 10 U.S.C. 1079(a)(11), as discussed further below.

Finally, following the recent repeal (section 703 of the NDAA for FY 15) of the statutory authority (previously codified at 10 U.S.C. 1079(i)(2)) for separate beneficiary financial liability for mental health benefits, the proposed rule revises the cost-sharing requirements for mental health and SUD benefits to be consistent with those that are applicable to TRICARE medical and surgical benefits.

(b) Expanding Coverage To Include Mental Health and SUD Intensive Outpatient Programs and Treatment of Opioid Use Disorder

Currently, TRICARE benefits do not fully reflect the full range of contemporary SUD treatment approaches (*i.e.*, outpatient counseling and intensive outpatient program (IOP)) that are now endorsed by the American Society of Addiction Medicine (ASAM), the Department of Health and Human Services (DHHS) Substance Abuse and Mental Health Services Administration (SAMHSA), and the VA/DoD Clinical Practice Guidelines (CPGs) for SUDs. Some existing benefit coverage restrictions inhibit access to community based outpatient services; may cause beneficiaries to be separated from their families while they are receiving treatment in geographically distant facilities; and may result in beneficiaries electing to forgo treatment. Further, restrictions may lead to difficulty receiving appropriate step-down care following acute inpatient and residential treatment services. TRICARE currently limits SUD treatment to TRICARE-authorized SUD Rehabilitation Facilities (SUDRFs) and hospitals.

An amendment to the regulation is necessary to authorize TRICARE benefit coverage of medically and psychologically necessary services and supplies which represent appropriate medical care and that are generally accepted by qualified professionals to be reasonable and adequate for the diagnosis and treatment of mental disorders. Office-based individual outpatient treatment is an effective, empirically-validated level of treatment for substance use disorder endorsed by The ASAM Criteria: Treatment Criteria for Addictive, Substance-Related, and Co-Occurring Conditions, Third Edition, 2013. Furthermore, TRICARE coverage of medication assisted treatment (MAT) for opioid use disorder, extended through regulatory revisions, as published in the **Federal Register** on October 22, 2013 (78 FR 62427), is currently limited to MAT provided by a TRICARE authorized SUDRF. This proposed revision of the TRICARE SUD treatment benefit will allow office-based opioid treatment (OBOT) by individual TRICARE-authorized physicians and will also add coverage of qualified opioid treatment programs (OTPs) as TRICARE authorized institutional providers of SUD treatment for opioid use disorder, which will expand access to this type of care.

(c) Streamlining Requirements for Institutional Mental Health and SUD Providers To Become TRICARE Authorized Providers

The current TRICARE certification requirements for institutional mental health and SUD providers were implemented over 20 years ago and designed to create comprehensive, stand-alone standards to address the full spectrum of requirements and expectations for mental health facilities and providers, rather than as mere supplements to the standards employed by the Joint Commission, which at the time had moved toward a more general set of facility standards. Over the last several decades, the accreditation process for institutional providers has evolved, and these standards are now monitored through a number of industry-accepted accrediting bodies. While TRICARE's comprehensive certification standards were once considered necessary to ensure quality and safety, these comprehensive certification requirements are now proving to be overly restrictive and at times inconsistent with current industry-based institutional provider standards and organization. There are currently several geographic areas that are inadequately served because providers in those regions do not meet TRICARE certification requirements, even though they may meet the industry standard. The proposed rule seeks to streamline TRICARE regulations to be consistent with industry standards for authorization of qualified institutional providers of mental health and SUD treatment. It is anticipated that these revisions will result in an increase in the number and geographic coverage areas of participating institutional providers of mental health and SUD treatment for TRICARE beneficiaries.

