# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| JANE DOE and SUSAN ROE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Docket No. 2:22-cv-00368-NT |
| | ) | |
| LLOYD J. AUSTIN, III, in his official | ) | |
| capacity as Secretary of Defense, the | ) | |
| U.S. DEPARTMENT OF DEFENSE, | ) | |
| the U.S. DEFENSE HEALTH | ) | |
| AGENCY, and the TRICARE | ) | |
| HEALTH PLAN, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

The Plaintiffs are two transgender women who receive health insurance through the United States military's TRICARE program ("**TRICARE**") as dependents of former servicemembers. The Defendants are TRICARE itself and three parties responsible for implementing and overseeing it: the U.S. Secretary of Defense Lloyd J. Austin, III; the U.S. Department of Defense; and the U.S. Defense Health Agency. The Plaintiffs challenge a TRICARE provision that bars coverage of any surgery that "improves physical appearance" without "significantly restor[ing] functions," including "sex gender changes." 10 U.S.C. § 1079(a)(11). They allege the Defendants' enforcement of this provision to deny coverage of medically necessary gender transition surgeries violates the Plaintiffs' Equal Protection rights under the Fifth Amendment of the United States Constitution.

Before me are the parties' cross-motions for summary judgment (ECF Nos. 36, 46). For the reasons below, the Plaintiffs' motion is **GRANTED** in part and **DENIED** in part, and the Defendants' motion is **GRANTED** in part and **DENIED** in part.

## SUMMARY JUDGMENT FACTS[1]

### I.   TRICARE Health Coverage

TRICARE is the U.S. military's healthcare program that serves over 9.6 million active-duty servicemembers, retirees, and their families. 10 U.S.C. § 1071; Parties' Stipulation of Facts ("**Stip.**") ¶¶ 4–5 (ECF No. 34-1). TRICARE delivers services through U.S. Department of Defense facilities and participating civilian healthcare providers. 10 U.S.C. §§ 1073d, 1076–80. Nearly sixty percent of TRICARE beneficiaries are retired servicemembers and their dependents (as opposed to active military personnel and families). Bryce H. P. Mendez, Cong. Rsch. Serv., IF10530, *Defense Primer: Military Health System* 1 (Nov. 18, 2022).[2]

---

[1]     This record comes from the parties' stipulated facts ("**Stip.**") (ECF No. 34-1) and the consolidated statement of all facts, admissions, denials, qualifications, and requests to strike. *See* Pl. Jane Doe & Susan Roe's Resp. to Defs.' Reqs. to Strike Pls.' Statement of Additional Facts ("**SMF**") (ECF No. 55). I resolved the Defendants' requests to strike and other objections to the Plaintiffs' asserted facts in a separate order.

     Facing cross-motions for summary judgment, I "view each motion separately and draw all reasonable inferences in favor of the respective non-moving party." *EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50, 57 (1st Cir. 2021) (internal citation omitted). In a typical case, the parties disagree about at least some facts, which means the record is slightly different depending on the moving party. But here, the only facts in the record are those stipulated by both parties and those offered by the Plaintiffs and deemed admitted because the Defendants failed to properly controvert them. As a result, the factual record is identical for both parties' cross-motions.

[2]     *Available at* https://crsreports.congress.gov/product/pdf/IF/IF10530/12 (last visited Oct. 30, 2024).

## II.    The Defendants

Defendant U.S. Secretary of Defense Lloyd Austin ("**Secretary of Defense**"), who oversees Defendant U.S. Department of Defense ("**DOD**"), has express statutory authority to "administer[ ]" Defendant TRICARE and "mak[e] any decision affecting such program." 10 U.S.C. § 1073(a)(2); Stip. ¶¶ 7–9. The Secretary of Defense has delegated authority to Defendant Defense Health Agency to manage and operate TRICARE, which includes promulgating regulations and policies to define TRICARE's scope. *See* Department of Defense Directive 5136.13, Defense Health Agency (Sept. 30, 2013);[3] Stip. ¶¶ 1–3, 6, 8.

## III.    Gender Identity and Gender Dysphoria

"Gender identity" is a "well-established medical concept" that describes a person's "internalized, inherent sense of their own gender." Stip. ¶ 10. Gender identity is "innate, impervious to external influences, and cannot be changed by medical or psychological intervention." Stip. ¶ 15. "There is a scientific consensus that gender identity is biologically based." Pl. Jane Doe & Susan Roe's Resp. to Defs.' Reqs. to Strike Pls.' Statement of Additional Facts ("**SMF**") ¶ 32 (ECF No. 55). Everyone has a gender identity, Stip. ¶ 11, and people are "transgender" if their gender identity is "not fully aligned with their sex assigned at birth," Stip. ¶ 12.[4] The misalignment

---

[3]    *Available at* https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodd/513613p.pdf (last visited Oct. 30, 2024).

[4]    "*Transgender* refers to the broad spectrum of individuals who transiently or persistently identify with a gender different from their natal gender." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 451 (5th ed. 2013) ("**DSM-V**"). A transgender man is assigned female at birth but has a male gender identity, and a transgender woman is assigned male at birth but has a female gender identity. Stip. ¶¶ 13–14.

between gender identity and birth sex, known as "gender incongruence," Stip. ¶ 22; SMF ¶ 34, means a transgender person feels "wrongly embodied" due to their anatomy, SMF ¶ 35. It may be "medically necessary" for the health and wellbeing of some transgender people to take steps to "facilitate living consistent with one's gender identity." Stip. ¶ 16.

If untreated, gender incongruence may lead to gender dysphoria, which can be a serious medical condition. Stip. ¶¶ 17, 20. The American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders ("**DSM-V**"), "an authoritative source for psychiatric conditions," defines gender dysphoria as a health condition experienced by a transgender person who has clinically significant distress or impaired functioning because of the incongruence between the person's "gender identity and sex classified at birth." Stip. ¶ 18.[5] To be diagnosed with gender dysphoria, a person must experience gender incongruence for at least six months and suffer from clinically significant distress or impairment. Stip. ¶ 19. The distress associated with gender dysphoria is an "indicator" of the underlying medical condition and is not the condition itself. Suppl. Aff. of Randi Ettner, Ph.D. ("**Ettner Suppl.**") ¶ 8 (ECF No. 48-1).