(d) TRICARE Reimbursement Methodologies for Newly Recognized Mental Health and SUD Intensive Outpatient Programs and Opioid Treatment Programs

Along with recognition of several new categories of TRICARE authorized providers, the proposed rule establishes reimbursement methodologies for these providers. Specifically, new reimbursement methodologies have been proposed for IOPs for mental health and SUD treatment as well as OTPs, as these providers have not

**5066** **Federal Register** / Vol. 81, No. 20 / Monday, February 1, 2016 / Proposed Rules

practice guidelines (VA/DoD CPGs) for SUD to improve access to medically or psychologically necessary SUD treatment for TRICARE beneficiaries in accordance with generally accepted standards of practice.

*B. Expanded TRICARE Coverage of Mental Health and SUD Treatment*

1. Eliminating Quantitative and Qualitative Treatment Limitations on SUD and Mental Health Benefit Coverage

There are existing waiver provisions for all of the quantitative treatment benefit limitations to ensure beneficiaries have access to medically or psychologically necessary and appropriate treatment. However, these limitations, which were designed to contain costs and address abuses decades ago, along with differential financial cost-sharing requirements relative to medical/surgical care are currently viewed as barriers to coverage of mental health services.

This proposed rule seeks to remove a number of quantitative and qualitative limits for coverage of mental health and SUD care under the TRICARE Program, including:

• All inpatient mental health day (30 days maximum for adults and 45 days maximum for children at 32 CFR 199.4(b)(9)) and annual day limits (150 days at 32 CFR 199.4(b)(8)) for RTC care for beneficiaries 21 years and younger, following the statutory revisions to 10 U.S.C. 1079;

• The 60-day limitation on partial hospitalization (32 CFR 199.4(b)(10)(iv)) and SUDRF residential treatment (32 CFR 199.4(e)(4)(ii)(A));

• Annual (60 days in a benefit period) and lifetime (three treatment episodes—32 CFR 199.4(e)(4)(ii)) limitations on SUD treatment;

• Presumptive limitations on outpatient services including the six-hour per year limit on psychological testing (32 CFR 199.4(c)(3)(ix)(A)(5)) and the limit of two sessions per week for outpatient therapy (32 CFR 199.4(c)(3)(ix)(B));

• Limits on family therapy (15 visits (32 CFR 199.4(e)(4)(ii)(C)) and outpatient therapy (60 visits—(32 CFR 199.4(e)(4)(ii)(B)) provided in free-standing or hospital based SUDRFs; and

• The limit of two smoking cessation quit attempts in a consecutive 12 month period and 18 face-to-face counseling sessions per attempt (32 CFR 199.4(e)(30)).

This proposed rule will allow coverage of outpatient treatment that is medically or psychologically necessary, including family therapy and other

covered diagnostic and therapeutic services, by a TRICARE authorized institutional provider or by authorized individual mental health providers without limits on the number of treatment sessions. The removal of these limitations also recognizes that SUDs are chronic conditions with periodic phases of relapse and readmission, often requiring multiple interventions over several years to achieve full remission. All claims submitted for services under TRICARE remain subject to review for quality and appropriate utilization in accordance with the Quality and Utilization Review Peer Review Organization Program, under 10 U.S.C. 1079(n) and 32 CFR 199.15.

The proposed rule also removes certain regulatory exclusions for the treatment of gender dysphoria for TRICARE beneficiaries who are diagnosed by a TRICARE authorized, qualified mental health professional, practicing within the scope of his or her license, to be suffering from a mental disorder, as defined in 32 CFR. 199.2. It is no longer justifiable to categorically exclude and not cover currently accepted medically and psychologically necessary treatments for gender dysphoria (such as psychotherapy, pharmacotherapy, and hormone replacement therapy) that are not otherwise excluded by statute. (Section 1079(a)(11) of title 10, U.S.C., excludes from CHAMPUS coverage surgery which improves physical appearance but is not expected to significantly restore functions, including mammary augmentation, face lifts, and sex gender changes.)