A "significant body of medical research" indicates that gender dysphoria may have a "physical and biological etiology," rather than a psychological or emotional

---

[5]     "*Gender dysphoria* refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender. Although not all individuals will experience distress as a result of such incongruence, many are distressed if the desired physical interventions by means of hormones and/or surgery are not available." DSM-V 451.

one. SMF ¶¶ 32, 40; Aff. of Randi Ettner, Ph.D. ¶ 15 (ECF No. 34-3). According to this research, gender dysphoria results from interactions between the developing brain and sex hormones. SMF ¶¶ 31, 33. That interaction leads to the "physical differentiation between brain development and . . . sex characteristics" known as gender incongruence. Ettner Suppl. ¶ 8; SMF ¶ 34 (describing gender incongruence as a "neurodevelopmental anatomical anomaly").

There is no medical or scientific support for the assertion that gender dysphoria is a "psychogenic" condition (*i.e.*, a disability without any physiological or organic cause). SMF ¶¶ 42–44. There are multiple conditions in the DSM-V that do not have a psychological or emotional etiology, such as various intellectual disabilities, certain neurocognitive disorders, and breathing-related sleep disorders. SMF ¶ 38.

## IV. Gender Dysphoria Treatment

Gender dysphoria is highly treatable, and with proper care, the condition can be improved or even cured. SMF ¶ 2. But without treatment, many people with gender dysphoria cannot adequately function in occupational, social, or other areas, and they may experience various debilitating physical and mental symptoms. SMF ¶ 1. Broadly speaking, medical treatment for gender dysphoria facilitates "gender transition," which is the process transgender people undergo to live consistent with their gender identity. Stip. ¶¶ 21, 25. By definition, a person with gender dysphoria is transgender, Stip. ¶ 22, only transgender people undergo gender transition, Stip. ¶ 43, and anyone who undergoes gender transition is transgender, Stip. ¶ 42. A core

5

goal of gender dysphoria treatment is to help people "live, function in society, and be regarded by others consistent with their gender identity." SMF ¶ 3.

The World Professional Association for Transgender Health publishes evidence-based Standards of Care ("**WPATH Standards**") for treating gender dysphoria. SMF ¶¶ 7, 10; Stip. ¶ 23. Organizations such as the American Medical Association and the Endocrine Society, the leading professional entity devoted to hormone research and endocrinology, SMF ¶ 8, consider the WPATH Standards to reflect the medical and mental health community's consensus on appropriate gender dysphoria treatment. Stip. ¶ 23; SMF ¶ 10.

According to the WPATH Standards and the Endocrine Society, gender dysphoria treatment must be "individually tailored and medically supervised." Stip. ¶ 24. The number and type of interventions to treat gender dysphoria vary by individual. Stip. ¶¶ 26–27. For some people with gender dysphoria, medically necessary treatment may include hormone replacement therapies or various surgical procedures. Stip. ¶¶ 28–29, 31. Such surgeries may include chest reconstruction, facial feminization, and genital reconstruction. Stip. ¶¶ 32–36. These same procedures also treat conditions other than gender dysphoria. SMF ¶ 15. For example, mastectomies, hysterectomies, salpingo-oophorectomies, and orchiectomies can treat cancer, and genital reconstruction may be performed after removing a patient's genitalia due to cancer, injury, or infection. SMF ¶ 15. The medical and mental health communities recognize gender transition surgeries as safe and

effective for treating gender dysphoria. SMF ¶¶ 8–9, 11. Delaying surgery may increase or worsen gender dysphoria's symptoms. Stip. ¶ 40.

Finally, gender transition surgery is not "cosmetic." SMF ¶ 11. Whether a surgery is "cosmetic" or "medically necessary" depends on its purpose and the patient's underlying diagnosis. SMF ¶¶ 12–13. Gender transition surgery is not cosmetic because the goal is not to enhance beauty or appearance, SMF ¶ 14; rather, it is a safe, effective treatment for a serious medical condition. SMF ¶ 11. These surgeries "ameliorat[e] the debilitation of gender dysphoria" by "better align[ing]" a transgender person's "primary and/or secondary sex characteristics with [their] gender identity." SMF ¶¶ 4–7; Stip. ¶ 30. In other words, surgery treats gender dysphoria by addressing the incongruence between a transgender person's "anatomy" and their "immutable brain-based gender identity." SMF ¶ 37.

"There is no recognized or effective psychiatric or psychological treatment for gender dysphoria." SMF ¶ 36. Treatment for gender dysphoria is not necessarily performed "for psychological reasons" simply because the underlying condition appears in the DSM-V. SMF ¶ 39.

## V.   The Challenged TRICARE Statutory Exclusion

### A.   The Statute

TRICARE's governing statutes contain a chapter outlining the benefits available to dependents of former servicemembers such as the Plaintiffs. *See generally* 10 U.S.C. § 1079. That chapter contains the following coverage exception (the "**Statutory Exclusion**") at issue in this case:

> Surgery which improves physical appearance but is not expected to significantly restore functions (including mammary augmentation, face lifts, and *sex gender changes*) . . . , except . . . — (A) breast reconstructive surgery following a mastectomy . . . ; (B) reconstructive surgery to correct serious deformities . . . ; and (C) neoplastic surgery . . . .

10 U.S.C. § 1079(a)(11) (emphasis added); *see* Compl. for Decl. and Inj. Relief ("**Am. Compl.**") ¶ 14 (ECF No. 5). The Defendants interpret the Statutory Exclusion to bar coverage of medically necessary gender transition surgeries. SMF ¶¶ 20–21, 29.[6]

## B.   The Regulations

Several TRICARE regulations list procedures excluded from coverage. One provision reiterates that TRICARE does not cover "[a]ny procedures related to sex gender changes," 32 C.F.R. §§ 199.4(e)(8)(ii)(D), also referred to as "sex reassignment surgery," *id.* § 199(g)(29); Am Comp. ¶ 15. Another regulation bars any "[s]urgery performed primarily for psychological reasons (such as psychogenic)." 32 C.F.R. § 199.4(g)(25) (the "**Psychological Reasons Regulation**").