2. Aligning Beneficiary Cost-Sharing for Mental Health and SUD Benefits With Those Applicable to Medical/Surgical Benefits

Following the recent repeal of statutory authority for separate beneficiary financial liability for mental health benefits, the proposed rule eliminates any differential in cost-sharing between mental health and SUD benefits and medical/surgical benefits. The following regulatory changes to 32 CFR 199.4(f) and 32 CFR 199.18 will reduce financial barriers to both outpatient and inpatient mental health and SUD benefits while, consistent with statutory requirements, minimizing out-of-pocket risk for those beneficiaries.

TRICARE Prime Co-Pays

Active duty family members enrolled in TRICARE Prime pay no copayment for inpatient or outpatient services. Currently, retirees and their dependents enrolled in Prime pay higher copays for inpatient and outpatient mental health

services than for other similar non-mental health services. Retirees and all other non-active duty dependents enrolled in Prime would see the following changes:

• The co-pay for individual outpatient mental health visits would be reduced from $25 to $12.

• The co-pay for group outpatient mental health visits would be reduced from $17 to $12.

The per diem charge of $40 for mental health and SUD inpatient admissions would be reduced to the non-mental health per diem rate of $11, with a minimum charge of $25 per admission.

TRICARE Standard Cost-Sharing

Currently, active duty family members (ADFMs) utilizing TRICARE Standard/Extra pay a higher per diem for mental health inpatient care than for other inpatient stays. ADFMs would see the following change:

• The per diem cost-share for inpatient mental health services would be reduced from $20/day to the daily charge ($18/day for FY16) that would have been charged had the inpatient care been provided in a Uniformed Services hospital.

Retirees and their dependents who are not enrolled in Prime but use non-network providers (Standard) for mental health care are generally required to pay 25% of the allowable charges for inpatient care (for inpatient services subject to the DRG-based payment system or mental health per diem payment system, beneficiaries pay the lesser of the per diem amount (which is equivalent to 25% of the CHAMPUS-determined allowable costs) or 25% of the hospital's billed charges). This would not change. Retirees and their dependents using Standard and Extra are currently responsible for their outpatient deductible and outpatient cost-sharing of 25% (Standard)/20% (Extra) of the CHAMPUS-determined allowable costs. This also would not change.

It is also being proposed that cost-sharing for partial hospitalization programs (PHPs) be changed from inpatient to outpatient to more accurately reflect the services being rendered, ensure consistency with the applicable statutes governing cost-sharing, and to further ensure parity between the surgical/medical and mental health benefit. The definition of partial hospitalization, by its very nature, is inconsistent with the definition of inpatient care. Notwithstanding, in a final rule (58 FR 35403) published on July 1, 1993, and pursuant to the authority granted to the Secretary to establish different cost-

# DEPARTMENT OF DEFENSE

## Office of the Secretary

**32 CFR Part 199**

**[DOD–2015–HA–0109]**

**RIN 0720–AB65**

## TRICARE; Mental Health and Substance Use Disorder Treatment

**AGENCY:** Office of the Secretary, Department of Defense (DoD).

**ACTION:** Final rule.

**SUMMARY:** This final rule modifies the TRICARE regulation to reduce administrative barriers to access to mental health benefit coverage and to improve access to substance use disorder (SUD) treatment for TRICARE beneficiaries, consistent with earlier Department of Defense and Institute of Medicine recommendations, current standards of practice in mental health and addiction medicine, and governing laws. This rule seeks to eliminate unnecessary quantitative and non-quantitative treatment limitations on SUD and mental health benefit coverage and align beneficiary cost-sharing for mental health and SUD benefits with those applicable to medical/surgical benefits, expand covered mental health and SUD treatment under TRICARE to include coverage of intensive outpatient programs and treatment of opioid use disorder and to streamline the requirements for mental health and SUD institutional providers to become TRICARE authorized providers, and to develop TRICARE reimbursement methodologies for newly recognized mental health and SUD intensive outpatient programs and opioid treatment programs.

**DATES:** This rule is effective October 3, 2016.

**FOR FURTHER INFORMATION CONTACT:** Dr. John Davison, Defense Health Agency, Clinical Support Division, Condition-Based Specialty Care Section, 703–681–8746.