DOD's 2016 rulemaking process sheds light on how the Defendants interpret the Statutory Exclusion. Before 2016, DOD's regulations categorically excluded *all* gender dysphoria-related medical treatment, including non-surgical procedures such as "psychotherapy, pharmacotherapy, and hormone replacement therapy." TRICARE; Mental Health and Substance Use Disorder Treatment, 81 Fed. Reg. 61068, 61071 (Sept. 2, 2016) (codified at 32 C.F.R. pt. 199). In 2016, DOD changed the rules to permit coverage of *non-surgical* gender dysphoria treatment for

---

[6]     The Statutory Exclusion does not apply to active-duty servicemembers—the Defendants *do* cover gender transition surgeries for active-duty personnel. Stip. ¶ 41.

dependents, reasoning that given "prevailing medical assessments and nondiscrimination principles," it was "no longer justifiable" to exclude "accepted medically and psychologically necessary treatments for gender dysphoria." 81 Fed. Reg. at 61071, 61074; *see* Pls.' Opp'n to Defs.' Cross-Mot. for Summ. J. and Reply to Defs.' Opp'n to Pls.' Mot. for Summ. J. ("**Pls.' Opp'n**") 29 (ECF No. 49). But DOD clarified that "*[s]urgical care* remain[ed] prohibited by statute at 10 U.S.C. [§] 1079(a)(11)," not because of "any Departmental position regarding the medical necessity" of such treatment but rather because DOD was "constrained in its authority absent a legislative change." 81 Fed. Reg. at 61068, 61073–74; *see* Pls.' Opp'n 32.

### C.    The Policy Manual

TRICARE's Policy Manual (the "**Policy Manual**") reiterates the Defendants' policy of barring coverage of gender transition surgery. The Policy Manual states that TRICARE bars coverage of "[s]urgical treatment of [gender dysphoria] for all beneficiaries," which it also refers to as "gender-affirming surgical procedures." Policy Manual, ch. 7 § 1.3, ¶ 3.1. It also states that TRICARE does not cover any "[s]urgery performed primarily for psychological reasons (such as psychogenic)." *Id.* ch. 1 § 1.2, ¶ 1.1.24. Another provision states expressly that TRICARE will not cover surgery to treat "any form of gender dysphoria." *Id.* ch. 4 § 2.1, ¶ 2.1.1; *see also id.* ch. 4 § 2.1, ¶ 3.18 (excluding "[c]osmetic procedures performed as part of gender-affirming surgery").

## VI.    The Plaintiffs' Medical Needs

The Plaintiffs Jane Doe and Susan Roe are two transgender women diagnosed with gender dysphoria who were assigned male at birth and have female gender identities. SMF ¶¶ 18–19, 25–26. Both receive health insurance through TRICARE as dependents of former U.S. servicemembers. SMF ¶¶ 16, 23.

Plaintiff Doe has been enrolled in TRICARE since approximately 2002. SMF ¶¶ 16–17. Her medically necessary gender dysphoria treatment has included surgeries not covered by TRICARE. SMF ¶ 20. Her treatment is ongoing, and she might seek additional surgeries in the future. SMF ¶ 21. Plaintiff Roe was enrolled in TRICARE until April 2023 and re-enrolled in November 2023. SMF ¶ 24. Her gender dysphoria treatment has involved one surgery in August 2023 when she was not enrolled in TRICARE. SMF ¶ 27. Plaintiff Roe's gender dysphoria treatment is also ongoing, and she will need more surgeries in the future. SMF ¶ 28.

As interpreted by the Defendants, the Statutory Exclusion completely bars TRICARE coverage of any additional gender transition surgeries the Plaintiffs may need. SMF ¶¶ 21, 29. If permitted, both Plaintiffs would use TRICARE for any future gender transition surgeries. SMF ¶¶ 22, 30.

## LEGAL STANDARD

Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any material fact" and it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if a rational factfinder could resolve the issue in the nonmoving party's favor, and a fact is "material" if it could "affect[ ] the outcome of the case." *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86,

93 (1st Cir. 2021) (cleaned up). "Generally speaking, 'conflicting evidence' is the hallmark of an issue that calls for factfinding, not summary judgment." *In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 915 F.3d 1, 11 (1st Cir. 2019) (internal citation omitted).

The party moving for summary judgment "bears the initial burden" of showing the absence of any genuine issue of material fact. *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020). Once the movant satisfies that burden, the nonmovant must "demonstrate that a trier of fact reasonably could find in [her] favor" on each disputed claim. *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (internal citation omitted). The nonmovant must support its assertions by "citing to particular parts of . . . the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "[C]onclusory allegations, improbable inferences, and unsupported speculation" do not suffice. *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 92–93 (1st Cir. 2018).

"Cross motions for summary judgment do not change the standard." *Perea v. Ed. Cultural, Inc.*, 13 F.4th 43, 50 (1st Cir. 2021) (internal citation omitted). When faced with cross-motions, I "view each motion separately and draw all reasonable inferences in favor of the respective non-moving party." *EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50, 57 (1st Cir. 2021) (internal citation omitted). Based on this standard, I determine whether either party "deserves judgment as a matter of law on facts that are not disputed." *Alasaad v. Mayorkas*,

988 F.3d 8, 16 (1st Cir.), c*ert. denied sub nom. Merchant v. Mayorkas*, 141 S. Ct. 2858 (2021) (internal citation omitted).

**ANALYSIS**

The Plaintiffs move for summary judgment on their sole remaining claim:[7] that the Defendants' interpretation of the Statutory Exclusion to deny coverage of medically necessary gender transition surgeries discriminates based on sex and transgender status in violation of the Fifth Amendment's Equal Protection guarantee. Am. Compl. ¶¶ 60–61. As a remedy, the Plaintiffs seek (1) "a declaratory judgment that the exclusion of surgeries for 'sex gender change' in [10 U.S.C. § 1079(a)(11)], including the categorical exclusion of surgical treatments for gender dysphoria, is unconstitutional," Am. Compl. at 13; and (2) a permanent injunction:

> [P]rohibiting the Defendants . . . from any enforcement or application of the exclusion of surgeries for "sex gender change" in 10 U.S.C. § 1079(a)(11), including surgeries for gender dysphoria, through regulations, policies or any other means, and directing Defendants to provide TRICARE coverage for Plaintiffs Jane Doe and Susan Roe's medically necessary gender affirming surgical procedures.

Am. Compl. at 14. The Defendants cross-move for summary judgment, arguing that the Plaintiffs lack standing and that the Defendants are entitled to summary judgment on the merits. *See generally* Defs.' Opp'n to Pls.' Mot. for Summ. J. and Cross-Mot. for Summ. J. ("**Defs.' MSJ**") (ECF Nos. 44, 46).