**SUPPLEMENTARY INFORMATION:**

## I. Executive Summary

### A. Purpose of the Final Rule

#### 1. The Need for the Regulatory Action

This final rule updates TRICARE mental health and substance use disorder benefits, consistent with earlier Department of Defense and Institute of Medicine recommendations, current standards of practice in mental health and addiction medicine, and our governing laws. The Department of Defense remains intently focused on supporting the mental health of our service members and their families, as this continues to be a top priority. The Department is also working to further de-stigmatize mental health treatment and expand the ways by which our beneficiaries can access authorized mental health services. This regulatory action eliminates unnecessary requirements that may be viewed as barriers to medically necessary and appropriate mental health services.

This rule has four main objectives: (a) To eliminate unnecessary quantitative and non-quantitative treatment limitations on SUD and mental health benefit coverage and align beneficiary cost-sharing for mental health and SUD benefits with those applicable to medical/surgical benefits; (b) to expand covered mental health and SUD treatment under TRICARE, to include coverage of intensive outpatient programs and treatment of opioid use disorder; (c) to streamline the requirements for mental health and SUD institutional providers to become TRICARE authorized providers; and (d) to develop TRICARE reimbursement methodologies for newly recognized mental health and SUD intensive outpatient programs and opioid treatment programs.

### (a) Eliminating Unnecessary Quantitative and Non-Quantitative Treatment Limitations on SUD and Mental Health Benefit Coverage and Aligning Beneficiary Cost-Sharing for Mental Health and SUD Benefits With Those Applicable to Medical/Surgical Benefits

The requirements of the Mental Health Parity Act (MHPA) of 1996 and the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act (MHPAEA) of 2008, as well as the plan benefit provisions contained in the Patient Protection and Affordable Care Act (PPACA) do not apply to the TRICARE program. The provisions of MHPAEA and PPACA served as models for TRICARE in proposing changes to existing benefit coverage. These changes are intended to reduce administrative barriers to treatment and increase access to medially or psychologically necessary mental health care consistent with TRICARE statutory authority and program design.

Section 703 of the National Defense Authorization Act (NDAA) National Defense Authorization Act (NDAA) for Fiscal Year (FY) 2015, signed into law December 19, 2014, amended section 1079 of title 10 of the U.S.C. to remove prior existing statutory limits and requirements on TRICARE coverage of inpatient mental health services. This rule is necessary to conform the regulation to provisions in the enacted law. Specifically, TRICARE coverage is no longer subject to an annual limit on stays in inpatient mental health facilities of 30 days for adults and 45 days for children. In addition, TRICARE coverage is no longer subject to a 150-day annual limit for stays at Residential Treatment Centers (RTCs) for eligible beneficiaries.

In addition to the elimination of these statutory inpatient day limits and corresponding waiver provisions, the rule will also eliminate other unnecessary quantitative and non-quantitative treatment limitations, consistent with principles of mental health parity and our governing laws.

Additionally, this rulemaking will remove the categorical exclusion on treatment of gender dysphoria. This change will permit coverage of all non-surgical medically necessary and appropriate care in the treatment of gender dysphoria, consistent with the program requirements applicable for treatment of all mental or physical illnesses. Surgical care remains prohibited by statute at 10 U.S.C. 1079(a)(11), as discussed further below.

Finally, following the recent repeal (section 703 of the NDAA for FY 15) of the statutory authority (previously codified at 10 U.S.C. 1079(i)(2)) for separate beneficiary financial liability for mental health benefits, the rule revises the cost-sharing requirements for mental health and SUD benefits to be consistent with those that are applicable to TRICARE medical and surgical benefits.

### (b) Expanding Coverage To Include Mental Health and SUD Intensive Outpatient Programs and Treatment of Opioid Use Disorder

Previously, TRICARE benefits did not fully reflect the full range of contemporary SUD treatment approaches (i.e., outpatient counseling and intensive outpatient program (IOP)) that are now endorsed by the American Society of Addiction Medicine (ASAM), the Department of Health and Human Services (DHHS) Substance Abuse and Mental Health Services Administration (SAMHSA), and the VA/DoD Clinical Practice Guidelines (CPGs) for SUDs.