---

[7]     The Amended Complaint included three counts and sought damages in addition to declaratory and injunctive relief. Am. Compl. (ECF No. 5). The Plaintiffs later agreed to dismiss the counts alleging violations of the Fifth Amendment's Due Process Clause and the Rehabilitation Act, and to withdraw the damages claim. *See* Stipulation of Voluntary Dismissal with Prejudice of Only Counts II and III of Am. Compl. and Withdrawal of Damages Claim (ECF No. 38).

I.      **Standing**

A.      **The Elements of Standing**

Given my obligation to ensure jurisdiction exists, I begin with the Defendants'
standing argument. *See Deniz v. Mun. of Guaynabo*, 285 F.3d 142, 150 (1st Cir. 2002)
("[I]f the court lacks subject matter jurisdiction, assessment of the merits becomes a
matter of purely academic interest."). To establish standing, the Plaintiffs must prove
three elements by alleging an injury that is (1) "concrete, particularized, and actual
or imminent"; (2) "fairly traceable to the challenged action"; and (3) "redressable by a
favorable ruling." *Blum v. Holder*, 744 F.3d 790, 796 (1st Cir. 2014) (quoting *Clapper
v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). The Plaintiffs' burden to establish
each standing element corresponds "with the manner and degree of evidence required
at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561
(1992). At summary judgment, " 'mere allegations' " are insufficient and the Plaintiffs
must instead " 'set forth' by affidavit or other evidence 'specific facts,' " which are
"taken to be true." *Id.* (quoting Fed. R. Civ. P. 56(e)).

To satisfy "redressability"—the only element the Defendants challenge[8]—the
Plaintiffs must show that "a favorable resolution of [their] claim would likely redress

---

[8]      Given my obligation to ensure jurisdiction exists before considering the merits, I briefly
address the first two standing requirements, even though the Defendants do not challenge them. *See
Deniz v. Mun. of Guaynabo*, 285 F.3d 142, 150 (1st Cir. 2002).
        To satisfy the first standing requirement, the Plaintiffs must allege a "concrete, particularized"
injury caused by the Statutory Exclusion that is "actual" or "imminent." *Blum v. Holder*, 744 F.3d 790,
796 (1st Cir. 2014). If the Plaintiffs have not yet sustained an "actual" injury, they can show an
"imminent" one if there is "a realistic danger of sustaining a direct injury as a result of the statute's
. . . enforcement." *Id.* (internal citation omitted). Here, the Plaintiffs satisfy the "injury" requirement
because they are eligible for TRICARE and have received "medically necessary gender transition
surgeries" or will need such surgeries in the future. SMF ¶¶ 16–17, 20–22, 24, 27–30.

the professed injury." *Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2012). It must be more than "merely speculative that, if a court grants the requested relief, the injury will be redressed." *Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc.*, 958 F.3d 38, 49 (1st Cir. 2020) (internal citation omitted). However, it is enough for the Plaintiffs to "show that a favorable ruling could potentially *lessen* [their] injury; [they] need not definitively demonstrate that a victory would *completely* remedy the harm." *Antilles Cement Corp. v. Fortuño*, 670 F.3d 310, 318 (1st Cir. 2012) (emphases added).

## B.   The Defendants' Redressability Argument

The Defendants say the Plaintiffs cannot prove redressability, arguing that even if I found the Statutory Exclusion unconstitutional, coverage for the Plaintiffs' desired surgeries would be "independently precluded by a separate regulation" that the Plaintiffs "do not challenge." Defs.' MSJ 2; *accord* Defs.' Reply to Pls.' Opp'n to Defs.' Cross-Mot. for Summ. J. 2–3 (ECF No. 53). According to the Defendants, that "separate" unchallenged rule is the Psychological Reasons Regulation, 32 C.F.R. § 199.4(g)(25), which bars coverage of surgeries "performed primarily for psychological reasons (such as psychogenic)." Defs.' MSJ 2. The Defendants argue that because gender transition surgery treats gender dysphoria, which the Defendants call "a psychological condition," then it is necessarily "performed

---

To prove "causation," the alleged injury must be "fairly traceable" to the challenged law. *Blum*, 744 F.3d at 796 (internal citation omitted). Here, the Plaintiffs show causation by alleging injuries—noncoverage of medically necessary surgeries—that are directly "traceable" to the Defendants' enforcement of the Statutory Exclusion. *See, e.g.*, SMF ¶¶ 21–22, 29–30.

primarily for psychological reasons" and therefore excluded from coverage. Defs.' MSJ 13–14. The Defendants then assert that because the Psychological Reasons Regulation poses "an independent bar to TRICARE coverage" that would persist even if I enjoined enforcement of the Statutory Exclusion, the Plaintiffs' injury is not redressable by this litigation. Defs.' MSJ 13. I disagree.

As a preliminary matter, I note the Defendants likely do not meet their summary judgment burden of proving gender transition surgery is "performed primarily for psychological reasons."[9] However, I need not decide that issue because I find the Plaintiffs could still prove a redressable injury, for at least three reasons.

First and most simply, the Defendants' argument is undermined by the fact that the Plaintiffs' requested injunction would "redress" their injury by prohibiting the Defendants from enforcing the Statutory Exclusion to bar gender transition surgery "through *regulations*, policies[,] or any other means." Am. Compl. at 14 (emphasis added). Those "regulations" presumably would include the Psychological

---

[9]     Though I need not decide the issue, the record before me appears to create a genuine dispute as to whether gender transition surgery is "performed primarily for psychological reasons."

    The Defendants rest their argument on the premise that gender dysphoria is "principally" a psychiatric condition. *See* Defs.' Opp'n to Pls.' Mot. for Summ. J. and Cross-Mot. for Summ. J. ("**Defs.' MSJ**") 13 (ECF Nos. 44, 46). However, various facts in the record put that statement in dispute by describing gender dysphoria in terms of biology and anatomy. *See, e.g.*, Stip. ¶ 18 (citing the DSM-V definition of gender dysphoria that references "sex classified at birth"); Stip. ¶ 30 (stating surgery treats gender dysphoria by aligning one's "body" and gender identity); SMF ¶ 35 (stating people with gender dysphoria feel "wrongly embodied due to their anatomy"); SMF ¶¶ 32, 40 (gender dysphoria's "etiology" is "physical and biological," not "psychological or emotional"); SMF ¶¶ 31, 33 (gender dysphoria results from interactions between the "brain and sex hormones"); SMF ¶ 44 ("There is no medical or scientific support for any assertion that gender dysphoria is a psychogenic condition . . . .").