An amendment to the regulation was necessary to authorize TRICARE benefit coverage of medically and psychologically necessary services and supplies which represent appropriate medical care and that are generally accepted by qualified professionals to be reasonable and adequate for the diagnosis and treatment of mental disorders. TRICARE coverage of

Department appreciates the comment, we have elected to retain this regulatory language as having these medical necessity criteria in regulation is instructive and informative for all stakeholders in administering the TRICARE benefit. Further, we do not believe these criteria are discriminatory or unnecessary but rather are reflective of the overarching statutory requirement that care be medically necessary and appropriate. These terms ("medically or psychologically necessary" and "appropriate medical care") are further defined in regulation at § 199.2. These same requirements apply to TRICARE medical and surgical benefits. The language where included in § 199.4 is specifically tailored to address medically necessity in that context, particularly with respect to the different levels of care that are available for the treatment of mental health and SUD that do not have a corresponding medical or surgical counterpart. The Department has also sought to strike an appropriate balance between eliminating unnecessary language and regulatory provisions while at the same time ensuring transparency in program administration.

Regarding comments that the Department set forth more elaborate descriptions and requirements for mental health institutional providers than for medical/surgical settings, a major objective of this rule has been to achieve significant streamlining of the descriptions and requirements for TRICARE authorization of institutional mental health care providers under §§ 199.6(b)(4)(vii) (RTCs), 199.6(b)(4)(xii) (PHPs), and 199.6(b)(4)(xiv) (SUDRFs) and we believe we have achieved that objective. The proposed revisions which are finalized in this rule have eliminated a large portion of the existing descriptions and requirements for existing mental health/SUD institutional providers. For each type of provider, the amended regulation includes a definition/general description of the type of institutional provider and eligibility requirements including licensing, accreditation, a written participation agreement and adherence to general TRICARE requirements. We have eliminated the elaborate descriptions that are contained in the existing regulations regarding such things as the organization of the facility and specific qualifications of the governing body (including the facility's Chief Executive Officer, Clinical Director, Medical Director and Medical or professional staff organization), staff composition, staff qualifications, admission process, assessments,

treatment planning, discharge and transition planning, standards for physical plant and environment and a variety of other requirements that we believe are more appropriately satisfied through a national accreditation process. Similarly, we have also eliminated the requirements regarding capacity (30 percent) and length of time licensed and at full operational status (6 months) for OTPs, RTCs, PHPs, IOPs, and SUDRFs.

Furthermore, we would note the general requirement in § 199.6(a)(8)(i) that all institutional providers must be participating providers under TRICARE. Hospitals (whether providing medical/surgical and/or mental health/SUD care) that are certified and participating under Medicare are deemed to meet TRICARE requirements and are not required to request TRICARE approval formally. (See § 199.6(b)(3).) Section 199.6 lists a variety of additional institutional providers, some of the medical/surgical variety (including, for example, skilled nursing facilities, freestanding ambulatory surgery centers, birthing centers, hospice programs, and home health agencies) and others that are mental health and SUD providers, which require specific approval to become TRICARE authorized institutional providers.

With respect to comments about specific requirements for inclusion in participation agreements, all institutional providers are required, under § 199.6(8)(i)(A), to be a participating provider under TRICARE, and the general provisions that must be included in the agreement are outlined in regulation at § 199.6(a)(13) and are equally applicable to medical/surgical and mental health/SUD institutional providers. In general, we believe the specific requirements outlined in § 199.6(b) are reflective of the general participation agreement requirements and simply tailored to the particular type of provider (so for instance, when requiring that the participating provider agree to accept the determined allowable amount, the regulatory provisions cross reference to the applicable reimbursement methodology for that type of provider). Again, we have sought to balance the competing interests of streamlining our regulations to the extent practicable with ease of reference for the reader, coupled with our commitment to ensuring transparency in program requirements. Further, these participation agreements ensure providers accept assignment on TRICARE claims, thereby protecting our beneficiaries from financial liability above their applicable deductibles and cost-shares, and ensure compliance with

applicable program requirements in support of the provision of safe, quality care to our beneficiaries.