    There is also a genuine dispute about the inference the Defendants draw from that premise: that gender transition surgeries are performed "primarily for psychological reasons." *See, e.g.*, Stip. ¶ 30 (gender transition surgery changes one's "body"); SMF ¶ 6 (gender transition surgery targets "primary or secondary sex characteristics"); SMF ¶ 36 ("There is no recognized or effective psychiatric or psychological treatment for gender dysphoria."); SMF ¶ 37 (gender transition surgery affects one's "anatomy").

Reasons Regulation, which is codified within a Code of Federal Regulations chapter promulgated "for the administration of [TRICARE]." *See* 32 C.F.R. § 199.1(a) (describing the purpose of the TRICARE "guidelines and policies" contained in Part 199); *see also* Am. Compl. ¶ 15 (referring to Part 199 as containing the Statutory Exclusion's "implementing regulations").

Second and relatedly, the broader statutory and regulatory framework does not support the Defendants' claim that the Psychological Reasons Regulation is "separate" from the Statutory Exclusion and thus "independently preclude[s]" coverage of gender transition surgery. For example, a TRICARE regulation not cited in this litigation incorporates language from both the Statutory Exclusion and the Psychological Reasons Regulation, which suggests these two provisions do not operate "independently." *See* 32 C.F.R. § 199.4(e)(8)(ii)(B) (excluding any "[c]osmetic, reconstructive, or plastic surgery . . . performed primarily for psychological reasons").

Moreover, the legislative and regulatory history shows the Statutory Exclusion and the Psychological Reasons Regulation are fundamentally related because they were both implemented to achieve the goal of eliminating the "costly" practice of performing "nonmedical services" such as "cosmetic surgery" in military medical facilities. H.R. Rep. No. 94-517 at 146, 327 (1975). A Department of Defense Appropriation Act—eventually codified (with revisions) as the Statutory Exclusion[10]—barred surgeries "justified solely on psychiatric needs including, . . . sex gender changes" and other services deemed "not medically necessary." Pub. L. No.

---

[10]    *See* Department of Defense Authorization Act, 1985, Pub. L. No. 98-525, 98 Stat. 2492, 2617.

94-212, § 751, 90 Stat. 153, 176 (1976). Congress considered all "cosmetic" procedures (including "sex gender changes") to be "nonmedical" in the sense that they were "psychologically" or "psychiatrically" justified, and not strictly medically necessary. This history undermines the Defendants' assertion that the Psychological Reasons Regulation and the Statutory Exclusion pose two "separate" and "independent" bars to coverage of gender transition surgery.

Third and finally, the Defendants' argument rests on an overstatement of the Plaintiffs' redressability burden. The First Circuit has held that plaintiffs can prove redressability by showing their injury would "at least be alleviated"—even if not *completely* remedied—by the requested relief. *Antilles Cement Corp.*, 670 F.3d at 317–19; *Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council*, 589 F.3d 458, 467 (1st Cir. 2009) (redressability requires showing "a likelihood that prevailing in the action will afford *some* redress for the injury") (emphasis added and internal citation omitted).[11] Here, enjoining the Defendants from enforcing the Statutory Exclusion would eliminate one major "barrier" to the Plaintiffs' ability to obtain coverage of gender transition surgery, even if barriers under other TRICARE policies might remain. *Weaver's Cove*, 589 F.3d at 468–69 (plaintiff showed redressability where the remedy would eliminate one "barrier" to building a natural gas facility, even though the project's "ultimate approval" was not guaranteed). Moreover, because all entities authorized to enforce TRICARE's laws and policies are the named Defendants in this

---

[11]    *See also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149–53 (2010) (plaintiffs showed redressability even where the requested relief—vacating an injunction preventing them from planting a regulated crop—would let them petition only for partial deregulation).

litigation, this is not a case where the Plaintiffs' relief requires action by nonparties who would not be bound by a court ruling. *Cf. Haaland v. Brackeen*, 599 U.S. 255, 292 (2023) (petitioners failed to show redressability where enjoining the federal defendants from enforcing a federal adoption law "would not remedy the alleged injury, because state courts apply the placement preferences, and state agencies carry out the court-ordered placements").[12]

For these reasons, I find the Plaintiffs meet their burden to prove all three standing requirements, including redressability.

## II.     Constitutional Avoidance

Before considering the merits, I briefly address the parties' arguments about the doctrine of constitutional avoidance, which instructs federal courts "not to reach constitutional issues where alternative grounds for resolution are available." *Marasco & Nesselbush, LLP v. Collins*, 6 F.4th 150, 178 (1st Cir. 2021) (internal citations omitted). I agree constitutional avoidance is relevant to the issues presented, though not quite in the ways the parties assert.

On the one hand, the Plaintiffs contend that because gender transition surgery is medically necessary and not cosmetic, it necessarily is not a procedure that "improves physical appearance" without "significantly restor[ing] functions." *See* Pls. Jane Doe & Susan Roe's Mot. for Summ. J. ("**Pls.' MSJ**") 2, 10 (quoting 10 U.S.C.

---

[12]     *See also Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc.*, 958 F.3d 38, 49 (1st Cir. 2020) (plaintiffs failed to prove redressability because their injury "depend[ed] in large part, if not in total, on the conduct of [nonparty] ocean freight carriers" and it was "far from certain" a court order would change that conduct); *Katz v. Pershing, LLC*, 672 F.3d 64, 76 (1st Cir. 2012) (plaintiffs failed to show causation where "the injury alleged [was] the result of actions by some third party, not the defendant").

§ 1079(a)(11)) (ECF No. 36). The Plaintiffs say I can therefore reject the Defendants' interpretation as inaccurate without deciding whether it violates Equal Protection. Pls.' MSJ 13–14. This argument might apply if, for example, the Plaintiffs had challenged the Defendants' interpretation under the Administrative Procedures Act. *See* 5 U.S.C. § 704 (providing for judicial review of "final agency action"); *id.* § 706(2) (requiring courts to set aside agency decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").[13] But here, because the sole claim arises under the Constitution, there are no "alternative grounds for resolution" that would let me avoid a constitutional ruling.[14]

On the other hand, the Defendants' constitutional avoidance argument also misses the mark. The Defendants claim that, unless the Statutory Exclusion is facially unconstitutional, any Equal Protection violation must arise from some "specific regulatory provision interpreting or implementing" it. Defs.' MSJ 3–4. Because the Plaintiffs did not "directly challenge[ ] any . . . regulations" implementing the Statutory Exclusion, the Defendants contend that I cannot consider whether the

---

[13]     Plaintiffs in other cases have taken this approach. *See, e.g.*, *Berge v. United States*, 949 F. Supp. 2d 36, 42 (D.D.C. 2013) (finding clear error where the court failed to remand to the agency in an Administrative Procedures Act ("**APA**") case challenging TRICARE's refusal to cover behavioral therapy); *Flores v. United States*, No. 11-12119, 2011 WL 4806769, at *1 (E.D. Mich. Oct. 11, 2011) (denying motion to dismiss APA claims challenging TRICARE's refusal to cover in-home nursing care).