Additionally, while we wanted to address the general mental health parity comments here, several of the specific requirements for mental health and SUD institutional providers contained in § 199.6 and referenced in public comments are more appropriately addressed below in the following sections.

*Comment:* Nineteen respondents expressed strong objection to the addition of benefit coverage for the diagnosis of gender dysphoria citing cost concerns and an inappropriate use of taxpayer funds. Several commenters expressed concerns about impact on military units and military readiness resulting from the treatment of transgender Service Members. Sixteen respondents commented in support of the proposed rule's addition of benefit coverage for psychological and medical care for gender dysphoria. Four respondents expressed objection to surgical coverage of gender dysphoria under the proposed rule. Two commenters expressed objection based on the conscience rights and first amendment liberties of those who work in the healthcare field and urged the retention of the regulatory exclusion as the diagnosis and treatment of gender dysphoria remains medically controversial. Conversely, several national organizations cited support for the addition of benefit coverage for the diagnosis of gender dysphoria but expressed significant objection to the exclusion of surgical treatment for gender dysphoria.

*Response:* The Department proposed to remove the exclusion on non-surgical treatment of gender dysphoria as it is no longer justifiable to categorically exclude and not cover current medical and psychologically necessary and appropriate proven treatments that are not otherwise excluded by law. Section 1557 of the Affordable Care Act prohibits discrimination on the basis of race, origin, sex, disability, or age (consistent with the scope of Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975). HHS recently released a final rule implementing Section 1557. That rule prohibits discrimination based on gender identity (incident to the Title IX ban on sex discrimination) in health programs. The rule by its terms applies only to HHS programs, but the statute applies to all federal health programs, and DoD considers these portions (45 CFR 92.206, 92.207) of the HHS rule

relevant guidance for purposes of administering TRICARE. Notably, the HHS regulation does not say plans must cover all gender transition related health care, just that they should not exclude all coverage for gender dysphoria, a mental health diagnosis established in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM–5). DoD agrees that to the extent the Department has discretion, prevailing medical assessments and nondiscrimination principles call for removal of this categorical exclusion. With respect to the public comments regarding military readiness, we would note that this TRICARE rule does not control policies and practices regarding treatment of gender dysphoria in Active Duty Service Members. Additionally, there is nothing in this rule that requires providers to render care against their beliefs. Existing policies allow DoD providers who, as a matter of conscience or moral principle, do not wish to provide psychotherapy, psychopharmacological, or hormone treatment, to request excusal from any such involvement. Regarding commenters' concerns about the cost of non-surgical treatment of gender dysphoria, the Department does not believe cost estimates are at all substantial or out of line with treatment of other medical or psychological conditions covered by TRICARE and most health plans.

Surgical coverage of gender dysphoria was not included in the proposed rule, is not included in this final rule, and remains prohibited by statute at 10 U.S.C. 1079(a)(11). Several commenters argued the rule did not go far enough and others suggested the Department reconsider including coverage for transgender surgeries. Several argued the statutory exclusion was otherwise not applicable or ambiguous, must be interpreted in accordance with modern medical science and contemporary standards of care, and thus should not be read to exclude medically necessary surgical care to treat gender dysphoria. The pertinent statutory provision (10 U.S.C. 1079(a)(11)) states: "Surgery which improves physical appearance but is not expected to significantly restore functions (including mammary augmentation, face lifts, and sex gender changes) may not be provided. . . ." The statute lists three exceptions—breast reconstructive surgery following a mastectomy, reconstructive surgery to correct serious deformities caused by congenital anomalies or accidental injuries, and neoplastic surgery. Some commenters believed that DoD could disregard the listing of "sex gender