[14]     The Plaintiffs cite cases that, unlike the present litigation, all involved a combination of constitutional and *nonconstitutional* claims, which gave the courts the opportunity to rule on nonconstitutional grounds. *See, e.g.*, *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (involving claims under the Immigration and Nationality Act); *United States v. Dwinells*, 508 F.3d 63, 68 (1st Cir. 2007) (involving charges under a state criminal statute). *See also Marasco & Nesselbush, LLP v. Collins*, 6 F.4th 150, 178 (1st Cir. 2021) (holding it would be "unnecessary" and "inappropriate" for the court to reach the constitutional claims if it could rule on APA grounds); *Doe v. Mass. Dep't of Corr.*, No. 17-12255-RGS, 2018 WL 2994403, at *6–8 (D. Mass. June 14, 2018) (reasoning the court could avoid an Equal Protection holding by finding gender dysphoria to be a "disability" under the Americans with Disabilities Act and Rehabilitation Act).

Defendants' *implementation* of the Statutory Exclusion is unconstitutional. Defs.' MSJ 17–18.[15] First, as noted above, the Defendants seem to overlook that the Plaintiffs address all relevant TRICARE regulations and policies in their requested injunction, which would bar the Defendants from enforcing the Statutory Exclusion "through regulations, policies[,] or any other means." Am. Compl. at 14. Second, and more fundamentally, the Defendants' argument is inconsistent with the law of as-applied constitutional challenges, which requires proof only that the challenged law is unconstitutional "as applied to [the plaintiffs'] situation." *Britell v. United States*, 150 F. Supp. 2d 211, 222 (D. Mass. 2001). Here, the Plaintiffs do just that by challenging the Defendants' "interpretation" of the Statutory Exclusion as applied to transgender people with gender dysphoria. Pls.' MSJ 13–14.[16] Accordingly, because the Plaintiffs were not required to "directly challenge[ ]" specific TRICARE regulations or policies, principles of constitutional avoidance do not bar me from evaluating their as-applied Equal Protection claim.

---

[15]    The Defendants provide no support for their assertion that the Plaintiffs must identify a specific written rule or policy to make an as-applied challenge against a facially valid law. The Defendants cite *Rothe Development, Inc. v. United States Department of Defense*, in which the court held it could not consider the constitutionality of an implementing regulation's "racial classification" because the only question before it concerned "the *statute itself*." 836 F.3d 57, 61–62, 65 (D.C. Cir. 2016). But in *Rothe*, the plaintiff had "expressly" said it was challenging only the statute and not its "implementation." *Id.* at 65. *Rothe* is inapposite because here, the Plaintiffs expressly challenge the "Defendants' *interpretation* of Section 1079(a)(11)." Pls. Jane Doe & Susan Roe's Mot. for Summ. J. ("**Pls.' MSJ**") 13 (ECF No. 36) (emphasis added).

[16]    The Defendants themselves stated in 2016 that the policy of excluding gender transition surgery stems directly from the Statutory Exclusion and that they lack authority to change that policy "absent a legislative change." TRICARE; Mental Health and Substance Use Disorder Treatment, 81 Fed. Reg. 61068, 61073–74 (Sept. 2, 2016) (codified at 32 C.F.R. pt. 199). ("Surgical coverage of gender dysphoria . . . remains prohibited by statute at 10 U.S.C. [§] 1079(a)(11)").

## III.   The Plaintiffs' Equal Protection Claim

Having resolved the standing issue and responded to the parties' constitutional avoidance arguments, I proceed to the merits of the Plaintiffs' Equal Protection claim. The Fifth Amendment's Equal Protection guarantee requires the government "to treat alike all persons similarly situated." *Toledo v. Sánchez*, 454 F.3d 24, 33 (1st Cir. 2006) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).[17] The Plaintiffs raise both facial and as-applied Equal Protection challenges. I address each in turn.

### A.   The Plaintiffs' Facial Challenge

To succeed on a facial constitutional challenge, a party must "establish that no set of circumstances exists under which the statute would be valid." *Frese v. Formella*, 53 F.4th 1, 7 (1st Cir. 2022), *cert. denied*, 144 S. Ct. 72 (2023) (internal citation omitted). The Supreme Court has advised that facial challenges "are disfavored" because they "often rest on speculation," "run contrary to the fundamental principle of judicial restraint," and "threaten to short circuit the democratic process." *Id.* (internal citation omitted).

Here, the Plaintiffs' facial challenge fails because, as they acknowledge, there is an interpretation of the Statutory Exclusion that does not violate their Equal Protection rights. Specifically, the Plaintiffs argue that the "plain language" of the Statutory Exclusion does not encompass *medically necessary* gender transition surgeries, which "significantly restore functions and are not designed to improve

---

[17]   Because this action concerns federal (not state) legislation, the "applicable equality guarantee" arises not under the Fourteenth Amendment's "explicit" Equal Protection Clause but rather the Fifth Amendment Due Process Clause's "implicit" guarantee. *Sessions v. Morales-Santana*, 582 U.S. 47, 52 n.1 (2017) (citing *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975)).

physical appearance." Pls.' MSJ 7 (emphasis added). I agree with the Plaintiffs that the Statutory Exclusion can be interpreted constitutionally. The record before me establishes that gender transition surgery is performed not to "improve[ ] physical appearance," 10 U.S.C. § 1079(a)(11), but rather to treat the debilitating symptoms of gender dysphoria, a serious medical condition. SMF ¶¶ 1, 11, 14.[18]

Because I agree with the Plaintiffs that there are "circumstances where the [provision at issue] is clearly constitutional," *Hightower v. City of Bos.*, 693 F.3d 61, 78 (1st Cir. 2012), the Plaintiffs' facial challenge cannot succeed.