changes" in the parenthetical examples of surgery "which improves physical appearance but is not expected to significantly restore functions" because it is contrary to modern medical assessment and because they believe there is Supreme Court precedent[1] for disregarding a parenthetical example misaligned with the proposition for which it is listed as an example. However, in that Supreme Court case, the Court concluded that the parenthetical example at issue was "a drafting mistake"—"an example that Congress included inadvertently"—resulting from a failure to make conforming adjustments as changes in the draft legislation were made through the process.[2] That circumstance does not apply to the statutory provision at issue here. Commenters did not provide any other justification that allows DoD to disregard this unambiguous specification. While some commenters have argued that sex-gender changes should not be considered cosmetic, elective or unnecessary, and should be seen as surgery to significantly restore areas of social, psychological and physical functioning that may have been impaired by gender dysphoria, the statutory language itself is focused on restoring function of the body part upon which surgery is performed. As noted above, Congress has enacted several exceptions to the general prohibition on surgeries that are not expected to significantly restore functions. As a statutory entitlement program, the Department is constrained in its authority absent a legislative change. The final regulatory language is dictated by statute and is not meant to imply any Departmental position regarding the medical necessity of surgical treatment.

3. Provisions of the Final Rule. The final rule is consistent with the proposed rule except that sections making specific reference to mental health inpatient and partial hospitalization utilization review, quality assurance, and reauthorization requirements have been removed at § 199.4(a)(11) and (12).

*B. Aligning Beneficiary Cost-Sharing for Mental Health and SUD Benefits With Those Applicable to Medical/Surgical Benefits*

1. Provisions of the Proposed Rule. Following the recent repeal of statutory authority for separate beneficiary financial liability for mental health benefits, the rule eliminates any differential in cost-sharing between

---

[1] Chickasaw Nation v. United States, 534 U.S. 84, 91 (2001).
[2] Id.

mental health and SUD benefits and medical/surgical benefits. The regulatory changes to 32 CFR 199.4(f) and 32 CFR 199.18 will reduce financial barriers to both outpatient and inpatient mental health and SUD benefits while, consistent with statutory requirements, minimize out-of-pocket risk for those beneficiaries.

With respect to TRICARE Prime co-payments, active duty family members (ADFMs) enrolled in TRICARE Prime will continue to pay no copayment for inpatient or outpatient services. Retirees and all other non-active duty dependents enrolled in Prime will see the following changes:

• The co-pay for individual outpatient mental health visits will be reduced from $25 to $12.

• The co-pay for group outpatient mental health visits will be reduced from $17 to $12.

• The per diem charge of $40 for mental health and SUD inpatient admissions will be reduced to the non-mental health per diem rate of $11, with a minimum charge of $25 per admission.

Regarding TRICARE Standard cost-sharing, ADFMs utilizing TRICARE Standard/Extra previously paid a higher per diem for mental health inpatient care than for other inpatient stays. ADFMs will see the following change:

• The per diem cost-share for inpatient mental health services will be reduced from $20/day to the daily charge ($18/day for FY16) that would have been charged had the inpatient care been provided in a Uniformed Services hospital.

Retirees and their dependents who are not enrolled in Prime but use non-network providers (Standard) for mental health care are generally required to pay 25% of the allowable charges for inpatient care, and this will not change. Retirees and their dependents using Standard and Extra are currently responsible for their outpatient deductible and outpatient cost-sharing of 25% (Standard)/20% (Extra) of the CHAMPUS-determined allowable costs. This also will not change.

Cost-sharing for partial hospitalization programs (PHPs) will change from inpatient to outpatient to more accurately reflect the services being rendered, ensure consistency with the applicable statutes governing cost-sharing, and to further ensure parity between the surgical/medical and mental health benefit. Congress revoked the statutory authority granted to the Secretary to establish different cost-shares for mental health care. These factors provided the impetus for adoption of outpatient cost-sharing for