### B.    The Plaintiffs' As-Applied Challenge

To succeed on an as-applied challenge at the summary judgment stage, the Plaintiffs must show no genuine issue of material fact exists as to whether the Statutory Exclusion "operate[s] unconstitutionally as applied to [their] situation." *Britell*, 150 F. Supp. 2d at 222.[19]

To evaluate whether the Statutory Exclusion violates the Plaintiffs' Equal Protection rights as applied to their situation, I conduct a three-step inquiry. First, I "identify whether the challenged classification is explicitly based upon sex or neutral on its face." *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 513 F. Supp. 3d

---

[18]    *See also, e.g.*, Stip. ¶¶ 18–19 (gender dysphoria entails clinically significant distress or impaired functioning); Stip. ¶ 40 (delaying gender transition surgery may increase or worsen symptoms); SMF ¶¶ 8–9 (the medical and mental health communities recognize gender transition surgeries as safe and effective treatment); SMF ¶ 11 (gender transition surgery is not "cosmetic"); SMF ¶¶ 28–29, 31 (gender transition surgery may be medically necessary).

[19]    As discussed above, the Defendants do not engage with the merits of the Plaintiffs' Equal Protection claim; they merely assert the Plaintiffs' as-applied challenge "effectively amounts to a complaint about DoD's interpretation of § 1079(a)(11)" and should be denied because "Plaintiffs have not directly challenged any of Defendants' regulations." Defs.' MSJ 18. For the reasons explained above, that argument is not consistent with the nature of as-applied constitutional claims.

215, 228 (D. Mass. 2021). If the law is "facially neutral," the Plaintiffs must show "disparate impact and an intent to discriminate on the basis of sex"; if it discriminates on its face, I can move immediately to the next step. *Id.* (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272–74 (1979)); *accord Joyce v. Town of Dennis*, 705 F. Supp. 2d 74, 79 (D. Mass. 2010) ("[W]here a line is overtly drawn on the basis of gender, a suspect classification is established by definition and the analysis proceeds to scrutinize that classification."). Second, I "determine the appropriate level of scrutiny" to apply to the challenged classification. *Toledo*, 454 F.3d at 33. Third, I evaluate whether the Defendants' justifications for the classification survive that level of scrutiny. *Joyce*, 705 F. Supp. 2d at 80.

### 1.   The Statutory Exclusion Facially Classifies Based on Sex and Transgender Status

The Plaintiffs allege, and I agree, that the Statutory Exclusion is facially discriminatory[20] because it expressly excludes "sex gender changes" from TRICARE coverage, 10 U.S.C. § 1079(a)(11), a procedure the Defendants elsewhere refer to as

---

[20]     I agree with the Plaintiffs, that even if the Statutory Exclusion could be construed as facially neutral, I could still find it discriminates based on sex and transgender status by gleaning discriminatory intent from its legislative history. *See* Pls.' MSJ 15–16; *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos.*, 996 F.3d 37, 45 (1st Cir. 2021) (explaining that facially neutral laws may trigger strict or heightened scrutiny if motivated by "a discriminatory purpose" as evidenced by, among other things, the law's "legislative or administrative historical background" (internal citation omitted)); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) (stating that to determine whether a facially neutral law was enacted with discriminatory intent, "legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."). *See also Tirrell v. Edelblut*, No. 24-cv-251-LM-TSM, 2024 WL 4132435, at *8 (D.N.H. Sept. 10, 2024) ("Even if HB 1205 could somehow be viewed as facially neutral, one need only consider the legislative history of HB 1205 to discern that it was intentionally written to bar transgender girls from girls' sports.") (internal citations omitted).

"sex reassignment surgery," 32 C.F.R. § 199.4(g)(29), or "gender-affirming surgical procedures," Policy Manual, ch. 7 § 1.3, ¶ 3.1.

The Fourth Circuit reached the same conclusion about two state healthcare provisions that respectively barred coverage of "[t]reatment or studies leading to or in connection with sex changes" and "[t]ranssexual surgery." *Kadel v. Folwell*, 100 F.4th 122, 141–57 (4th Cir. 2024). The Fourth Circuit reasoned that even though the challenged coverage exclusions only mentioned specific "treatments" and "[did] not explicitly mention transgender *people*," they were nonetheless facially discriminatory because they targeted treatments for gender dysphoria, which is "inextricable" from transgender status. *Id.* at 146 (emphasis in original); *id.* ("The excluded treatments aim at addressing incongruity between sex assigned at birth and gender identity, the very heart of transgender status."). The court also observed that application of the challenged laws revealed their discriminatory nature because, for example, "determining whether . . . reduction mammoplasty constitutes 'transsexual surgery' . . . is impossible—literally cannot be done—without inquiring into a patient's sex assigned at birth and comparing it to their gender identity." *Id.* at 146–47.[21]

---

[21]　　*See also Brandt v. Rutledge*, 677 F. Supp. 3d 877, 885, 917 (E.D. Ark. 2023) (holding that a law prohibiting doctors from providing "gender transition procedures" to minors facially discriminates based on sex "because a minor's sex at birth determines whether the minor can receive certain types of medical care" and discriminates based on transgender status because it "prohibits medical care that only transgender people choose to undergo"); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 988, 997 (W.D. Wis. 2018) (holding that a law excluding insurance coverage of services "associated with gender reassignment" "on its face treats transgender individuals differently on the basis of sex"); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 937, 948 (W.D. Wis. 2018) (holding, in the context of a challenge under the Affordable Care Act, that a law excluding coverage of "[t]ranssexual surgery" facially discriminated based on sex by "deny[ing] medically necessary surgical procedures based on a patient's *natal* sex") (emphasis in original).

Here too, the Statutory Exclusion facially discriminates by sex because it is "impossible" to determine whether a procedure such as a mastectomy is an excluded "sex gender change[ ]" without inquiring whether the procedure is being performed to treat gender dysphoria. *See* SMF ¶ 15 ("When performing gender confirmation surgeries, surgeons use many of the same procedures they use to treat other medical conditions."). And the Statutory Exclusion therefore facially discriminates based on transgender status because, as the parties agree, anyone with gender dysphoria is necessarily transgender. Stip. ¶ 22.

A recent District of New Hampshire opinion followed a similar approach in concluding that a state law requiring interscholastic sports teams to be expressly designated male, female, or coed facially classified based on transgender status and sex even without using the word "transgender." *Tirrell v. Edelblut*, No. 24-cv-251-LM-TSM, 2024 WL 4132435, at *6–7 (D.N.H. Sept. 10, 2024). The court noted the law determined students' eligibility to participate in girls' sports based on "biological sex at birth" and reasoned that " 'biological sex' function[ed] as a form of proxy discrimination." *Id.* at *7–8 (internal citation omitted).

Having concluded the TRICARE Statutory Exclusion facially classifies based on sex and transgender status, I now consider the level of scrutiny to apply.

### 2.     Intermediate Scrutiny Applies

It is well-established in the First Circuit that sex- and gender-based classifications "invoke intermediate scrutiny." *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1, 9 (1st Cir. 2012); *id.* at 9 n.5 (collecting cases). In the Title VII context, the Supreme Court has held that "discrimination based

on . . . transgender status necessarily entails discrimination based on sex" and thus triggers heightened scrutiny. *Bostock v. Clayton County*, 590 U.S. 644, 669 (2020). While the First Circuit has not squarely addressed the issue, other circuits have extended *Bostock* and applied intermediate scrutiny to transgender-based discrimination claims in the Equal Protection context.[22] Various district courts in this Circuit have reached the same conclusion.[23] Because I agree with the reasoning of these other courts, I apply intermediate scrutiny to the Plaintiffs' claim that the Statutory Exclusion violates Equal Protection by discriminating based on sex and transgender status.

---

[22]   *See, e.g.*, *M.H. v. Hamso*, No. 23-35485, 2024 WL 4100235, at *1–2 (9th Cir. Sept. 6, 2024) (stating that Equal Protection claim against "then-unwritten policy" classifying surgeries as "cosmetic" only when treating gender dysphoria discriminates by transgender status and sex and thus "clearly" triggers heightened scrutiny); *Fowler v. Stitt*, 104 F.4th 770, 793 (10th Cir. 2024) (applying intermediate scrutiny to Equal Protection claim after concluding that transgender discrimination is necessarily sex discrimination); *Kadel v. Folwell*, 100 F.4th 122, 141–43 (4th Cir. 2024) (applying intermediate scrutiny to Equal Protection claims against state health insurance laws denying coverage for "sex changes" and "transsexual surgery"); *Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661, 669–70 (8th Cir. 2022) (applying heightened scrutiny to Equal Protection claim against law barring "gender transition procedures" for minors); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608–09 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (applying intermediate scrutiny to Equal Protection claim alleging school bathroom policy discriminated by sex and transgender status); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051–52 (7th Cir. 2017) (reasoning that Equal Protection claim against school bathroom policy triggers heightened scrutiny because it discriminates by transgender status and therefore sex), *abrogated on other grounds by Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020).

　　　*But see Gore v. Lee*, 107 F.4th 548, 555–61 (6th Cir. 2024) (holding birth certificate amendment policy does not discriminate against transgender people based on sex for equal protection purposes); *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484–85 (6th Cir. 2023) (declining to apply *Bostock* to equal protection claims), *cert. granted sub nom. United States v. Skrmetti*, No. 23-477, 144 S. Ct. 2679 (2024); *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1228–29 (11th Cir. 2023) (same).

[23]   *See, e.g.*, *Tirrell*, 2024 WL 4132435, at *11 (reasoning "[t]he transgender-based classification apparent on the face of HB 1205 necessarily entails sex discrimination" and "therefore triggers heightened scrutiny under the Equal Protection Clause"); *Bos. Alliance of Gay, Lesbian, Bisexual & Transgender Youth v. U.S. Dep't of Health & Hum. Servs.*, 557 F. Supp. 3d 224, 244 (D. Mass. 2021) (applying intermediate scrutiny to transgender-based discrimination in the equal protection context, reasoning *Bostock* "applies equally outside of Title VII"); *Doe v. Mass. Dep't of Corr.*, 2018 WL 2994403, at *9 (stating in an Equal Protection case that a transgender-based classification "is tantamount to discrimination based on sex and is therefore subject to heightened judicial scrutiny").

### 3. The Defendants Fail to Identify a "Governmental Objective"

In an ordinary case, having determined intermediate scrutiny applies, I would next carefully analyze whether the challenged classification withstands that level of review. Intermediate scrutiny is "far more demanding than rational basis review." *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d at 9. To survive intermediate scrutiny, the government must show the challenged classification is "substantially related to achieving an important governmental objective." *Id.*; *see United States v. Virginia* ("**VMI**"), 518 U.S. 515, 532–33 (1996). That "burden of justification" must be "exceedingly persuasive" and "rests entirely on the State." *VMI*, 518 U.S. at 533 (emphasis added).[24] The government may fall short of this standard merely by "fail[ing] to *advance* a persuasive justification" and "not necessarily because no such justification exists." *Joyce*, 705 F. Supp. 2d at 82 (emphasis added).

But this is not an ordinary case because the Defendants have not identified a single governmental interest to justify the Statutory Exclusion. Their briefing makes only technical and procedural objections to the Plaintiffs' Equal Protection claim and does not engage with the merits. *See* Defs.' MSJ 2–4 (summarizing the Defendants' bases for summary judgment). Because the Defendants offer no justification for denying coverage of gender transition surgeries, they fall far short of their burden under intermediate scrutiny to show the Statutory Exclusion is "substantially related

---

[24] By contrast, under rational basis review, the party defending the classification "has no obligation to produce evidence to sustain the rationality of a statutory classification." *Heller v. Doe*, 509 U.S. 312, 320 (1993). Instead, "the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Id.* at 320–321 (internal citation and quotation marks omitted).

to achieving an important governmental objective." *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d at 9. The Plaintiffs are therefore entitled to summary judgment on their as-applied Equal Protection claim.

## CONCLUSION

For the reasons stated above, the Plaintiffs' motion for summary judgment (ECF No. 36) is **GRANTED IN PART** (the as-applied Equal Protection claim) and **DENIED IN PART** (the facial claim), and the Defendants' cross-motion for summary judgment (ECF No. 46) is **GRANTED IN PART** (the Plaintiffs' facial Equal Protection claim) and **DENIED IN PART** (the as-applied claim).

Declaratory judgment will therefore be entered stating that the Statutory Exclusion is unconstitutional as applied to the Plaintiffs. The parties are directed to meet and confer and to inform the Court by November 15, 2024 whether injunctive relief is necessary, and if it is, to propose an injunction consistent with this order.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 1st day of November, 2024.